Case No. _____

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

IN RE ADOBE SYSTEMS, INC.,
APPLE, INC., GOOGLE, INC., and INTEL CORP.
_____

ADOBE SYSTEMS, INC., APPLE INC., GOOGLE INC., and
INTEL CORP., Defendants-Petitioners,

v.

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA, Respondent,

MICHAEL DEVINE, MARK FICHTNER, SIDDHARTH HARIHARAN,
BRANDON MARSHALL, and DANIEL STOVER,
Plaintiffs-Real Parties in Interest.

_____

From the United States District Court
Northern District of California
The Honorable Lucy H. Koh, Presiding
Case No. 5:11-2509-LHK

_____

### PETITION FOR WRIT OF MANDAMUS
_____

Robert A. Van Nest (State Bar No. 84065)
Daniel Purcell (State Bar No. 191424)
Eugene M. Paige (State Bar No. 202849)
Justina Sessions (State Bar No. 270914)
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant and Petitioner
Google Inc.

Additional petitioners and counsel listed
on signature pages

## CORPORATE DISCLOSURE STATEMENTS

Adobe Systems, Inc. submits the following corporate disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1: (1) Adobe is a publicly held corporation; (2) Adobe does not have any parent corporation; and (3) no publicly held corporation owns ten percent or more of Adobe's stock.


Dated:  September 4, 2014                    JONES DAY


By:  /s/ *David C. Kiernan*
     David C. Kiernan

     Robert A. Mittelstaedt
     Craig A. Waldman
     555 California Street, 26th Floor
     San Francisco, CA 94104
     Telephone: (415) 626-3939
     Facsimile:  (415) 875-5700

     *Attorneys for Defendant and Petitioner Adobe Systems, Inc.*

i

Apple Inc. submits the following corporate disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1: (1) Apple is a publicly held corporation; (2) Apple does not have any parent corporation; and (3) no publicly held corporation owns ten percent or more of Apple's stock.

Dated:  September 4, 2014                O'MELVENY & MYERS LLP


                                By:   /s/ *Michael F. Tubach*
                                      Michael F. Tubach

                                      George A. Riley
                                      Christina J. Brown
                                      Two Embarcadero Center, 28th Floor
                                      San Francisco, CA 94111
                                      Telephone: (415) 984-8700
                                      Facsimile:  (415) 984-8701

                                      *Attorneys for Defendant and Petitioner Apple*
                                      *Inc.*

Google Inc. submits the following corporate disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1: (1) Google Inc. is a publicly held corporation; (2) Google Inc. does not have any parent corporation; and (3) no publicly held corporation owns ten percent or more of Google Inc.'s stock.

Dated:  September 4, 2014                    KEKER & VAN NEST LLP

                                        By:   /s/ *Robert A. Van Nest*
                                              Robert A. Van Nest

                                              Daniel Purcell
                                              Eugene M. Paige
                                              Justina Sessions
                                              633 Battery Street
                                              San Francisco, CA 94111
                                              Telephone: (415) 391-5400
                                              Facsimile: (415) 397-7188

                                              Edward D. Johnson
                                              Lee H. Rubin
                                              Donald M. Falk
                                              MAYER BROWN LLP
                                              Two Palo Alto Square
                                              3000 El Camino Real, Suite 300
                                              Palo Alto, CA 94306-2112
                                              Telephone: (650) 331-2057
                                              Facsimile:  (650) 331-4557

                                              *Attorneys for Defendant and Petitioner*
                                              *Google Inc.*

iii

Intel Corporation submits the following corporate disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1: (1) Intel is a publicly held corporation; (2) Intel does not have any parent corporation; and (3) no publicly held corporation owns 10% or more of Intel's stock.

Dated:  September 4, 2014               MUNGER TOLLES & OLSON, LLP


                              By:  /s/ *Gregory P. Stone*
                                   Gregory P. Stone

                                   Bradley S. Phillips
                                   Steven M. Perry
                                   355 South Grand Avenue, 35th Floor
                                   Los Angeles, CA 90071-1560
                                   Telephone: (213) 683-9100
                                   Facsimile:  (213) 687-3702

                                   *Attorneys for Defendant and Petitioner Intel*
                                   *Corporation*

iv

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

BACKGROUND ..................................................................................3

ISSUE PRESENTED ...........................................................................7

RELIEF SOUGHT ...............................................................................7

LEGAL STANDARD ...........................................................................7

ARGUMENT .......................................................................................8

I.     The Preliminary Approval Standard Will Evade Appellate Review and Harm the Parties Absent Mandamus ..............................................8

II.    The District Court's New Preliminary Approval Standard Is Clearly Erroneous as a Matter of Law................................................10

    A.     The Court's Benchmark Standard for Preliminary Approval Is Clear Legal Error................................................................10

    B.     The Arm's-Length Settlement Reached by the Parties Is Reasonable and Should Be Given Preliminary Approval.................18

III.   If Allowed to Stand, the Court's Decision on an Important Matter of First Impression Will Severely Hamper Class Settlement ...........................22

CONCLUSION ..................................................................................24

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bauman v. U.S. Dist. Court*,
557 F.2d 650 (9th Cir. 1977) ................................................................8

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ..............................................................21

*Christensen v. Hillyard, Inc.*,
2014 WL 3749523 (N.D. Cal. July 30, 2014) ....................................23

*Cintech Indus. Coatings, Inc. v. Bennett Indus., Inc.*,
85 F.3d 1198 (6th Cir. 1996) ..............................................................16

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ...............................................................15

*City P'ship Co. v. Atl. Acquisition Ltd. P'ship*,
100 F.3d 1041 (1st Cir. 1996)..............................................................12

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013).........................................................................21

*Douglas v. U.S. Dist. Court*,
495 F.3d 1062 (9th Cir. 2007) ........................................... 2, 8, 22, 23

*Ellis v. Midland Credit Mgmt., Inc.*,
2012 WL 4356251 (D. Colo. Sept. 24, 2012)....................................15

*Evans v. Jeff D.*,
475 U.S. 717 (1986)..............................................................................17

*Gates v. Rohm & Haas Co.*,
248 F.R.D. 434 (E.D. Pa. 2008).........................................................11

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ............................................................12

## TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Cement Antitrust Litig.*,
    688 F.2d 1297 (9th Cir. 1982) ..............................................................8

*In re Crocs, Inc. Sec. Litig.*,
    2013 WL 4547404 (D. Colo. Aug. 28, 2013) ......................................11

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    961 F. Supp. 2d 708 (E.D. Pa. 2014) ..................................................14

*In re Netflix Privacy Litig.*,
    2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ............................... 11, 12

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ................................................................12

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    986 F. Supp. 2d 207 (E.D.N.Y. 2013) ................................................16

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ............................................................22

*In re Syncor ERISA Litig.*,
    516 F.3d 1095 (9th Cir. 2008) ............................................................11

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) ..............................................15

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998) ............................................................15

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) ...................................................... 9, 11, 12

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ..................................................... passim

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ..............................................................15

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Pitney Bowes, Inc.*,
  25 F.3d 66 (2d Cir. 1994) ...............................................................................9

*Valenzuela–Gonzalez v. U.S. Dist. Court*,
  915 F.2d 1276 (9th Cir. 1990) .......................................................................8

## **STATUTES**

28 U.S.C. § 1651 ...............................................................................................7

## **OTHER AUTHORITIES**

4 *Newberg on Class Actions* (4th ed. 2014)..................................................16

Brandon Bailey, *Judge Orders Tech Giants to Fatten Offer*, San Jose
  Mercury News, Aug. 9, 2014, at 1-A ............................................................24

Chris O'Brien, *Deal is rejected in tech hiring case*, L.A. Times, Aug.
  9, 2014, at 4..................................................................................................24

David Streitfeld, *Court Rejects Deal on Hiring in Silicon Valley*, N.Y.
  Times, Aug. 8, 2014, at A-1 ...................................................................... 9, 24

Jeff Elder, *Judge Rejects Settlement in Silicon Valley Wage Case*,
  Wall St. J., Aug. 8, 2014,
  http://online.wsj.com/articles/judge-rejects-settlement-in-silicon-
  valley-wage-case-1407528633 .....................................................................24

Kristen V. Brown, *She lays down law to tech's giants*, S.F. Chron.,
  Aug. 10, 2014, at A-1 ...................................................................................24

Manual for Complex Litigation (3d) § 30.41 (1995)...............................14

# INTRODUCTION

The district court committed clear legal error by creating an unprecedented and rigid test for preliminary settlement approval in class actions, and then using that test to reject a $324.5 million cash settlement reached after months of vigorous arm's-length negotiation among experienced counsel aided by the mediation services of a highly regarded former federal judge. There was no suggestion that the settlement was collusive; indeed, it was the highest settlement ever in an employment antitrust case and satisfied any preliminary approval test ever articulated by any federal court. But the court nonetheless refused to grant preliminary approval, because it deemed the settlement to be 16% lower than a "benchmark" supposedly set by earlier settlements by different defendants under entirely different circumstances. This formulaic approach to the parties' settlement contravenes *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009), where this Court explained that it "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution, and [has] never prescribed a particular formula by which that outcome must be tested." *Id.* at 965.

The district court's benchmark formula impermissibly substituted the court's assessment of the value of the case for that of the parties who have been litigating the case for more than three years, and in particular plaintiffs' counsel, who were "sobered" by the "very real risks" faced at trial after devoting "a lot of work

product" to analyzing the case and conducting jury research and other "empirical work"—none of which the district court had access to.  6/19/14 Tr. 25:4-17, 75:1-5, 75:15-21.  The district court dismissed the parties' analysis of the trial risks, suggesting that, unless the settlement was larger, the court had—in its own words—"wasted years on this case."  *Id*. at 74:25.  This too directly contradicts *Rodriguez*, which held that "'[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.'"  563 F.3d at 967 (alteration in original) (citation omitted).

The proper standard for preliminary approval of class settlements is an important issue of first impression on which this Court's guidance is urgently needed.  The court below acknowledged the "relatively scant appellate authority regarding the standard."  Dkt. 974 ("Op.") at 5:23-25.  In fact, this Court has never articulated the standard governing preliminary approval, and has no ready means of addressing this interlocutory issue except through mandamus.  Because the order is not appealable, mandamus is the parties' only avenue of relief in order to avoid clear and irreparable damage.  *Douglas v. U.S. Dist. Court*, 495 F.3d 1062, 1065-66 (9th Cir. 2007).

The district court's stunning decision has attracted substantial national media attention.  The decision forces plaintiffs to seek to obtain a unanimous jury verdict

and a damages award exceeding $324.5 million—even though their jury research tells them there is a very real chance that they and the absent class members will receive nothing. And it forces defendants to abandon the bargain they reached with highly qualified class counsel and instead either pay at least an additional $55.5 million to settle the case or proceed to trial. This Court should therefore issue the writ because, without mandamus, this fundamentally erroneous ruling will evade appellate review, irreparably harm plaintiffs, absent class members, and defendants, and make it significantly more difficult for parties to settle class actions in future cases.

## BACKGROUND

Plaintiffs allege that defendants (Pixar, Lucasfilm, Apple, Adobe, Google, Intuit, and Intel) entered into an illegal conspiracy not to "cold-call" each other's technical employees, and seek treble damages under federal and state antitrust laws. Plaintiffs do not allege that the defendants agreed not to *hire* one another's employees. Rather, the alleged conspiracy comprised only six two-party "do-not-cold-call" agreements; and no defendant was involved in more than three, so that most employees had unlimited access to cold calls from most other defendants.

After initially denying class certification in April 2013 without prejudice (Dkt. 382), the court granted certification in October 2013 after plaintiffs narrowed their class definition to "technical employees" (Dkt. 531). While plaintiffs' second

3

certification motion was pending, plaintiffs settled with Lucasfilm and Pixar for $9 million, and with Intuit for $11 million (Dkts. 501, 540), which the court approved (Dkt. 540).

The district court has since denied defendants' summary judgment motions (Dkt. 771) and granted in part and denied in part defendants' motions to exclude plaintiffs' expert testimony (Dkt. 788). Trial was set for May 27, 2014. Dkt. 388.

In May 2014, after months of vigorous arm's-length negotiations, plaintiffs executed a settlement agreement with the remaining defendants. Dkt. 921 ¶ 10. The agreement (Dkt. 921 Ex.1) resolves all remaining claims in exchange for $324,500,000, to be paid directly to all identified class members. Plaintiffs termed this "the second largest settlement of employee class action claims in history" and "(by far) the largest recovery ever achieved in an employee class action bringing claims under the antitrust laws, on either an aggregate or net per class member basis." Dkt. 938, at 2:12-15. Plaintiffs were required to seek preliminary approval of the settlement by the district court, after which the class would be notified and invited to comment on or object to the settlement before the court finally approved the settlement. *See Rodriguez*, 563 F.3d at 957-58.

On June 19, 2014, the district court held a hearing to consider plaintiffs' motion for preliminary approval of the settlement. Dkts. 920, 948. During the hearing, plaintiffs explained they had "done jury testing," through which they

4

"f[ou]nd out what jurors think about this evidence, what jurors think about these class members, what jurors think about certain themes that are in this case." 6/19/14 Tr. 24:23-25:3.  The results of the jury testing cast serious doubt on the viability of plaintiffs' claims at trial; counsel explained that "you have to be sobered when you do that kind of testing to understand that while you might have great evidence, you have to overcome a number of hurdles." *Id.* at 25:4-6.

Plaintiffs walked the court through "several" of these hurdles.  6/19/14 Tr. 25:7-17.  "There is a risk that a jury might find that there was no overarching conspiracy"; "the jury might conclude that these workers are among the most desirable in the world and they had plenty of other opportunity to go other places besides these seven companies"; and jurors might not "like plaintiffs' damages model," or "think that it wasn't $3 billion," but "less than $1 billion," or "some small fraction." *Id.* at 26:21-27:9.  Plaintiffs acknowledged the "risk that a jury, hearing a whole bunch of different experts, even as we think we have the best one, might come to a different perspective." *Id.* at 27:24-28:1.  Plaintiffs thus explained that "[i]t is not without … great concern that we would ever take this case to trial." *Id.* at 64:2-3.

Plaintiffs also explained that they had analyzed "other cases that have been tried in this district recently where people got less than what we're getting as a percentage of exposure."  6/19/14 Tr. 28:12-14.  "And the problem for us, as we

look at what's happened in other antitrust trials in the last decade, is that it's very, very tough." *Id.* at 25:15-17. Indeed, plaintiffs explained, in antitrust cases involving actual price-fixing agreements and criminal guilty pleas—neither of which were present here—plaintiffs have received tiny fractions of the damages they sought. *Id*. at 28:12-31:1; *see also* Dkt. 921 Exs. 4-5 (analysis of other jury awards).

Despite plaintiffs' grave concerns with their case, on August 8, 2014, the court denied preliminary approval of the settlement. Dkt. 974. The court admitted that "Class counsel have been zealous advocates for the Class." Op. 31:21; *see also* Dkt. 531, at 7:20-21 (class counsel "have vigorously prosecuted this action and will continue to do so"). But the court found that "the total settlement amount falls below the range of reasonableness" because, according to the court, "Class members recover less on a proportional basis from the instant settlement with Remaining Defendants than from the settlement with the Settled Defendants a year ago." Op. 6:21-7:2. The court reasoned that the "Remaining Defendants are alleged to have received 95% of the benefit of the anti-solicitation agreements and to have caused 95% of the harm suffered by the Class in terms of lost compensation," and that, as a result, the "Remaining Defendants should have to pay at least 95% of the damages …." Op. 9:2-5. Because the court's novel and unsupported test and calculation purportedly required a settlement of "at least $380

6

million" (Op. 7:22 & n.8)—$55.5 million more than the parties agreed to—the court rejected the settlement.

## ISSUE PRESENTED

Whether a district court can, at the preliminary approval stage, reject an arm's-length, non-collusive class action settlement reached by experienced counsel after extensive discovery, motions practice, and jury research, which exposed very real risks that compelled plaintiffs to settle their claims, because the court deems the settlement amount 16% too low based on a rigid and formulaic comparison with an earlier settlement.

## RELIEF SOUGHT

Petitioners seek a writ of mandamus directing the district court (1) to vacate its order denying preliminary approval of the $324.5 million settlement and (2) to enter an order granting preliminary approval.

## LEGAL STANDARD

This Court weighs five factors in determining whether to grant a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651:

> (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires.  (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal.  (3) The district court's order is clearly erroneous as a matter of law.  (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules.  (5) The district court's order raises new and important problems, or issues of law of first impression.

7

*Douglas v. U.S. Dist. Court*, 495 F.3d 1062, 1065-66 (9th Cir. 2007) (quoting *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654-55 (9th Cir. 1977)) (internal quotation marks omitted). Not every element of the mandamus standard must be satisfied in order to warrant a writ. *Valenzuela–Gonzalez v. U.S. Dist. Court*, 915 F.2d 1276, 1279 (9th Cir. 1990) ("all five factors need not be satisfied at once"). "Exercise of [the Court's] supervisory mandamus authority is particularly appropriate when an important question of law would repeatedly evade review because of the collateral nature of the issue." *In re Cement Antitrust Litig.*, 688 F.2d 1297, 1304 (9th Cir. 1982).

## ARGUMENT

### I.    The Preliminary Approval Standard Will Evade Appellate Review and Harm the Parties Absent Mandamus

It is beyond dispute that the issues presented by the district court's order denying preliminary approval will evade appellate review, and that the parties will be irreparably harmed, absent this Court's issuing a writ of mandate. These elements of the mandamus standards are therefore clearly established here.

Petitioners lack any other means to secure relief. The order denying preliminary approval is not a final judgment or otherwise appealable. And unlike evidentiary rulings and other orders that are reviewable once a final judgment is entered, there will never be an opportunity for a direct appeal of a district court's order denying preliminary approval of a settlement.

8

Moreover, if the court's errors are not corrected now, the $324.5 million settlement will be nullified and the resources spent in negotiating it will be wasted. Either the parties will proceed to trial—where either defendants or plaintiffs, including the absent class members, will lose—or defendants under the court's order will be forced to pay at least an additional $55.5 million above the record-setting amount they agreed to. *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 72 (2d Cir. 1994) ("jeopardizing a settlement agreement causes prejudice to the existing parties to a lawsuit").

The prejudice to defendants would be particularly acute here, where the district court reached extensive "ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). The court's comments expressing its view on hotly contested issues such as the supposed culpability of defendants and their executives (Op. 11-16) were widely reported in the press including on the front page of *The New York Times* (David Streitfeld, *Court Rejects Deal on Hiring in Silicon Valley*, N.Y. Times, Aug. 8, 2014, at A-1 (lede: "There is 'ample evidence' that Silicon Valley was engaged in 'an overarching conspiracy' against its own employees, a federal judge said on Friday, and it should either pay dearly or have its secrets exposed at trial")), threatening to taint the jury pool and prejudice defendants' ability to obtain a fair trial.

9

## II.     The District Court's New Preliminary Approval Standard Is Clearly Erroneous as a Matter of Law

The parties negotiated at arm's length for several months aided by an experienced mediator. Their efforts were informed by a fully developed evidentiary record, careful analysis of the risks of trial, and rigorous jury testing. From this process, the parties agreed to the highest recorded settlement amount of any employee class action under the antitrust laws. It was clearly erroneous for the district court to substitute its own judgment for the parties' agreement based on an unprecedented "benchmark" analysis. The error is magnified here, where the analysis is untethered to—and actually at odds with—plaintiffs' counsel's calculation of the class's likelihood of recovery.

### A.     The Court's Benchmark Standard for Preliminary Approval Is Clear Legal Error

This Court requires district courts at the *final* approval stage to "explore[] comprehensively all factors" in determining whether to approve a class action settlement, including:

> (1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Rodriguez*, 563 F.3d at 963-64 (citation and internal quotation marks omitted).

This Court has never articulated the standard for *preliminary* approval of a class

10

settlement, but numerous district courts around the country have held that "[t]he standards for preliminary approval" of a class settlement "are not as stringent as those applied for final approval." *In re Crocs, Inc. Sec. Litig.*, 2013 WL 4547404, at *3 (D. Colo. Aug. 28, 2013); *see also Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 444 n.7 (E.D. Pa. 2008) ("the standard for preliminary approval is far less demanding" than the standard for final approval); Dkt. 920, at 14-15 (citing several cases). At the preliminary stage, district courts in this Circuit focus on whether a settlement agreement "was the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel." *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013).

In undertaking the approval analysis, this Court has emphasized the "strong judicial policy that favors settlement, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008). "[V]oluntary conciliation and settlement are the preferred means of dispute resolution," and "[t]his is especially true in complex class action litigation." *Officers for Justice*, 688 F.2d at 625.

The Court recognized in *Rodriguez* that, even in the context of more stringent *final* approval, "'[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.'" 563 F.3d at 967 (quoting *In re Pac. Enters. Sec.*

11

*Litig.*, 47 F.3d 373, 378 (9th Cir. 1995)).  Courts must "put a good deal of stock in the product of an arms-length, non-collusive negotiated resolution" and defer to a "private consensual decision of the parties."  *Id.* at 965.  The possibility "that the settlement could have been better ... does not mean the settlement presented was not fair, reasonable or adequate."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).  As a result, a court's role in approving a settlement is not to demand the *best* or *highest* settlement amount; rather, review "*must be limited* to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties" and is on the whole reasonable and fair.  *Officers for Justice*, 688 F.2d at 625 (emphasis added).

District courts in this Circuit, following *Rodriguez*, have therefore "afforded a *presumption* of fairness and reasonableness [to] a settlement agreement where that agreement was the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel."  *In re Netflix*, 2013 WL 1120801, at *4 (emphasis added); *see also City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996) ("When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement").  This presumption is particularly appropriate at the preliminary approval stage because class members will have an opportunity to

12

lodge objections before final approval.

No one has alleged any sort of collusion in agreeing to the settlement, yet the court improperly failed to presume the settlement was fair and reasonable. It was undisputed below that the settlement was "the result of years of hard-fought litigation and arm's length negotiations conducted by capable counsel with extensive experience in class action litigation" (Dkt. 938, at 2:6-8), and the objector specifically explained that he was not arguing that plaintiffs "got together with the defendants and entered into a collusive settlement" (6/19/14 Tr. 10:4-7). The court nonetheless disapproved the settlement based on a formula of its own creation that imposed a strict requirement that the settlements be somehow proportionate to earlier settlements by different defendants.[1] And the court's formula ignored that those defendants were jointly and severally liable for any judgment, with no right to contribution, so that a strict proportionality approach based on "liability shares" is especially misguided and unprincipled.

The court's rigid and formulaic approach to preliminary settlement approval unduly narrowed the "range of possible approval" (Manual for Complex Litigation

---

[1] The court appears to have adopted the recommendation of the objector, who asked the court to avoid the "historically ... deferential approach" of "postponing close scrutiny of proposed settlements until final approval," and instead because "this case is … highly visible[,] … take an active role in evaluating the merits of [the] proposed settlement[s] early in the process." Dkt. 934, at 7:10-22.

13

(3d) § 30.41 (1995)), and directly contravenes *Rodriguez*; indeed, no other federal appellate court has adopted the standard in the context of either preliminary or final approval.  It is a clear error of law warranting mandamus review.

The court began by comparing the present settlement to an earlier settlement involving much smaller defendants (Op. 7 n.8), which, given their relative size, may have settled for an amount reflecting their anticipated litigation expenses rather than any measure of share or fault.  The court improperly assumed the defendants were comparable, ignored joint and several liability, and brushed aside the developments that came later in the case and were unfavorable to plaintiffs' position.  Instead, the court determined that the present defendants had agreed to pay proportionally less than the defendants that settled previously.  Op. 6-7.  Applying this unprecedented proportionality approach, the court concluded that the $324.5 million settlement fell outside the "range of reasonableness" because defendants "should, at a minimum, pay their fair share as compared to the Settled Defendants."  Op. 6:11-20, 31:25.

The district court purportedly premised its formulaic test on a Pennsylvania district court decision (*In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014)), which in turn was based on cases holding that the "primary" or "most important" factor concerning the fairness of a settlement is "plaintiffs' expected recovery balanced against the value of the

14

settlement offer" (*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007); *see also Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)).  None of those decisions, however, involved any comparisons with other defendants' settlements.

Moreover, in *Rodriguez*, this Court specifically considered and rejected a formulaic approach, and reaffirmed that it has "*never* prescribed a particular formula" for approving settlements.  563 F.3d at 965 (emphasis added); *see also id.* ("[T]he factors we identify, are somewhat different [from *Synfuel*].  We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution, … and have never prescribed a particular formula by which that outcome must be tested.") (citation omitted).  As this Court has cautioned elsewhere, "that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 & n.2 (2d Cir. 1974)).

"Settlement negotiation is an art more than a science" (*Ellis v. Midland Credit Mgmt., Inc.*, 2012 WL 4356251, at *5 (D. Colo. Sept. 24, 2012)), and involves a nuanced and delicate exercise of judgment that should not be second-guessed de novo by a court.  But the district court here did just that, substituting a

15

formulaic test and the court's own view of the likely outcome at trial for the judgment of plaintiffs' counsel, whose "jury testing," "work product," and "empirical work" left counsel "sobered" by the "very, very real risks" faced at trial. 6/19/14 Tr. 25:4-17, 63:22-25, 75:1-5, 75:15-21. The court also nullified months of settlement negotiations directed by an experienced and respected mediator, former federal district judge Layn Phillips (Dkt. 921 ¶ 10), despite this Court's recognition of the value of an experienced mediator (*see Rodriguez*, 563 F.3d at 965-66), who helps ensure that settlement negotiations are "fair and conducted at arm's length" (*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 221 (E.D.N.Y. 2013)).

The practical effect of the court's approach was to impose a variant of a "most favored nations" rule for prior settlements—even though the parties had not negotiated or come to such an agreement. Rather than entitling the prior-settling parties to refunds based on later settlements, the court's rule forces later-settling parties to essentially match the amounts agreed to in the earlier settlements. Most favored nations arrangements have been "disfavored because they often inhibit compromise and settlement." *Cintech Indus. Coatings, Inc. v. Bennett Indus., Inc.*, 85 F.3d 1198, 1203 (6th Cir. 1996); *see also* 4 *Newberg on Class Actions* § 12:2 (4th ed. 2014) ("most favored nations clauses are criticized in the Manual for Complex Litigation and are rarely included in most class settlement agreements").

16

And the imposition of a similar arrangement by a court falls entirely outside the proper judicial role:  "[T]he power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed."  *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986).

To make matters worse, the district court's calculation of the proportionality among the settlements was incorrect.  The court reasoned that defendants "received 95% of the benefit … and … caused 95% of the harm."  Op. 9:2-3.  But plaintiffs' damages model actually shows that only 94.386% of the damages are payable to the present defendants' employees, so that even under the trial court's flawed methodology, the "appropriate benchmark settlement" would be $336.2 million, just slightly higher than the actual settlement amount.  Dkt. 964-5, at 380 Ex. V.3 (setting out alleged damages payable to each defendant's employees).  In addition, using the same formula, the *net* amount of the present settlement that will be paid to class members is proportionately *greater* than it was in the prior settlement, because the proportion of the previous settlement that was allotted for fees and expenses is significantly higher than in the present settlement.  Dkt. 916, at 5 (granting $8.7 million, or more than 40%, of the $20 million total for fees and expenses).  In substituting its formulaic calculation for the judgment of the parties, the court therefore not only committed legal error but also misapplied its own

17

erroneous standard. The court's mathematical errors highlight the fundamentally inappropriate nature of the court's formulaic methodology, given that very small changes in the inputs to the formula can mean the difference between approving and rejecting a settlement even if all the other factors overwhelmingly favor approval.

### B. The Arm's-Length Settlement Reached by the Parties Is Reasonable and Should Be Given Preliminary Approval

Under a proper analysis, the settlement between the parties unquestionably should have received preliminary approval.

Two of the relevant factors in final settlement approval—the risk, expense, complexity, and likely duration of further litigation; and the extent of discovery completed and the stage of the proceedings (*Rodriguez*, 563 F.3d at 966-67)— weigh strongly in favor of approval, given how much time and resources had been devoted to the case, and the complex trial that lay ahead. The significant "experience … of counsel" also is indisputable. *Id.* at 963. And the fact that the settlement here "is in cash, not in kind" is a particularly "good indicator of a beneficial settlement." *Id.* at 965. That these factors are clearly established should have at the very least caused the district court to presume the settlement was reasonable, but the court accorded them no weight at all.

As to the strength of their case, plaintiffs acknowledged that to establish liability, much less obtain a $3 billion damages award, they "have to overcome a

number of hurdles." 6/19/14 Tr. 25:4-6. There is a significant risk that a jury would not link together six separate two-party "do-not-cold-call" agreements into one massive conspiracy, which is required by plaintiffs' damages model. There is also a risk that the jury would reject the only evidence in favor of the model: the testimony of a single expert who admits the results are not statistically significant. Plaintiffs' counsel explained that their jury research left them "sobered by … learning how difficult it is to convince a unanimous room of people … to meet the standard in this case." *Id*. at 75:3-5. Based on these and other significant litigation risks, plaintiffs determined that $324.5 million was a reasonable settlement figure.

The court gave no weight to plaintiffs' counsel's considered and good-faith acknowledgment of the "very, very real risks" plaintiffs faced. 6/19/14 Tr. 25:13-14. Rather, the court substituted its own view of the evidence, which the court believed supports plaintiffs' case. Op. 10-30. In so doing, the court disregarded the substantial weaknesses in plaintiffs' case, as well as plaintiffs' repeated explanation of their concerns based on, among other things, their confidential jury testing.

The court also determined that any risk plaintiffs faced going to trial "existed and was even greater when Plaintiffs settled with the Settled Defendants a year ago" (Op. 7), but there is no basis for this conclusion. The court reasoned that because the court had certified the class and denied summary judgment, "the

19

procedural posture of the case swung dramatically in Plaintiffs' favor after the initial settlements were reached." Op. 10:3-4. But this Court in *Rodriguez* counseled precisely the opposite; it approved the district court's determination that "successfully opposing … summary judgment did not mean that the class had established liability or would obtain a favorable, unanimous jury verdict." 563 F.3d at 964. The district court's contrary decision here was legal error.

Moreover, the district court ignored the serious weaknesses in plaintiffs' case identified by defendants. For example, plaintiffs do not allege any agreement on the level of employee compensation, nor do they even allege any agreement not to hire each other's employees; and plaintiffs allege no express agreement at all among all defendants. Rather, plaintiffs allege that seven defendants, through six alleged two-party agreements not to "cold-call" each other's employees, somehow conspired as one group to depress the wages of all their employees. Plaintiffs are correct that there is a "very real risk" that a jury would reject plaintiffs' theory.

In fact, at trial, if plaintiffs failed to prove that any *one* of the six agreements was not part of their alleged overarching conspiracy, defendants would avoid any damages whatsoever. Plaintiffs contend that the compensation of *every* technical employee at all seven companies was suppressed by about 10% each year of the class period, resulting in $3 billion in depressed wages. Dkt. 967-1, at 21 Fig. 7. Plaintiffs' expert's opinion arriving at the $3 billion figure was integrally premised

on the involvement of *all seven defendants* in the alleged conspiracy.  Dkt. 564, at 13; Dkt. 938, at 11.  As he acknowledged, if a single defendant was found not to be part of the conspiracy, his model could not calculate damages.  Dkt. 569-14, at 1031:19-1032:14.  With no damages model, plaintiffs would be unable to recover damages, let alone $3 billion, and would be unable to proceed with a class action.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432-33 (2013).

The district court also took it as a given that class certification was final and settled because the Ninth Circuit did not grant interlocutory review.  Op. 10:8-20.  But the court ignored the risk that defendants would prevail on appeal from class certification after final judgment.  The district court's analysis was, again, directly contrary to *Rodriguez*.  *See* 563 F.3d at 966 (although 23(f) petition had been denied, "[a]t the time of settlement, the risk remained that the nationwide class might be decertified").

Even plaintiffs acknowledged that "the issue of class certification is still an open issue on appeal."  6/19/14 Tr. 23:5-6.  Courts of appeals have reversed the certification of a class even after judgment following trial.  *See*, *e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 336-37 (4th Cir. 1998).  Defendants would have strong arguments on appeal from the certification of a broad and disparate class of 60,000 technical employees ranging from Intel semiconductor design engineers in Massachusetts to Lucasfilm digital animators in

21

Silicon Valley.    Plaintiffs' theory of antitrust impact depended on an unprecedented use of aggregate analyses and averages that were extrapolated class-wide, which several courts of appeals have rejected (*see*, *e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253-55 (D.C. Cir. 2013)), and which were not even statistically significant (Dkt. 715, at 3).    The risk that defendants ultimately would prevail on class certification therefore should have been considered as part of the *Rodriguez* analysis.

In essence, the district court considered what it perceived to be the strengths of plaintiffs' case, while ignoring the fact that *plaintiffs themselves* developed serious concerns about their evidence and legal theories based on a comprehensive view of the record and jury testing that post-dated the earlier settlements.    Such a one-sided analysis clearly is not the required "comprehensive[]" "explor[ation of] all factors" that this Court requires.    *Rodriguez*, 563 F.3d at 964 (citation omitted).

## III.    If Allowed to Stand, the Court's Decision on an Important Matter of First Impression Will Severely Hamper Class Settlement

This petition also presents a compelling case for mandamus review because important "issues of law of first impression" will completely evade review in the absence of a writ of mandate.    *Douglas*, 495 F.3d at 1065-66.

The district court expressly acknowledged the "scant appellate guidance" (Op. 5:24) on the standard district courts should use to review preliminary approval motions.    Plaintiffs "couldn't find a single circuit level decision where a court says

22

this is the standard that you, as a district court, are required to apply." 6/19/14 Tr. 11:15-18. This Court has never opined on the standards district courts are to use when deciding whether to grant preliminary approval of a settlement. As a result, the district courts in this Circuit, including the district court here, have been left to rely heavily on decisions from other district courts in determining how to evaluate class action settlements. Op. 5-6; *see also*, *e.g.*, *Christensen v. Hillyard, Inc.*, 2014 WL 3749523, at *3-4 (N.D. Cal. July 30, 2014).

Failing to review this ruling would create "new and important problems" warranting mandamus (*Douglas*, 495 F.3d at 1065-66), as the court's widely publicized benchmark methodology—if adopted elsewhere—will significantly hinder parties' ability to settle in future class actions. Class counsel who are looking to reach early settlements with fewer than all defendants to finance prosecution of the litigation will be forced to assume that the early settlements will create a floor below which they will not be allowed to settle with the remaining defendants. Defendants who do not settle early in the litigation will be bound against their will by the settlement decisions of their co-defendants. The court's rule thus restricts the ability of plaintiffs and defendants to reach negotiated settlements fully informed by the myriad factors that should guide the parties' decisionmaking.

In addition, courts considering whether to approve early settlements between

23

a class and fewer than all defendants will be forced to consider whether the resulting "benchmark settlement amount" for the remaining defendants would be sufficient to warrant later approval by the court.  If it would not, the court might conclude that the early settlement, for that reason alone, was not in the best interest of the class and therefore refuse to approve it.

These results will deter class settlement and disrupt the efforts of class counsel to finance complex litigation.  The decision below has received unusually widespread publicity,[2] and certainly has come to the attention of district courts and the class settlement objectors' bar.  This Court's review is therefore critical to ensure that class settlement remains a viable option for parties in order to resolve complex class actions in a fair and efficient manner.

## CONCLUSION

This petition presents an issue of first impression that is vital to the civil justice system's ability to resolve aggregated claims.  The district court's rejection

---

[2] *E.g.*, David Streitfeld, *Court Rejects Deal on Hiring in Silicon Valley*, N.Y. Times, Aug. 8, 2014, at A-1 ("'I cannot recall a judge saying in a class-action case that the amount of settlement is too low and you need to go back and go for broke at trial,' said Daniel Crane, who teaches antitrust law at the University of Michigan Law School. 'This is very striking.'"); Jeff Elder, *Judge Rejects Settlement in Silicon Valley Wage Case*, Wall St. J., Aug. 8, 2014, http://online.wsj.com/articles/judge-rejects-settlement-in-silicon-valley-wage-case-1407528633; Chris O'Brien, *Deal is rejected in tech hiring case*, L.A. Times, Aug. 9, 2014, at 4; Kristen V. Brown, *She lays down law to tech's giants*, S.F. Chron., Aug. 10, 2014, at A-1; Brandon Bailey, *Judge Orders Tech Giants to Fatten Offer*, San Jose Mercury News, Aug. 9, 2014, at 1-A.

of the settlement was clear error as a matter of law.  The district court applied a

mechanical formula that overrode sensitive judgments of the class's own counsel

based on confidential information regarding the serious risks posed by their claims

and their chances of success at trial.  The ruling will inflict significant harm on all

parties and the class action procedure.  Absent mandamus, this controversial and

erroneous ruling will evade review.  This Court should grant the petition.

Dated: September 4, 2014                    KEKER & VAN NEST LLP


                              By:    /s/ *Robert A. Van Nest*
                                     Robert A. Van Nest

                                     Daniel Purcell
                                     Eugene M. Paige
                                     Justina Sessions
                                     633 Battery Street
                                     San Francisco, CA 94111
                                     Telephone: (415) 391-5400
                                     Facsimile: (415) 397-7188

                                     Edward D. Johnson
                                     Lee H. Rubin
                                     Donald M. Falk
                                     MAYER BROWN LLP
                                     Two Palo Alto Square
                                     3000 El Camino Real, Suite 300
                                     Palo Alto, CA 94306-2112
                                     Telephone: (650) 331-2057
                                     Facsimile:  (650) 331-4557

                                     *Attorneys for Defendant and Petitioner*
                                     *GOOGLE INC.*

Dated:  September 4, 2014                O'MELVENY & MYERS LLP


By:  /s/ *Michael F. Tubach*
     Michael F. Tubach

     George A. Riley
     Christina J. Brown
     Two Embarcadero Center, 28th Floor
     San Francisco, CA 94111
     Telephone: (415) 984-8700
     Facsimile:  (415) 984-8701

     *Attorneys for Defendant and Petitioner*
     *APPLE INC.*



Dated:  September 4, 2014                JONES DAY


By:  /s/ *David C. Kiernan*
     David C. Kiernan

     Robert A. Mittelstaedt
     Craig A. Waldman
     555 California Street, 26th Floor
     San Francisco, CA 94104
     Telephone: (415) 626-3939
     Facsimile:  (415) 875-5700

     *Attorneys for Defendant and Petitioner*
     *ADOBE SYSTEMS, INC.*

Dated:  September 4, 2014          MUNGER TOLLES & OLSON, LLP


By:  */s/ Bradley S. Phillips*
     Bradley S. Phillips

     Gregory P. Stone
     Steven M. Perry
     Gregory M. Sergi
     John P. Mittelbach
     355 South Grand Avenue, 35th Floor
     Los Angeles, CA 90071-1560
     Telephone: (213) 683-9100
     Facsimile:  (213) 687-3702

     *Attorneys for Defendant and Petitioner INTEL*
     *CORPORATION*


**ATTESTATION**: The filer attests that concurrence in the filing of this document has been obtained from all signatories.

## STATEMENT OF RELATED CASES

Petitioners are not aware of any related cases pending in this circuit.

## CERTIFICATE OF SERVICE

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is O'Melveny & Myers LLP, Two Embarcadero Center, 28th Floor, San Francisco, CA 94111.

On September 4, 2014, I served the following document(s):

### PETITION FOR WRIT OF MANDAMUS

by transmitting on this date via Email and/or U.S. Mail a true and correct copy of the above referenced documents.

Richard M. Heimann                           *Via Email and U.S. Mail*
Kelly M. Dermody
Brendan P. Glackin
Dean M. Harvey
Anne P. Shaver
Lisa J. Cisneros
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: (415) 956-1000
Fax: (415) 956-1008

Email:
rheimann@lchb.com
kdermody@lchb.com
bglackin@lchb.com
dharvey@lchb.com
ashaver@lchb.com
lcisneros@lchb.com

*Attorneys for Plaintiffs*

Joseph R. Saveri                                    *Via Email and U.S. Mail*
Kevin E. Rayhill
James G. Dallal
JOSEPH SAVERI LAW FIRM
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Tel:   (415) 500.6800
Fax:   (415) 500.6803

Email:
jsaveri@saverilawfirm.com
krayhill@saverilawfirm.com
jdallal@saverilawfirm.com

*Attorneys for Plaintiffs*


Daniel C. Girard                                    *Via Email and U.S. Mail*
Dena C. Sharp
Elizabeth A. Kramer
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
Tel:   (415) 981-4800
Fax:   (415) 981-4846

Email:
dcg@girardgibbs.com
chc@girardgibbs.com
eak@girardgibbs.com

*Attorneys for Class Representative
Michael Devine*


Robert A. Van Nest                                  *Via Email and U.S. Mail*
Daniel Purcell
Eugene M. Paige
Justina Sessions
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Email:
rvannest@kvn.com
dpurcell@kvn.com
epaige@kvn.com
jsessions@kvn.com

*Attorneys for Defendant and Petitioner
GOOGLE INC.*

Edward D. Johnson                                  *Via Email and U.S. Mail*
Lee H. Rubin
Donald M. Falk
MAYER BROWN LLP
Two Palo Alto Square
3000 El Camino Real, Suite 300
Palo Alto, CA 94306-2112
Tel:   (650) 331-2057
Fax:   (650) 331-4557

Email:
wjohnson@mayerbrown.com
lrubin@mayerbrown.com
dfalk@mayerbrown.com

*Attorneys for Defendant and Petitioner*
*GOOGLE INC.*

David C. Kiernan                                   *Via Email and U.S. Mail*
Robert A. Mittelstaedt
Craig A. Waldman
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Tel:   (415) 626-3939
Fax:   (415) 875-5700

Email:
dkiernan@jonesday.com
ramittelstaedt@jonesday.com
cwaldman@jonesday.com

*Attorneys for Defendant  and Petitioner*
*ADOBE SYSTEMS, INC.*

Gregory P. Stone                                   *Via Email and U.S. Mail*
Bradley S. Phillips
Steven M. Perry
MUNGER TOLLES & OLSON, LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Tel:  (213) 683-9100
Fax: (213) 687-3702

Email:
gregory.stone@mto.com
brad.phillips@mto.com
steven.perry@mto.com

*Attorneys for Defendant and Petitioner*
*INTEL CORPORATION*

Robert A. Mittelstaedt                    *Via Email and U.S. Mail*
Craig E. Stewart
Catherine T. Zeng
Roberta D. Tonelli
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Tel:   (415) 626-3939
Fax:   (415) 875-5700

Email:
ramittelstaedt@jonesday.com
cestewart@jonesday.com
czeng@jonesday.com
rtonelli@jonesday.com

*Attorneys for Defendant*
*Intuit Inc.*

Emily Johnson Henn
COVINGTON & BURLING LLP                    *Via Email and U.S. Mail*
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel:   (650) 632-4700

Email:
ehenn@cov.com

*Attorneys for Defendants Pixar and Lucasfilm*
*Ltd.*

Honorable Lucy H. Koh
United States District Court                    *Via U.S. Mail*
Robert F. Peckham Federal Building
280 S. First Street
San Jose, CA 95113


        I declare under penalty of perjury under the laws of the State of California

that the above is true and correct.

        Executed on September 4, 2014, at San Francisco, California.


                                        /s/ Michael O'Donnell
                                        Michael O'Donnell

# ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT WITH ADOBE, APPLE, GOOGLE, AND INTEL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | Case No.: 11-CV-02509-LHK |
| | ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL |
| THIS DOCUMENT RELATES TO: | |
| **ALL ACTIONS** | |

Before the Court is a Motion for Preliminary Approval of Class Action Settlement with Defendants Adobe Systems Inc. ("Adobe"), Apple Inc. ("Apple"), Google Inc. ("Google"), and Intel Corp. ("Intel") (hereafter, "Remaining Defendants") brought by three class representatives, Mark Fichtner, Siddharth Hariharan, and Daniel Stover (hereafter, "Plaintiffs"). *See* ECF No. 920. The Settlement provides for $324.5 million in recovery for the class in exchange for release of antitrust claims. A fourth class representative, Michael Devine ("Devine"), has filed an Opposition contending that the settlement amount is inadequate. *See* ECF No. 934. Plaintiffs have filed a Reply. *See* ECF No. 938. Plaintiffs, Remaining Defendants, and Devine appeared at a hearing on June 19, 2014. *See* ECF No. 940. In addition, a number of Class members have submitted letters in

1

**United States District Court**
For the Northern District of California

1  support of and in opposition to the proposed settlement. ECF Nos. 914, 949-51. The Court, having

2  considered the briefing, the letters, the arguments presented at the hearing, and the record in this

3  case, DENIES the Motion for Preliminary Approval for the reasons stated below.

## I.  BACKGROUND AND PROCEDURAL HISTORY

Michael Devine, Mark Fichtner, Siddharth Hariharan, and Daniel Stover, individually and

on behalf of a class of all those similarly situated, allege antitrust claims against their former

employers, Adobe, Apple, Google, Intel, Intuit Inc. ("Intuit"), Lucasfilm Ltd. ("Lucasfilm"), and

Pixar (collectively, "Defendants"). Plaintiffs allege that Defendants entered into an overarching

conspiracy through a series of bilateral agreements not to solicit each other's employees in

violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 4 of the Clayton

Antitrust Act, 15 U.S.C. § 15. Plaintiffs contend that the overarching conspiracy, made up of a

series of six bilateral agreements (Pixar-Lucasfilm, Apple-Adobe, Apple-Google, Apple-Pixar,

Google-Intuit, and Google-Intel) suppressed wages of Defendants' employees.

The five cases underlying this consolidated action were initially filed in California Superior

Court and removed to federal court. *See* ECF No. 532 at 5. The cases were related by Judge

Saundra Brown Armstrong, who also granted a motion to transfer the related actions to the San

Jose Division. *See* ECF Nos. 52, 58. After being assigned to the undersigned judge, the cases were

consolidated pursuant to the parties' stipulation. *See* ECF No. 64. Plaintiffs filed a consolidated

complaint on September 23, 2011, *see* ECF No. 65, which Defendants jointly moved to dismiss,

*see* ECF No. 79. In addition, Lucasfilm filed a separate motion to dismiss on October 17, 2011. *See*

ECF No. 83. The Court granted in part and denied in part the joint motion to dismiss and denied

Lucasfilm's separate motion to dismiss. *See* ECF No. 119.

On October 1, 2012, Plaintiffs filed a motion for class certification. *See* ECF No. 187. The

motion sought certification of a class of all of the seven Defendants' employees or, in the

alternative, a narrower class of just technical employees of the seven Defendants. After full

briefing and a hearing, the Court denied class certification on April 5, 2013. *See* ECF No. 382. The

Court was concerned that Plaintiffs' documentary evidence and empirical analysis were

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

1    insufficient to determine that common questions predominated over individual questions with

2    respect to the issue of antitrust impact. *See id.* at 33. Moreover, the Court expressed concern that

3    there was insufficient analysis in the class certification motion regarding the class of technical

4    employees. *Id.* at 29. The Court afforded Plaintiffs leave to amend to address the Court's concerns.

5    *See id.* at 52.

6           On May 10, 2013, Plaintiffs filed their amended class certification motion, seeking to

7    certify only the narrower class of technical employees. *See* ECF No. 418. Defendants filed their

8    opposition on June 21, 2013, ECF No. 439, and Plaintiffs filed their reply on July 12, 2013, ECF

9    No. 455. The hearing on the amended motion was set for August 5, 2013.

10          On July 12 and 30, 2013, after class certification had been initially denied and while an

11    amended motion was pending, Plaintiffs settled with Pixar, Lucasfilm, and Intuit (hereafter,

12    "Settled Defendants"). *See* ECF Nos. 453, 489. Plaintiffs filed a motion for preliminary approval of

13    the settlements with Settled Defendants on September 21, 2013. *See* ECF No. 501. No opposition

14    to the motion was filed, and the Court granted the motion on October 30, 2013, following a hearing

15    on October 21, 2013. *See* ECF No. 540. The Court held a fairness hearing on May 1, 2014, ECF

16    No. 913, and granted final approval of the settlements and accompanying requests for attorneys'

17    fees, costs, and incentive awards over five objections on May 16, 2014, ECF Nos. 915-16.

18    Judgment was entered as to the Settled Defendants on June 20, 2014. ECF No. 947.

19          After the Settled Defendants settled, this Court certified a class of technical employees of

20    the seven Defendants (hereafter, "the Class") on October 25, 2013 in an 86-page order granting

21    Plaintiffs' amended class certification motion. *See* ECF No. 532. The Remaining Defendants

22    petitioned the Ninth Circuit to review that order under Federal Rule of Civil Procedure 23(f). After

23    full briefing, including the filing of an amicus brief by the National and California Chambers of

24    Commerce and the National Association of Manufacturing urging the Ninth Circuit to grant

25    review, the Ninth Circuit denied review on January 15, 2014. *See* ECF No. 594.

26          Meanwhile, in this Court, the Remaining Defendants filed a total of five motions for

27    summary judgment and filed motions to strike and to exclude the testimony of Plaintiffs' principal

28

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

expert on antitrust impact and damages, Dr. Edward Leamer, who opined that the total damages to the Class exceeded $3 billion in wages Class members would have earned in the absence of the anti-solicitation agreements.[1] The Court denied the motions for summary judgment on March 28, 2014, and on April 4, 2014, denied the motion to exclude Dr. Leamer and denied in large part the motion to strike Dr. Leamer's testimony. ECF Nos. 777, 788.

On April 24, 2014, counsel for Plaintiffs and counsel for Remaining Defendants sent a joint letter to the Court indicating that they had reached a settlement. *See* ECF No. 900. This settlement was reached two weeks before the Final Pretrial Conference and one month before the trial was set to commence.[2] Upon receipt of the joint letter, the Court vacated the trial date and pretrial deadlines and set a schedule for preliminary approval. *See* ECF No. 904. Shortly after counsel sent the letter, the media disclosed the total amount of the settlement, and this Court received three letters from individuals, not including Devine, objecting to the proposed settlement in response to media reports of the settlement amount.[3] *See* ECF No. 914. On May 22, 2014, in accordance with this Court's schedule, Plaintiffs filed their Motion for Preliminary Approval. *See* ECF No. 920. Devine filed an Opposition on June 5, 2014.[4] *See* ECF No. 934. Plaintiffs filed a Reply on June 12, 2014. *See* ECF No. 938. The Court held a hearing on June 19, 2014. *See* ECF No. 948. After the hearing, the Court received a letter from a Class member in opposition to the proposed settlement and two letters from Class members in support of the proposed settlement. *See* ECF Nos. 949-51.

---

[1] Dr. Leamer was subject to vigorous attack in the initial class certification motion, and this Court agreed with some of Defendants' contentions with respect to Dr. Leamer and thus rejected the initial class certification motion. *See* ECF No. 382 at 33-43.

[2] Defendants' motions in limine, Plaintiffs' motion to exclude testimony from certain experts, Defendants' motion to exclude testimony from certain experts, a motion to determine whether the per se or rule of reason analysis applied, and a motion to compel were pending at the time the settlement was reached.

[3] Plaintiffs in the instant Motion represent that two of the letters are from non-Class members and that the third letter is from a Class member who may be withdrawing his objection. *See* ECF No. 920 at 18 n.11. The objection has not been withdrawn at the time of this Order.

[4] Devine stated in his Opposition that the Opposition was designed to supersede a letter that he had previously sent to the Court. *See* ECF No. at 934 n.2. The Court did not receive any letter from Devine. Accordingly, the Court has considered only Devine's Opposition.

4

United States District Court
For the Northern District of California

## II.      LEGAL STANDARD

The Court must review the fairness of class action settlements under Federal Rule of Civil Procedure 23(e). The Rule states that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." The Rule requires the Court to "direct notice in a reasonable manner to all class members who would be bound by the proposal" and further states that if a settlement "would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)-(2). The principal purpose of the Court's supervision of class action settlements is to ensure "the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).

District courts have interpreted Rule 23(e) to require a two-step process for the approval of class action settlements: "the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004). At the final approval stage, the Ninth Circuit has stated that "[a]ssessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

In contrast to these well-established, non-exhaustive factors for final approval, there is relatively scant appellate authority regarding the standard that a district court must apply in reviewing a settlement at the preliminary approval stage. Some district courts, echoing commentators, have stated that the relevant inquiry is whether the settlement "falls within the range of possible approval" or "within the range of reasonableness." *In re Tableware Antitrust Litig.*, 484

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

F. Supp. 2d 1078, 1079 (N.D. Cal. 2007); *see also Cordy v. USS-Posco Indus.*, No. 12-553, 2013 WL 4028627, at *3 (N.D. Cal. Aug. 1, 2013) ("Preliminary approval of a settlement and notice to the proposed class is appropriate if the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with the range of possible approval." (internal quotation marks omitted)). To undertake this analysis, the Court "must consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014) (internal quotation marks omitted).

## III.     DISCUSSION

Pursuant to the terms of the instant settlement, Class members who have not already opted out and who do not opt out will relinquish their rights to file suit against the Remaining Defendants for the claims at issue in this case. In exchange, Remaining Defendants will pay a total of $324.5 million, of which Plaintiffs' counsel may seek up to 25% (approximately $81 million) in attorneys' fees, $1.2 million in costs, and $80,000 per class representative in incentive payments. In addition, the settlement allows Remaining Defendants a pro rata reduction in the total amount they must pay if more than 4% of Class members opt out after receiving notice.[5] Class members would receive an average of approximately $3,750[6] from the instant settlement if the Court were to grant all requested deductions and there were no further opt-outs.[7]

The Court finds the total settlement amount falls below the range of reasonableness. The Court is concerned that Class members recover less on a proportional basis from the instant

---

[5] Plaintiffs also assert that administration costs for the settlement would be $160,000.
[6] Devine calculated that Class members would receive an average of $3,573. The discrepancy between this number and the Court's calculation may result from the fact that Devine's calculation does not account for the fact that 147 individuals have already opted out of the Class. The Court's calculation resulted from subtracting the requested attorneys' fees ($81,125,000), costs ($1,200,000), incentive awards ($400,000), and estimated administration costs ($160,000) from the settlement amount ($324,500,000) and dividing the resulting number by the total number of remaining class members (64,466).
[7] If the Court were to deny any portion of the requested fees, costs, or incentive payments, this would increase individual Class members' recovery. If less than 4% of the Class were to opt out, that would also increase individual Class members' recovery.

6

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

settlement with Remaining Defendants than from the settlement with the Settled Defendants a year ago, despite the fact that the case has progressed consistently in the Class's favor since then. Counsel's sole explanation for this reduced figure is that there are weaknesses in Plaintiffs' case such that the Class faces a substantial risk of non-recovery. However, that risk existed and was even greater when Plaintiffs settled with the Settled Defendants a year ago, when class certification had been denied.

The Court begins by comparing the instant settlement with Remaining Defendants to the settlements with the Settled Defendants, in light of the facts that existed at the time each settlement was reached. The Court then discusses the relative strengths and weaknesses of Plaintiffs' case to assess the reasonableness of the instant settlement.

### A. Comparison to the Initial Settlements

#### 1. Comparing the Settlement Amounts

The Court finds that the settlements with the Settled Defendants provide a useful benchmark against which to analyze the reasonableness of the instant settlement. The settlements with the Settled Defendants led to a fund totaling $20 million. *See* ECF No. 915 at 3. In approving the settlements, the Court relied upon the fact that the Settled Defendants employed 8% of Class members and paid out 5% of the total Class compensation during the Class period. *See* ECF No. 539 at 16:20-22 (Plaintiffs' counsel's explanation at the preliminary approval hearing with the Settled Defendants that the 5% figure "giv[es] you a sense of how big a slice of the case this settlement is relative to the rest of the case"). If Remaining Defendants were to settle at the same (or higher) rate as the Settled Defendants, Remaining Defendants' settlement fund would need to total at least $380 million. This number results from the fact that Remaining Defendants paid out 95% of the Class compensation during the Class period, while Settled Defendants paid only 5% of the Class compensation during the Class period.[8]

At the hearing on the instant Motion, counsel for Remaining Defendants suggested that the

---

[8] One way to think about this is to set up the simple equation: $5/95 = \$20,000,000/x$. This equation asks the question of how much 95% would be if 5% were $20,000,000. Solving for x would result in $380,000,000.

7

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    relevant benchmark is not total Class compensation, but rather is total Class membership. This

2    would result in a benchmark figure for the Remaining Defendants of $230 million (92 divided by 8

3    is 11.5; 11.5 times $20 million is $230 million).[9] At a minimum, counsel suggested, the Court

4    should compare the settlement amount to a range of $230 million to $380 million, within which the

5    instant settlement falls. The Court rejects counsel's suggestion, which is contrary to the record.

6    Counsel has provided no basis for why the number of Class members employed by each Defendant

7    is a relevant metric. To the contrary, the relevant inquiry has always been total Class compensation.

8    For example, in both of the settlements with the Settled Defendants and in the instant settlement,

9    the Plans of Allocation call for determining each individual Class member's pay out by dividing

10   the Class member's compensation during the Class period by *the total Class compensation during*

11   *the Class period*. ECF No. 809 at 6 (noting that the denominator in the plan of allocation in the

12   settlements with the Settled Defendants is the "total of base salaries paid to all approved Claimants

13   in class positions during the Class period"); ECF No. 920 at 22 (same in the instant settlement); *see*

14   *also* ECF No. 539 at 16:20-22 (Plaintiffs' counsel's statement that percent of the total Class

15   compensation was relevant for benchmarking the settlements with the Settled Defendants to the

16   rest of the case). At no point in the record has the percentage of Class membership employed by

17   each Defendant ever been the relevant factor for determining damages exposure. Accordingly, the

18   Court rejects the metric proposed by counsel for Remaining Defendants. Using the Settled

19   Defendants' settlements as a yardstick, the appropriate benchmark settlement for the Remaining

20   Defendants would be at least $380 million, more than $50 million greater than what the instant

21   settlement provides.

22        Counsel for Remaining Defendants also suggested that benchmarking against the initial

23   settlements would be inappropriate because the magnitude of the settlement numbers for

24   Remaining Defendants dwarfs the numbers at issue in the Settled Defendants' settlements. This

25   argument is premised on the idea that Defendants who caused more damage to the Class and who

26   benefited more by suppressing a greater portion of class compensation should have to pay less than

27

28

---

[9] Again, 8/92 = $20,000,000/x would lead to x = $230,000,000.

8

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

1    Defendants who caused less damage and who benefited less from the allegedly wrongful conduct.

2    This argument is unpersuasive. Remaining Defendants are alleged to have received 95% of the

3    benefit of the anti-solicitation agreements and to have caused 95% of the harm suffered by the

4    Class in terms of lost compensation. Therefore, Remaining Defendants should have to pay at least

5    95% of the damages, which, under the instant settlement, they would not.

6        The Court also notes that had Plaintiffs prevailed at trial on their more than $3 billion

7    damages claim, antitrust law provides for automatic trebling, *see* 15 U.S.C. § 15(a), so the total

8    damages award could potentially have exceeded $9 billion. While the Ninth Circuit has not

9    determined whether settlement amounts in antitrust cases must be compared to the single damages

10   award requested by Plaintiffs or the automatically trebled damages amount, *see Rodriguez v. W.*

11   *Publ'g Corp.*, 563 F.3d 948, 964-65 (9th Cir. 2009), the instant settlement would lead to a total

12   recovery of 11.29% of the single damages proposed by Plaintiffs' expert or 3.76% of the treble

13   damages. Specifically, Dr. Leamer has calculated the total damages to the Class resulting from

14   Defendants' allegedly unlawful conduct as $3.05 billion. *See* ECF No. 856-10. If the Court

15   approves the instant settlements, the total settlements with all Defendants would be $344.5 million.

16   This total would amount to 11.29% of the single damages that Dr. Leamer opines the Class

17   suffered or 3.76% if Dr. Leamer's damages figure had been trebled.

18                  **2.      Relative Procedural Posture**

19       The discount that Remaining Defendants have received vis-à-vis the Settled Defendants is

20   particularly troubling in light of the changes in the procedural posture of the case between the two

21   settlements, changes that the Court would expect to have increased, rather than decreased,

22   Plaintiffs' bargaining power. Specifically, at the time the Settled Defendants settled, Plaintiffs were

23   at a particularly weak point in their case. Though Plaintiffs had survived Defendants' motion to

24   dismiss, Plaintiffs' motion for class certification had been denied, albeit without prejudice.

25   Plaintiffs had re-briefed the class certification motion, but had no class certification ruling in their

26   favor at the time they settled with the Settled Defendants. If the Court ultimately granted

27   certification, Plaintiffs also did not know whether the Ninth Circuit would grant Federal Rule of

28

9

United States District Court
For the Northern District of California

1    Civil Procedure 23(f) review and reverse the certification. Accordingly, at that point, Defendants

2    had significant leverage.

3        In contrast, the procedural posture of the case swung dramatically in Plaintiffs' favor after

4    the initial settlements were reached. Specifically, the Court certified the Class over the vigorous

5    objections of Defendants. In the 86-page order granting class certification, the Court repeatedly

6    referred to Plaintiffs' evidence as "substantial" and "extensive," and the Court stated that it "could

7    not identify a case at the class certification stage with the level of documentary evidence Plaintiffs

8    have presented in the instant case." ECF No. 531 at 69. Thereafter, the Ninth Circuit denied

9    Defendants' request to review the class certification order under Federal Rule of Civil Procedure

10   23(f). This Court also denied Defendants' five motions for summary judgment and denied

11   Defendants' motion to exclude Plaintiffs' principal expert on antitrust impact and damages. The

12   instant settlement was reached a mere two weeks before the final pretrial conference and one

13   month before a trial at which damaging evidence regarding Defendants would have been presented.

14       In sum, Plaintiffs were in a much stronger position at the time of the instant settlement—

15   after the Class had been certified, appellate review of class certification had been denied, and

16   Defendants' dispositive motions and motion to exclude Dr. Leamer's testimony had been denied—

17   than they were at the time of the settlements with the Settled Defendants, when class certification

18   had been denied. This shift in the procedural posture, which the Court would expect to have

19   increased Plaintiffs' bargaining power, makes the more recent settlements for a proportionally

20   lower amount even more troubling.

21       **B.    Strength of Plaintiffs' Case**

22       The Court now turns to the strength of Plaintiffs' case against the Remaining Defendants to

23   evaluate the reasonableness of the settlement.

24       At the hearing on the instant Motion, Plaintiffs' counsel contended that one of the reasons

25   the instant settlement was proportionally lower than the previous settlements is that the

26   documentary evidence against the Settled Defendants (particularly, Lucasfilm and Pixar) is more

27   compelling than the documentary evidence against the Remaining Defendants. As an initial matter,

28

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

the Court notes that relevant evidence regarding the Settled Defendants would be admissible at a trial against Remaining Defendants because Plaintiffs allege an overarching conspiracy that included all Defendants. Accordingly, evidence regarding the role of Lucasfilm and Pixar in the creation of and the intended effect of the overarching conspiracy would be admissible.

Nonetheless, the Court notes that Plaintiffs are correct that there are particularly clear statements from Lucasfilm and Pixar executives regarding the nature and goals of the alleged conspiracy. Specifically, Edward Catmull (Pixar President) conceded in his deposition that anti-solicitation agreements were in place because solicitation "messes up the pay structure." ECF No. 431-9 at 81. Similarly, George Lucas (former Lucasfilm Chairman of the Board and CEO) stated, "we cannot get into a bidding war with other companies because we don't have the margins for that sort of thing." ECF No. 749-23 at 9.

However, there is equally compelling evidence that comes from the documents of the Remaining Defendants. This is particularly true for Google and Apple, the executives of which extensively discussed and enforced the anti-solicitation agreements. Specifically, as discussed in extensive detail in this Court's previous orders, Steve Jobs (Co-Founder, Former Chairman, and Former CEO of Apple, Former CEO of Pixar), Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO), and Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google) were key players in creating and enforcing the anti-solicitation agreements. The Court now turns to the evidence against the Remaining Defendants that the finder of fact is likely to find compelling.

### 1. Evidence Related to Apple

There is substantial and compelling evidence that Steve Jobs (Co-Founder, Former Chairman, and Former CEO of Apple, Former CEO of Pixar) was a, if not the, central figure in the alleged conspiracy. Several witnesses, in their depositions, testified to Mr. Jobs' role in the anti-solicitation agreements. For example, Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) stated that Mr. Jobs "believed that you should not be hiring each others', you know, technical people" and that "it was inappropriate in [Mr. Jobs'] view for us

11

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

to be calling in and hiring people." ECF No. 819-12 at 77. Edward Catmull (Pixar President) stated that Mr. Jobs "was very adamant about protecting his employee force." ECF No. 431-9 at 97. Sergey Brin (Google Co-Founder) testified that "I think Mr. Jobs' view was that people shouldn't piss him off. And I think that things that pissed him off were—would be hiring, you know— whatever." ECF No. 639-1 at 112. There would thus be ample evidence Mr. Jobs was involved in expanding the original anti-solicitation agreement between Lucasfilm and Pixar to the other Defendants in this case. After the agreements were extended, Mr. Jobs played a central role in enforcing these agreements. Four particular sets of evidence are likely to be compelling to the fact-finder.

*First*, after hearing that Google was trying to recruit employees from Apple's Safari team, Mr. Jobs threatened Mr. Brin, stating, as Mr. Brin recounted, "if you hire a single one of these people that means war." ECF No. 833-15.[10] In an email to Google's Executive Management Team as well as Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google), Mr. Brin advised: "lets [sic] not make any new offers or contact new people at Apple until we have had a chance to discuss." *Id.* Mr. Campbell then wrote to Mr. Jobs: "Eric [Schmidt] told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple." ECF No. 746-5. As Mr. Brin testified in his deposition, "Eric made a—you know, a—you know, at least some kind of—had a conversation with Bill to relate to Steve to calm him down." ECF No. 639-1 at 61. As Mr. Schmidt put it, "Steve was unhappy, and Steve's unhappiness absolutely influenced the change we made in recruiting practice." ECF No. 819-12 at 21. Danielle Lambert (Apple's head of Human Resources) reciprocated to maintain Apple's end of the anti-solicitation agreements, instructing Apple recruiters: "Please add Google to your 'hands-off' list. We recently agreed not to recruit from one another so if you hear of any recruiting they are doing against us, please be sure to let me know." ECF No. 746-15.

---

[10] On the same day, Mr. Campbell sent an email to Mr. Brin and to Larry Page (Google Co-Founder) stating, "Steve just called me again and is pissed that we are still recruiting his browser guy." ECF No. 428-13. Mr. Page responded "[h]e called a few minutes ago and demanded to talk to me." *Id.*

12

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

*Second*, other Defendants' CEOs maintained the anti-solicitation agreements out of fear of and deference to Mr. Jobs. For example, in 2005, when considering whether to enter into an anti-solicitation agreement with Apple, Bruce Chizen (former Adobe CEO), expressed concerns about the loss of "top talent" if Adobe did not enter into an anti-solicitation agreement with Apple, stating, "if I tell Steve it's open season (other than senior managers), he will deliberately poach Adobe just to prove a point. Knowing Steve, he will go after some of our top Mac talent like Chris Cox and he will do it in a way in which they will be enticed to come (extraordinary packages and Steve wooing)."[11] ECF No. 297-15.

This was the genesis of the Apple-Adobe agreement. Specifically, after Mr. Jobs complained to Mr. Chizen on May 26, 2005 that Adobe was recruiting Apple employees, ECF No. 291-17, Mr. Chizen responded by saying, "I thought we agreed not to recruit any senior level employees . . . . I would propose we keep it that way. Open to discuss. It would be good to agree." *Id*. Mr. Jobs was not satisfied, and replied by threatening to send Apple recruiters after Adobe's employees: "OK, I'll tell our recruiters that they are free to approach any Adobe employee who is not a Sr. Director or VP. Am I understanding your position correctly?" *Id*. Mr. Chizen immediately gave in: "I'd rather agree NOT to actively solicit any employee from either company . . . . If you are in agreement I will let my folks know." *Id*. (emphasis in original). The next day, Theresa Townsley (Adobe Vice President Human Resources) announced to her recruiting team, "Bruce and Steve Jobs have an agreement that we are not to solicit ANY Apple employees, and vice versa." ECF No. 291-18 (emphasis in original). Adobe then placed Apple on its "[c]ompanies that are off limits" list, which instructed Adobe employees not to cold call Apple employees. ECF No. 291-11.

Google took even more drastic actions in response to Mr. Jobs. For example, when a recruiter from Google's engineering team contacted an Apple employee in 2007, Mr. Jobs forwarded the message to Mr. Schmidt and stated, "I would be very pleased if your recruiting department would stop doing this." ECF No. 291-23. Google responded by making a "public example" out of the recruiter and "terminat[ing] [the recruiter] within the hour." *Id*. The aim of this

---

[11] Mr. Jobs successfully expanded the anti-solicitation agreements to Macromedia, a company acquired by Adobe, both before and after Adobe's acquisition of Macromedia.

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

1   public spectacle was to "(hopefully) prevent future occurrences." *Id.* Once the recruiter was

2   terminated, Mr. Schmidt emailed Mr. Jobs, apologizing and informing Mr. Jobs that the recruiter

3   had been terminated. Mr. Jobs forwarded Mr. Schmidt's email to an Apple human resources

4   official and stated merely, ":)." ECF No. 746-9.

5        A year prior to this termination, Google similarly took seriously Mr. Jobs' concerns.

6   Specifically, in 2006, Mr. Jobs emailed Mr. Schmidt and said, "I am told that Googles [sic] new

7   cell phone software group is relentlessly recruiting in our iPod group. If this is indeed true, can you

8   put a stop to it?" ECF No. 291-24 at 3. After Mr. Schmidt forwarded this to Human Resources

9   professionals at Google, Arnnon Geshuri (Google Recruiting Director) prepared a detailed report

10  stating that an extensive investigation did not find a breach of the anti-solicitation agreement.

11       Similarly, in 2006, Google scrapped plans to open a Google engineering center in Paris

12  after a Google executive emailed Mr. Jobs to ask whether Google could hire three *former* Apple

13  engineers to work at the prospective facility, and Mr. Jobs responded "[w]e'd strongly prefer that

14  you not hire these guys." ECF No. 814-2. The whole interaction began with Google's request to

15  Steve Jobs for permission to hire Jean-Marie Hullot, an Apple engineer. The record is not clear

16  whether Mr. Hullot was a current or former Apple employee. A Google executive contacted Steve

17  Jobs to ask whether Google could make an offer to Mr. Hullot, and Mr. Jobs did not timely respond

18  to the Google executive's request. At this point, the Google executive turned to Intuit's Board

19  Chairman Bill Campbell as a potential ambassador from Google to Mr. Jobs. Specifically, the

20  Google executive noted that Mr. Campbell "is on the board at Apple and Google, so Steve will

21  probably return his call." ECF No. 428-6. The same day that Mr. Campbell reached out to Mr.

22  Jobs, Mr. Jobs responded to the Google executive, seeking more information on what exactly the

23  Apple engineer would be working. ECF No. 428-9. Once Mr. Jobs was satisfied, he stated that the

24  hire "would be fine with me." *Id.* However, two weeks later, when Mr. Hullot and a Google

25  executive sought Mr. Jobs' permission to hire four of Mr. Hullot's former Apple colleagues (three

26  were former Apple employees and one had given notice of impending departure from Apple), Mr.

27  Jobs promptly responded, indicating that the hires would not be acceptable. ECF No. 428-9.

28

United States District Court
For the Northern District of California

Google promptly scrapped the plan, and the Google executive responded deferentially to Mr. Jobs, stating, "Steve, Based on your strong preference that we not hire the ex-Apple engineers, Jean-Marie and I decided not to open a Google Paris engineering center." *Id.* The Google executive also forwarded the email thread to Mr. Brin, Larry Page (Google Co-Founder), and Mr. Campbell. *Id.*

*Third*, Mr. Jobs attempted (unsuccessfully) to expand the anti-solicitation agreements to Palm, even threatening litigation. Specifically, Mr. Jobs called Edward Colligan (former President and CEO of Palm) to ask Mr. Colligan to enter into an anti-solicitation agreement and threatened patent litigation against Palm if Palm refused to do so. ECF No. 293 ¶¶ 6-8. Mr. Colligan responded via email, and told Mr. Jobs that Mr. Jobs' "proposal that we agree that neither company will hire the other's employees, regardless of the individual's desires, is not only wrong, it is likely illegal." *Id.* at 4-5. Mr. Colligan went on to say that, "We can't dictate where someone will work, nor should we try. I can't deny people who elect to pursue their livelihood at Palm the right to do so simply because they now work for Apple, and I wouldn't want you to do that to current Palm employees." *Id.* at 5. Finally, Mr. Colligan wrote that "[t]hreatening Palm with a patent lawsuit in response to a decision by one employee to leave Apple is just out of line. A lawsuit would not serve either of our interests, and will not stop employees from migrating between our companies . . . . We will both just end up paying a lot of lawyers a lot of money." *Id.* at 5-6. Mr. Jobs wrote the following back to Mr. Colligan: "This is not satisfactory to Apple." *Id.* at 8. Mr. Jobs went on to write that "I'm sure you realize the asymmetry in the financial resources of our respective companies when you say: 'we will both just end up paying a lot of lawyers a lot of money.'" *Id.* Mr. Jobs concluded: "My advice is to take a look at our patent portfolio before you make a final decision here." *Id.*

*Fourth*, Apple's documents provide strong support for Plaintiffs' theory of impact, namely that rigid wage structures and internal equity concerns would have led Defendants to engage in structural changes to compensation structures to mitigate the competitive threat that solicitation would have posed. Apple's compensation data shows that, for each year in the Class period, Apple had a "job structure system," which included categorizing and compensating its workforce

15

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

1     according to a discrete set of company-wide job levels assigned to all salaried employees and four

2     associated sets of base salary ranges applicable to "Top," "Major," "National," and "Small"

3     geographic markets. ECF No. 745-7 at 14-15, 52-53; ECF No.517-16 ¶¶ 6, 10 & Ex. B. Every

4     salary range had a "min," "mid," and "max" figure. *See id.* Apple also created a Human Resources

5     and recruiting tool called "Merlin," which was an internal system for tracking employee records

6     and performance, and required managers to grade employees at one of four pre-set levels. *See* ECF

7     No. 749-6 at 142-43, 145-46; ECF No. 749-11 at 52-53; ECF No. 749-12 at 33. As explained by

8     Tony Fadell (former Apple Senior Vice President, iPod Division, and advisor to Steve Jobs),

9     Merlin "would say, this is the employee, this is the level, here are the salary ranges, and through

10    that tool we were then—we understood what the boundaries were." ECF No. 749-11 at 53. Going

11    outside these prescribed "guidelines" also required extra approval. ECF No. 749-7 at 217; ECF No.

12    749-11 at 53 ("And if we were to go outside of that, then we would have to pull in a bunch of

13    people to then approve anything outside of that range.").

14          Concerns about internal equity also permeated Apple's compensation program. Steven

15    Burmeister (Apple Senior Director of Compensation) testified that internal equity—which Mr.

16    Burmeister defined as the notion of whether an employee's compensation is "fair based on the

17    individual's contribution relative to the other employees in your group, or across your

18    organization"—inheres in some, "if not all," of the guidelines that managers consider in

19    determining starting salaries. ECF No. 745-7 at 61-64; ECF No. 753-12. In fact, as explained by

20    Patrick Burke (former Apple Technical Recruiter and Staffing Manager), when hiring a new

21    employee at Apple, "compar[ing] the candidate" to the other people on the team they would join

22    "was the biggest determining factor on what salary we gave." ECF No. 745-6 at 279.

23                **2.**      **Evidence Related to Google**

24          The evidence against Google is equally compelling. Email evidence reveals that Eric

25    Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO)

26    terminated at least two recruiters for violations of anti-solicitation agreements, and threatened to

27    terminate more. As discussed above, there is direct evidence that Mr. Schmidt terminated a

28

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

1    recruiter at Steve Jobs' behest after the recruiter attempted to solicit an Apple employee. Moreover,

2    in an email to Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple,

3    and advisor to Google), Mr. Schmidt indicated that he directed a for-cause termination of another

4    Google recruiter, who had attempted to recruit an executive of eBay, which was on Google's do-

5    not-cold-call list. ECF No. 814-14. Finally, as discussed in more detail below, Mr. Schmidt

6    informed Paul Otellini (CEO of Intel and Member of the Google Board of Directors) that Mr.

7    Schmidt would terminate any recruiter who recruited Intel employees.

8    Furthermore, Google maintained a formal "Do Not Call" list, which grouped together

9    Apple, Intel, and Intuit and was approved by top executives. ECF No. 291-28. The list also

10   included other companies, such as Genentech, Paypal, and eBay. *Id.* A draft of the "Do Not Call"

11   list was presented to Google's Executive Management Group, a committee consisting of Google's

12   senior executives, including Mr. Schmidt, Larry Page (Google Co-Founder), Sergey Brin (Google

13   Co-Founder), and Shona Brown (former Google Senior Vice President of Business Operations).

14   ECF No. 291-26. Mr. Schmidt approved the list. *See id.*; *see also* ECF No. 291-27 (email from Mr.

15   Schmidt stating: "This looks very good."). Moreover, there is evidence that Google executives

16   knew that the anti-solicitation agreements could lead to legal troubles, but nevertheless proceeded

17   with the agreements. When Ms. Brown asked Mr. Schmidt whether he had any concerns with

18   sharing information regarding the "Do Not Call" list with Google's competitors, Mr. Schmidt

19   responded that he preferred that it be shared "verbally[,] since I don't want to create a paper trail

20   over which we can be sued later?" ECF No. 291-40. Ms. Brown responded: "makes sense to do

21   orally. i agree." *Id.*

22   Google's response to competition from Facebook also demonstrates the impact of the

23   alleged conspiracy. Google had long been concerned about Facebook hiring's effect on retention.

24   For example, in an email to top Google executives, Mr. Brin in 2007 stated that "the facebook

25   phenomenon creates a real retention problem." ECF No. 814-4. A month later, Mr. Brin announced

26   a policy of making counteroffers within one hour to any Google employee who received an offer

27   from Facebook. ECF No. 963-2.

28

17

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

In March 2008, Arnnon Geshuri (Google Recruiting Director) discovered that non-party Facebook had been cold calling into Google's Site Reliability Engineering ("SRE") team. Mr. Geshuri's first response was to suggest contacting Sheryl Sandberg (Chief Operating Officer for non-party Facebook) in an effort to "ask her to put a stop to the targeted sourcing effort directed at our SRE team" and "to consider establishing a mutual 'Do Not Call' agreement that specifies that we will not cold-call into each other." ECF No. 963-3. Mr. Geshuri also suggested "look[ing] internally and review[ing] the attrition rate for the SRE group," stating, "[w]e may want to consider additional individual retention incentives or *team incentives* to keep attrition as low as possible in SRE." *Id.* (emphasis added). Finally, an alternative suggestion was to "[s]tart an aggressive campaign to call into their company and go after their folks—no holds barred. We would be unrelenting and a force of nature." *Id.* In response, Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google), in his capacity as an advisor to Google, suggested "Who should contact Sheryl [Sandberg] (or Mark [Zuckerberg]) to get a cease fire? We have to get a truce." *Id.* Facebook refused.

In 2010, Google altered its salary structure with a "Big Bang" in response to Facebook's hiring, which provides additional support for Plaintiffs' theory of antitrust impact. Specifically, after a period in which Google lost a significant number of employees to Facebook, Google began to study Facebook's solicitation of Google employees. ECF No. 190 ¶ 109. One month after beginning this study, Google announced its "Big Bang," which involved an increase to the base salary of *all* of its salaried employees by 10% and provided an immediate cash bonus of $1,000 to all employees. ECF No. 296-18. Laszlo Bock (Google Senior Vice President of People Operations) explained that the rationale for the Big Bang included: (1) being "responsive to rising attrition;" (2) supporting higher retention because "higher salaries generate higher fixed costs;" and (3) being "very strategic because start-ups don't have the cash flow to match, and big companies are (a) too worried about internal equity and scalability to do this and (b) don't have the margins to do this." ECF No. 296-20.

United States District Court
For the Northern District of California

Other Google documents provide further evidence of Plaintiffs' theory of antitrust impact. For example, Google's Chief Culture Officer stated that "[c]old calling into companies to recruit is to be expected unless they're on our 'don't call' list." ECF No. 291-41. Moreover, Google found that although referrals were the largest source of hires, "agencies and passively sourced candidates offer[ed] the highest yield." ECF No. 780-8. The spread of information between employees had there been active solicitations—which is central to Plaintiffs' theory of impact—is also demonstrated in Google's evidence. For example, one Google employee states that "[i]t's impossible to keep something like this a secret. The people getting counter offers talk, not just to Googlers and ex-Googlers, but also to the competitors where they received their offers (in the hopes of improving them), and those competitors talk too, using it as a tool to recruit more Googlers." ECF No. 296-23.

The wage structure and internal equity concerns at Google also support Plaintiffs' theory of impact. Google had many job families, many grades within job families, and many job titles within grades. *See, e.g.*, ECF No. 298-7, ECF No. 298-8; *see also* Cisneros Decl., Ex. S (Brown Depo.) at 74-76 (discussing salary ranges utilized by Google); ECF No. 780-4 at 25-26 (testifying that Google's 2007 salary ranges had generally the same structure as the 2004 salary ranges). Throughout the Class period, Google utilized salary ranges and pay bands with minima and maxima and either means or medians. ECF No. 958-1 ¶ 66; *see* ECF No. 427-3 at 15-17. As explained by Shona Brown (former Google Senior Vice President, Business Operations), "if you discussed a specific role [at Google], you could understand that role was at a specific level on a certain job ladder." ECF No. 427-3 at 27-28; ECF No. 745-11. Frank Wagner (Google Director of Compensation) testified that he could locate the target salary range for jobs at Google through an internal company website. *See* ECF No. 780-4 at 31-32 ("Q: And if you wanted to identify what the target salary would be for a certain job within a certain grade, could you go online or go to some place . . . and pull up what that was for that job family and that grade? . . . A: Yes."). Moreover, Google considered internal equity to be an important goal. Google utilized a salary algorithm in part for the purpose of "[e]nsur[ing] internal equity by managing salaries within a

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

1   reasonable range." ECF No. 814-19. Furthermore, because Google "strive[d] to achieve fairness in

2   overall salary distribution," "high performers with low salaries [would] get larger percentage

3   increases than high performers with high salaries." ECF No. 817-1 at 15.

4       In addition, Google analyzed and compared its equity compensation to Apple, Intel, Adobe,

5   and Intuit, among other companies, each of which it designated as a "peer company" based on

6   meeting criteria such as being a "high-tech company," a "high-growth company," and a "key labor

7   market competitor." ECF No. 773-1. In 2007, based in part on an analysis of Google as compared

8   to its peer companies, Mr. Bock and Dave Rolefson (Google Equity Compensation Manager) wrote

9   that "[o]ur biggest labor market competitors are significantly exceeding their own guidelines to

10  beat Google for talent." *Id.*

11      Finally, Google's own documents undermine Defendants' principal theory of lack of

12  antitrust impact, that compensation decisions would be one off and not classwide. Alan Eustace

13  (Google Senior Vice President) commented on concerns regarding competition for workers and

14  Google's approach to counteroffers by noting that, "it sometimes makes sense to make changes in

15  compensation, even if it introduces discontinuities in your current comp, to save your best people,

16  and send a message to the hiring company that we'll fight for our best people." ECF No. 296-23.

17  Because recruiting "a few really good people" could inspire "many, many others [to] follow," Mr.

18  Eustace concluded, "[y]ou can't afford to be a rich target for other companies." *Id.* According to

19  him, the "long-term . . . right approach is not to deal with these situations as one-off's but to have a

20  *systematic approach* to compensation that makes it very difficult for anyone to get a better offer."

21  *Id.* (emphasis added).

22      Google's impact on the labor market before the anti-solicitation agreements was best

23  summarized by Meg Whitman (former CEO of eBay) who called Mr. Schmidt "to talk about

24  [Google's] hiring practices." ECF No. 814-15. As Eric Schmidt told Google's senior executives,

25  Ms. Whitman said "Google is the talk of the valley because [you] are driving up salaries across the

26  board." *Id.* A year after this conversation, Google added eBay to its do-not-cold-call list. ECF No.

27  291-28.

28

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

### 3. Evidence Related to Intel

There is also compelling evidence against Intel. Google reacted to requests regarding enforcement of the anti-solicitation agreement made by Intel executives similarly to Google's reaction to Steve Jobs' request to enforce the agreements discussed above. For example, after Paul Otellini (CEO of Intel and Member of the Google Board of Directors) received an internal complaint regarding Google's successful recruiting efforts of Intel's technical employees on September 26, 2007, ECF No. 188-8 ("Paul, I am losing so many people to Google . . . . We are countering but thought you should know."), Mr. Otellini forwarded the email to Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) and stated "Eric, can you pls help here???" *Id.* Mr. Schmidt obliged and forwarded the email to his recruiting team, who prepared a report for Mr. Schmidt on Google's activities. ECF No. 291-34. The next day, Mr. Schmidt replied to Mr. Otellini, "If we find that a recruiter called into Intel, we will terminate the recruiter," the same remedy afforded to violations of the Apple-Google agreement. ECF No. 531 at 37. In another email to Mr. Schmidt, Mr. Otellini stated, "Sorry to bother you again on this topic, but my guys are very troubled by Google continuing to recruit our key players." *See* ECF No. 428-8.

Moreover, Mr. Otellini was aware that the anti-solicitation agreement could be legally troublesome. Specifically, Mr. Otellini stated in an email to another Intel executive regarding the Google-Intel agreement: "Let me clarify. We have nothing signed. We have a handshake 'no recruit' between eric and myself. I would not like this broadly known." *Id.*

Furthermore, there is evidence that Mr. Otellini knew of the anti-solicitation agreements to which Intel was not a party. Specifically, both Sergey Brin (Google Co-Founder) and Mr. Schmidt of Google testified that they would have told Mr. Otellini that Google had an anti-solicitation agreement with Apple. ECF No. 639-1 at 74:15 ("I'm sure that we would have mentioned it[.]"); ECF No. 819-12 at 60 ("I'm sure I spoke with Paul about this at some point."). Intel's own expert testified that Mr. Otellini was likely aware of Google's other bilateral agreements by virtue of Mr. Otellini's membership on Google's board. ECF No. 771 at 4. The fact that Intel was added to

21

1    Google's do-not-cold-call list on the same day that Apple was added further suggests Intel's

2    participation in an overarching conspiracy. ECF No. 291-28.

3        Additionally, notwithstanding the fact that Intel and Google were competitors for talent,

4    Mr. Otellini "lifted from Google" a Google document discussing the bonus plans of peer

5    companies including Apple and Intel. Cisneros Decl., Ex. 463. True competitors for talent would

6    not likely share such sensitive bonus information absent agreements not to compete.

7        Moreover, key documents related to antitrust impact also implicate Intel. Specifically, Intel

8    recognized the importance of cold calling and stated in its "Complete Guide to Sourcing" that

9    "[Cold] [c]alling candidates is one of the most efficient and effective ways to recruit." ECF No.

10   296-22. Intel also benchmarked compensation against other "tech companies generally considered

11   comparable to Intel," which Intel defined as a "[b]lend of semiconductor, software, networking,

12   communications, and diversified computer companies." ECF No. 754-2. According to Intel, in

13   2007, these comparable companies included Apple and Google. *Id.* These documents suggest, as

14   Plaintiffs contend, that the anti-solicitation agreements led to structural, rather than individual

15   depression, of Class members' wages.

16       Furthermore, Intel had a "compensation structure," with job grades and job classifications.

17   *See* ECF No. 745-13 at 73 ("[W]e break jobs into one of three categories—job families, we call

18   them—R&D, tech, and nontech, there's a lot more . . . ."). The company assigned employees to a

19   grade level based on their skills and experience. ECF No. 745-11 at 23; *see also* ECF No. 749-17 at

20   45 (explaining that everyone at Intel is assigned a "classification" similar to a job grade). Intel

21   standardized its salary ranges throughout the company; each range applied to multiple jobs, and

22   most jobs spanned multiple salary grades. ECF No. 745-16 at 59. Intel further broke down its

23   salary ranges into quartiles, and compensation at Intel followed "a bell-curve distribution, where

24   most of the employees are in the middle quartiles, and a much smaller percentage are in the bottom

25   and top quartiles." *Id.* at 62-63.

26        Intel also used a software tool to provide guidance to managers about an employee's pay

27   range which would also take into account market reference ranges and merit. ECF No. 758-9. As

28

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

explained by Randall Goodwin (Intel Technology Development Manager), "[i]f the tool recommended something and we thought we wanted to make a proposed change that was outside its guidelines, we would write some justification." ECF No. 749-15 at 52. Similarly, Intel regularly ran reports showing the salary range distribution of its employees. ECF No. 749-16 at 64.

The evidence also supports the rigidity of Intel's wage structure. For example, in a 2004 Human Resources presentation, Intel states that, although "[c]ompensation differentiation is desired by Intel's Meritocracy philosophy," "short and long term high performer differentiation is questionable." ECF No. 758-10 at 13. Indeed, Intel notes that "[l]ack of differentiation has existed historically based on an analysis of '99 data." *Id*. at 19. As key "[v]ulnerability [c]hallenges," Intel identifies: (1) "[m]anagers *(in)ability* to distinguish at [f]ocal"—"actual merit increases are significantly reduced from system generated increases," "[l]ong term threat to retention of key players"; (2) "*[l]ittle to no actual pay differentiation for HPs* [high performers]"; and (3) "[n]o explicit strategy to differentiate." *Id*. at 24 (emphasis added).

In addition, Intel used internal equity "to determine wage rates for new hires and current employees that correspond to each job's relative value to Intel." ECF No. 749-16 at 210-11; ECF No. 961-5. To assist in that process, Intel used a tool that generates an "Internal Equity Report" when making offers to new employees. ECF No. 749-16 at 212-13. In the words of Ogden Reid (Intel Director of Compensation and Benefits), "[m]uch of our culture screams egalitarianism . . . . While we play lip service to meritocracy, we really believe more in treating everyone the same within broad bands." ECF No. 769-8.

An Intel human resources document from 2002—prior to the anti-solicitation agreements—recognized "continuing inequities in the alignment of base salaries/EB targets between hired and acquired Intel employees" and "parallel issues relating to accurate job grading within these two populations." ECF No. 750-15. In response, Intel planned to: (1) "Review exempt job grade assignments for job families with 'critical skills.' Make adjustments, as appropriate"; and (2) "Validate perception of inequities . . . . Scope impact to employees. Recommend adjustments, as

United States District Court
For the Northern District of California

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

appropriate." *Id.* An Intel human resources document confirms that, in or around 2004, "[n]ew hire salary premiums *drove* salary range adjustment." ECF No. 298-5 at 7 (emphasis added).

Intel would "match an Intel job code in grade to a market survey job code in grade," ECF No. 749-16 at 89, and use that as part of the process for determining its "own focal process or pay delivery," *id.* at 23. If job codes fell below the midpoint, plus or minus a certain percent, the company made "special market adjustment[s]." *Id.* at 90.

### 4. Evidence Related to Adobe

Evidence from Adobe also suggests that Adobe was aware of the impact of its anti-solicitation agreements. Adobe personnel recognized that "Apple would be a great target to look into" for the purpose of recruiting, but knew that they could not do so because, "[u]nfortunately, Bruce [Chizen (former Adobe CEO)] and Apple CEO Steve Jobs have a gentleman's agreement not to poach each other's talent." ECF No. 291-13. Adobe executives were also part and parcel of the group of high-ranking executives that entered into, enforced, and attempted to expand the anti-solicitation agreements. Specifically, Mr. Chizen, in response to discovering that Apple was recruiting employees of Macromedia (a separate entity that Adobe would later acquire), helped ensure, through an email to Mr. Jobs, that Apple would honor Apple's pre-existing anti-solicitation agreements with both Adobe and Macromedia after Adobe's acquisition of Macromedia. ECF No. 608-3 at 50.

Adobe viewed Google and Apple to be among its top competitors for talent and expressed concern about whether Adobe was "winning the talent war." ECF No. 296-3. Adobe further considered itself in a "six-horse race from a benefits standpoint," which included Google, Apple, and Intuit as among the other "horses." *See* ECF No. 296-4. In 2008, Adobe benchmarked its compensation against nine companies including Google, Apple, and Intel. ECF No. 296-4; *cf.* ECF No. 652-6 (showing that, in 2010, Adobe considered Intuit to be a "direct peer," and considered Apple, Google, and Intel to be "reference peers," though Adobe did not actually benchmark compensation against these latter companies).

Nevertheless, despite viewing other Defendants as competitors, evidence from Adobe suggests that Adobe had knowledge of the bilateral agreements to which Adobe was not a party. Specifically, Adobe shared confidential compensation information with other Defendants, despite the fact that Adobe viewed at least some of the other Defendants as competitors and did not have a bilateral agreement with them. For example, HR personnel at Intuit and at Adobe exchanged information labeled "confidential" regarding how much compensation each firm would give and to which employees that year. ECF No. 652-8. Adobe and Intuit shared confidential compensation information even though the two companies had no bilateral anti-solicitation agreement, and Adobe viewed Intuit as a direct competitor for talent. Such direct competitors for talent would not likely share such sensitive compensation information in the absence of an overarching conspiracy.

Meanwhile, Google circulated an email that expressly discussed how its "budget is comparable to other tech companies" and compared the precise percentage of Google's merit budget increases to that of Adobe, Apple, and Intel. ECF No. 807-13. Google had Adobe's precise percentage of merit budget increases even though Google and Adobe had no bilateral anti-solicitation agreement. Such sharing of sensitive compensation information among competitors is further evidence of an overarching conspiracy.

Adobe recognized that in the absence of the anti-solicitation agreements, pay increases would be necessary, echoing Plaintiffs' theory of impact. For example, out of concern that one employee—a "star performer" due to his technical skills, intelligence, and collaborative abilities— might leave Adobe because "he could easily get a great job elsewhere if he desired," Adobe considered how best to retain him. ECF No. 799-22. In so doing, Adobe expressed concern about the fact that this employee had already interviewed with four other companies and communicated with friends who worked there. *Id.* Thus, Adobe noted that the employee "was aware of his value in the market" as well as the fact that the employee's friends from college were "making approximately $15k more per year than he [wa]s." *Id.* In response, Adobe decided to give the employee an immediate pay raise. *Id.*

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

Plaintiffs' theory of impact is also supported by evidence that every job position at Adobe was assigned a job title, and every job title had a corresponding salary range within Adobe's salary structure, which included a salary minimum, middle, and maximum. *See* ECF No. 804-17 at 4, 8, 72, 85-86. Adobe expected that the distribution of its existing employees' salaries would fit "a bell curve." ECF No. 749-5 at 57. To assist managers in staying within the prescribed ranges for setting and adjusting salaries, Adobe had an online salary planning tool as well as salary matrices, which provided managers with guidelines based on market salary data. *See* ECF No. 804-17 at 29-30 ("[E]ssentially the salary planning tool is populated with employee information for a particular manager, so the employees on their team [sic]. You have the ability to kind of look at their current compensation. It shows them what the range is for the current role that they're in . . . . The tool also has the ability to provide kind of the guidelines that we recommend in terms of how managers might want to think about spending their allocated budget."). Adobe's practice, if employees were below the minimum recommended salary range, was to "adjust them to the minimum as part of the annual review" and "red flag them." *Id*. at 12. Deviations from the salary ranges would also result in conversations with managers, wherein Adobe's officers explained, "we have a minimum for a reason because we believe you need to be in this range to be competitive." *Id.*

Internal equity was important at Adobe, as it was at other Defendants. As explained by Debbie Streeter (Adobe Vice President, Total Rewards), Adobe "always look[ed] at internal equity as a data point, because if you are going to go hire somebody externally that's making . . . more than somebody who's an existing employee that's a high performer, you need to know that before you bring them in." ECF No.749-5 at 175. Similarly, when considering whether to extend a counteroffer, Adobe advised "internal equity should ALWAYS be considered." ECF No. 746-7 at 5.

Moreover, Donna Morris (Adobe Senior Vice President, Global Human Resources Division) expressed concern "about internal equity due to compression (the market driving pay for new hires above the current employees)." ECF No. 298-9 ("Reality is new hires are requiring base pay at or above the midpoint due to an increasingly aggressive market."). Adobe personnel stated

1     that, because of the fixed budget, they may not be able to respond to the problem immediately "but

2     could look at [compression] for FY2006 if market remains aggressive."[12] *Id.*

### D. Weaknesses in Plaintiffs' Case

4     Plaintiffs contend that though this evidence is compelling, there are also weaknesses in

5     Plaintiffs' case that make trial risky. Plaintiffs contend that these risks are substantial. Specifically,

6     Plaintiffs point to the following challenges that they would have faced in presenting their case to a

7     jury: (1) convincing a jury to find a single overarching conspiracy among the seven Defendants in

8     light of the fact that several pairs of Defendants did not have anti-solicitation agreements with each

9     other; (2) proving damages in light of the fact that Defendants intended to present six expert

10     economists that would attack the methodology of Plaintiffs' experts; and (3) overcoming the fact

11     that Class members' compensation has increased in the last ten years despite a sluggish economy

12     and overcoming general anti-tech worker sentiment in light of the perceived and actual wealth of

13     Class members. Plaintiffs also point to outstanding legal issues, such as the pending motions in

14     limine and the pending motion to determine whether the per se or rule of reason analysis should

15     apply, which could have aided Defendants' ability to present a case that the bilateral agreements

16     had a pro-competitive purpose. *See* ECF No. 938 at 10-14.

17     The Court recognizes that Plaintiffs face substantial risks if they proceed to trial.

18     Nonetheless, the Court cannot, in light of the evidence above, conclude that the instant settlement

19     amount is within the range of reasonableness, particularly compared to the settlements with the

20     Settled Defendants and the subsequent development of the litigation. The Court further notes that

21     there is evidence in the record that mitigate at least some of the weaknesses in Plaintiffs' case.

---

[12] Adobe also benchmarked compensation off external sources, which supports Plaintiffs' theory of Class-wide impact and undermines Defendants' theory that the anti-solicitation agreements had only one off, non-structural effects. For example, Adobe pegged its compensation structure as a "percentile" of average market compensation according to survey data from companies such as Radford. ECF No. 804-17 at 4. Mr. Chizen explained that the particular market targets that Adobe used as benchmarks for setting salary ranges "tended to be software, high-tech, those that were geographically similar to wherever the position existed." ECF No. 962-7 at 22. This demonstrated that the salary structures of the various Defendants were linked, such that the effect of one Defendant's salary structure would ripple across to the other Defendants through external sources like Radford.

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

1    As to proving an overarching conspiracy, several pieces of evidence undermine

2    Defendants' contentions that the bilateral agreements were unrelated to each other. Importantly,

3    two individuals, Steve Jobs (Co-Founder, Former Chairman, and Former CEO of Apple) and Bill

4    Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to

5    Google), personally entered into or facilitated each of the bilateral agreements in this case.

6    Specifically, Mr. Jobs and George Lucas (former Chairman and CEO of Lucasfilm), created the

7    initial anti-solicitation agreement between Lucasfilm and Pixar when Mr. Jobs was an executive at

8    Pixar. Thereafter, Apple, under the leadership of Mr. Jobs, entered into an agreement with Pixar,

9    which, as discussed below, Pixar executives compared to the Lucasfilm-Pixar agreement. It was

10   Mr. Jobs again, who, as discussed above, reached out to Sergey Brin (Google Co-Founder) and

11   Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO)

12   to create the Apple-Google agreement. This agreement was reached with the assistance of Mr.

13   Campbell, who was Intuit's Board Chairman, a friend of Mr. Jobs, and an advisor to Google. The

14   Apple-Google agreement was discussed at Google Board meetings, at which both Mr. Campbell

15   and Paul Otellini (Chief Executive Officer of Intel and Member of the Google Board of Directors)

16   were present. ECF No. 819-10 at 47. After discussions between Mr. Brin and Mr. Otellini and

17   between Mr. Schmidt and Mr. Otellini, Intel was added to Google's do-not-cold-call list. Mr.

18   Campbell then used his influence at Google to successfully lobby Google to add Intuit, of which

19   Mr. Campbell was Chairman of the Board of Directors, to Google's do-not-cold-call list. *See* ECF

20   No. 780-6 at 8-9. Moreover, it was a mere two months after Mr. Jobs entered into the Apple-

21   Google agreement that Apple pressured Bruce Chizen (former CEO of Adobe) to enter into an

22   Apple-Adobe agreement. ECF No. 291-17. As this discussion demonstrates, Mr. Jobs and Mr.

23   Campbell were the individuals most closely linked to the formation of each step of the alleged

24   conspiracy, as they were present in the process of forming each of the links.

25   In light of the overlapping nature of this small group of executives who negotiated and

26   enforced the anti-solicitation agreements, it is not surprising that these executives knew of the other

27   bilateral agreements to which their own firms were not a party. For example, both Mr. Brin and

28

28

1    Mr. Schmidt of Google testified that they would have told Mr. Otellini of Intel that Google had an

2    anti-solicitation agreement with Apple. ECF No. 639-1 at 74:15 ("I'm sure we would have

3    mentioned it[.]"); ECF No. 819-12 at 60 ("I'm sure I spoke with Paul about this at some point.").

4    Intel's own expert testified that Mr. Otellini was likely aware of Google's other bilateral

5    agreements by virtue of Mr. Otellini's membership on Google's board. ECF No. 771 at 4.

6    Moreover, Google recruiters knew of the Adobe-Apple agreement. *Id.* (Google recruiter's notation

7    that Apple has "a serious 'hands-off' policy with Adobe"). In addition, Mr. Schmidt of Google

8    testified that it would be "fair to extrapolate" based on Mr. Schmidt's knowledge of Mr. Jobs, that

9    Mr. Jobs "would have extended [anti-solicitation agreements] to others." ECF No. 638-8 at 170.

10    Furthermore, it was this same mix of top executives that successfully and unsuccessfully attempted

11    to expand the agreement to other companies in Silicon Valley, such as eBay, Facebook,

12    Macromedia, and Palm, as discussed above, suggesting that the agreements were neither isolated

13    nor one off agreements.

14        In addition, the six bilateral agreements contained nearly identical terms, precluding each

15    pair of Defendants from affirmatively soliciting any of each other's employees. ECF No. 531 at 30.

16    Moreover, as discussed above, Defendants recognized the similarity of the agreements. For

17    example, Google lumped together Apple, Intel, and Intuit on Google's "do-not-cold-call" list.

18    Furthermore, Google's "do-not-cold-call" list stated that the Apple-Google agreement and the

19    Intel-Google agreement commenced on the same date. Finally, in an email, Lori McAdams (Pixar

20    Vice President of Human Resources and Administration), explicitly compared the anti-solicitation

21    agreements, stating that "effective now, we'll follow a gentleman's agreement with Apple that is

22    similar to our Lucasfilm agreement." ECF No. 531 at 26.

23        As to the contention that Plaintiffs would have to rebut Defendants' contentions that the

24    anti-solicitation agreements aided collaborations and were therefore pro-competitive, there is no

25    documentary evidence that links the anti-solicitation agreements to any collaboration. None of the

26    documents that memorialize collaboration agreements mentions the broad anti-solicitation

27    agreements, and none of the documents that memorialize broad anti-solicitation agreements

28

29

United States District Court
For the Northern District of California

1    mentions collaborations. Furthermore, even Defendants' experts conceded that those closest to the

2    collaborations did not know of the anti-solicitation agreements. ECF No. 852-1 at 8. In addition,

3    Defendants' top executives themselves acknowledge the lack of any collaborative purpose. For

4    example, Mr. Chizen of Adobe admitted that the Adobe-Apple anti-solicitation agreement was "not

5    limited to any particular projects on which Apple and Adobe were collaborating." ECF No. 962-7

6    at 42. Moreover, the U.S. Department of Justice ("DOJ") also determined that the anti-solicitation

7    agreements "were not ancillary to any legitimate collaboration," "were broader than reasonably

8    necessary for the formation or implementation of any collaborative effort," and "disrupted the

9    normal price-setting mechanisms that apply in the labor setting." ECF No. 93-1 ¶ 16; ECF No. 93-

10   4 ¶ 7. The DOJ concluded that Defendants entered into agreements that were restraints of trade that

11   were per se unlawful under the antitrust laws. ECF No. 93-1 ¶ 35; ECF No. 93-4 ¶ 3. Thus, despite

12   the fact that Defendants have claimed since the beginning of this litigation that there were pro-

13   competitive purposes related to collaborations for the anti-solicitation agreements and despite the

14   fact that the purported collaborations were central to Defendants' motions for summary judgment,

15   Defendants have failed to produce persuasive evidence that these anti-solicitation agreements

16   related to collaborations or were pro-competitive.

17   **IV.    CONCLUSION**

18          This Court has lived with this case for nearly three years, and during that time, the Court

19   has reviewed a significant number of documents in adjudicating not only the substantive motions,

20   but also the voluminous sealing requests. Having done so, the Court cannot conclude that the

21   instant settlement falls within the range of reasonableness. As this Court stated in its summary

22   judgment order, there is ample evidence of an overarching conspiracy between the seven

23   Defendants, including "[t]he similarities in the various agreements, the small number of

24   intertwining high-level executives who entered into and enforced the agreements, Defendants'

25   knowledge about the other agreements, the sharing and benchmarking of confidential

26   compensation information among Defendants and even between firms that did not have bilateral

27   anti-solicitation agreements, along with Defendants' expansion and attempted expansion of the

28

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

anti-solicitation agreements." ECF No. 771 at 7-8. Moreover, as discussed above and in this Court's class certification order, the evidence of Defendants' rigid wage structures and internal equity concerns, along with statements from Defendants' own executives, are likely to prove compelling in establishing the impact of the anti-solicitation agreements: a Class-wide depression of wages.

In light of this evidence, the Court is troubled by the fact that the instant settlement with Remaining Defendants is proportionally lower than the settlements with the Settled Defendants. This concern is magnified by the fact that the case evolved in Plaintiffs' favor since those settlements. At the time those settlements were reached, Defendants still could have defeated class certification before this Court, Defendants still could have successfully sought appellate review and reversal of any class certification, Defendants still could have prevailed on summary judgment, or Defendants still could have succeeded in their attempt to exclude Plaintiffs' principal expert. In contrast, the instant settlement was reached a mere month before trial was set to commence and after these opportunities for Defendants had evaporated. While the unpredictable nature of trial would have undoubtedly posed challenges for Plaintiffs, the exposure for Defendants was even more substantial, both in terms of the potential of more than $9 billion in damages and in terms of other collateral consequences, including the spotlight that would have been placed on the evidence discussed in this Order and other evidence and testimony that would have been brought to light. The procedural history and proximity to trial should have increased, not decreased, Plaintiffs' leverage from the time the settlements with the Settled Defendants were reached a year ago.

The Court acknowledges that Class counsel have been zealous advocates for the Class and have funded this litigation themselves against extraordinarily well-resourced adversaries. Moreover, there very well may be weaknesses and challenges in Plaintiffs' case that counsel cannot reveal to this Court. Nonetheless, the Court concludes that the Remaining Defendants should, at a minimum, pay their fair share as compared to the Settled Defendants, who resolved their case with Plaintiffs at a stage of the litigation where Defendants had much more leverage over Plaintiffs.

United States District Court
For the Northern District of California

1          For the foregoing reasons, the Court DENIES Plaintiffs' Motion for Preliminary Approval

2    of the settlements with Remaining Defendants. The Court further sets a Case Management

3    Conference for September 10, 2014 at 2 p.m.

4    **IT IS SO ORDERED.**

5

6    Dated: August 8, 2014    _____

7                                                    LUCY H. KOH

                                              United States District Judge

**United States District Court**
For the Northern District of California

32

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

# JUNE 19, 2014 HEARING TRANSCRIPT

**Page 1**

1

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5
      IN RE:  HIGH-TECH EMPLOYEE      )  C-11-02509 LHK
 6    ANTITRUST LITIGATION,           )
                                      )  SAN JOSE, CALIFORNIA
 7    _____ )
                                      )  JUNE 19, 2014
 8    THIS DOCUMENT RELATES TO:       )
      ALL ACTIONS                     )  PAGES 1-76
 9    _____ )

10

11            TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE LUCY H. KOH
12           UNITED STATES DISTRICT JUDGE

13    A P P E A R A N C E S :

14    FOR THE PLAINTIFFS:   JOSEPH SAVERI LAW FIRM
                            BY:  JOSEPH SAVERI
15                          255 CALIFORNIA STREET, SUITE 450
                            SAN FRANCISCO, CALIFORNIA  94111
16
                            LIEFF, CABRASER,
17                          HEIMANN & BERNSTEIN
                            BY:  KELLY M. DERMODY
18                          BRENDAN P. GLACKIN
                            DEAN M. HARVEY
19                          275 BATTERY STREET, 30TH FLOOR
                            SAN FRANCISCO, CALIFORNIA  94111
20

21            APPEARANCES CONTINUED ON NEXT PAGE

22

23    OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED WITH COMPUTER
```

UNITED STATES COURT REPORTERS

**Page 2**

2

```
 1    APPEARANCES (CONTINUED)

 2    FOR THE PLAINTIFFS:    JOSEPH SAVERI LAW FIRM
                            BY:  JOSEPH R. SAVERI
 3                          505 MONTGOMERY STREET, SUITE 625
                            SAN FRANCISCO, CALIFORNIA  94111
 4
 5    FOR DEFENDANT        KEKER & VAN NEST
      GOOGLE:              BY:  ROBERT A. VAN NEST
 6                          JUSTINA K. SESSIONS
                            633 BATTERY STREET
 7                          SAN FRANCISCO, CALIFORNIA  94111

 8    FOR DEFENDANT        O'MELVENY & MYERS
      APPLE:               BY:  GEORGE A. RILEY
 9                          CHRISTINA BROWN
                            TWO EMBARCADERO CENTER
10                          28TH FLOOR
                            SAN FRANCISCO, CALIFORNIA  94111
11
      FOR DEFENDANTS       JONES DAY
12    ADOBE:               BY:  LIN W. KAHN
                            555 CALIFORNIA STREET, 26TH FLOOR
13                          SAN FRANCISCO, CALIFORNIA  94104

14    FOR DEFENDANT        MUNGER, TOLLES & OLSEN
      INTEL:               BY:  STEVEN M. PERRY
15                          355 SOUTH GRAND AVENUE, 35TH FLOOR
                            LOS ANGELES, CALIFORNIA  90071
16

17    FOR MICHAEL DEVINE:   GIRARD GIBBS
                            BY:  DANIEL C. GIRARD
18                          601 CALIFORNIA STREET, 14TH FLOOR
                            SAN FRANCISCO, CALIFORNIA  94108

19

20

21

22

23

24

25
```

UNITED STATES COURT REPORTERS

**Page 3**

3

```
            1    SAN JOSE, CALIFORNIA          JUNE 19, 2014

            2              P R O C E E D I N G S

01:50PM     3       (COURT CONVENED AT 1:50 P.M.)

01:50PM     4       THE CLERK:  CALLING CASE NUMBER C-11-02509 LHK, IN

01:50PM     5    RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION.

01:50PM     6       MS. DERMODY:  GOOD AFTERNOON, YOUR HONOR.

01:50PM     7    KELLY DERMODY FROM LEIFF CABRASER.  WITH ME ARE MY PARTNERS,

01:50PM     8    BRENDAN GLACKIN AND DEAN HARVEY.

01:50PM     9       MR. SAVERI:  GOOD AFTERNOON, YOUR HONOR.

01:50PM    10    JOSEPH SAVERI.

01:51PM    11       MR. GIRARD:  GOOD AFTERNOON.  I'M DAN GIRARD

01:51PM    12    APPEARING FOR CLASS REPRESENTATIVE MICHAEL DEVINE.

01:51PM    13       THE COURT:  OKAY.

01:51PM    14       MR. VAN NEST:  GOOD AFTERNOON, YOUR HONOR.

01:51PM    15    BOB VAN NEST, KEKER & VAN NEST, HERE FOR GOOGLE, AND I'M HERE

01:51PM    16    WITH JUSTINA SESSIONS.

01:51PM    17       THE COURT:  OKAY.

01:51PM    18       MR. RILEY:  GOOD AFTERNOON, YOUR HONOR.  GEORGE RILEY

01:51PM    19    OF O'MELVENY & MYERS.  I REPRESENT APPLE.  I'M HERE WITH MY

01:51PM    20    COLLEAGUE, CHRISTINA BROWN.

01:51PM    21       MS. KAHN:  GOOD AFTERNOON.  LIN KAHN FROM JONES DAY

01:51PM    22    ON BEHALF OF ADOBE.

01:51PM    23       MR. PERRY:  AND STEVE PERRY FROM MUNGER TOLLES FOR

01:51PM    24    INTEL.

01:51PM    25       THE COURT:  OKAY.  GOOD AFTERNOON TO EVERYONE AND
```

UNITED STATES COURT REPORTERS

**Page 4**

4

```
01:51PM     1    WELCOME.

01:51PM     2       HOW MANY OPT OUTS TO THE LITIGATION CLASS WERE --

01:51PM     3       MS. DERMODY:  YOUR HONOR, WE CAN GET THAT NUMBER FOR

01:51PM     4    YOU.  IT WAS NOT VERY MANY.

01:51PM     5       THE COURT:  OKAY.  HOW MANY OPT OUTS WERE THERE TO

01:52PM     6    THE LUCASFILM/PIXAR SETTLEMENT?

01:52PM     7       MS. DERMODY:  I THINK IT WAS 160, SOMEWHERE IN THERE,

01:52PM     8    155 OR SOMETHING LIKE THAT, YOUR HONOR.  IT WAS IN YOUR ORDER.

01:52PM     9       AND THERE WERE NOT THAT MANY MORE THAT WERE JUST

01:52PM    10    LITIGATION.  IT WAS DE MINIMIS.

01:52PM    11       THE COURT:  OKAY.  WHAT ABOUT FOR INTUIT CLASS?  ARE

01:52PM    12    THOSE --

01:52PM    13       MS. DERMODY:  I MEAN ALL TOGETHER.

01:52PM    14       THE COURT:  IF I REMEMBER, THOSE WERE THE SAME.

01:52PM    15       MS. DERMODY:  YES.

01:52PM    16       THE COURT:  THEY OPTED OUT OF BOTH.  BUT DID THEY

01:52PM    17    ALSO OPT OUT OF THE LITIGATION CLASS SIMULTANEOUSLY, OR NOT?

01:52PM    18       MS. DERMODY:  THERE WERE SOME THAT DID.  IT WAS KIND

01:52PM    19    OF A MIX, DIFFERENT BUCKETS.  THERE WERE MOSTLY PEOPLE THAT IF

01:52PM    20    THEY OPTED OUT, THEY OPTED OUT OF THE SETTLEMENTS OF THE PIXAR,

01:52PM    21    LUCAS, AND INTUIT, AND THEN THERE WERE SOME ADDITIONAL ONES

01:52PM    22    THAT OPTED OUT OF THE LITIGATION THAT WAS ONGOING.

01:52PM    23       THE COURT:  SO YOU DON'T KNOW THE NUMBER OF THE

01:52PM    24    LITIGATION OPT OUTS AT THIS TIME?

01:52PM    25       MS. DERMODY:  ONLY THAT IT WAS RELATIVELY NOT THAT
```

UNITED STATES COURT REPORTERS

5

01:52PM 1 MANY MORE PEOPLE, YOUR HONOR. IT WAS A SMALL NUMBER OF PEOPLE.

01:52PM 2 MAYBE YOU ALL REMEMBER IT BETTER THAN I DO, BUT IT WAS

01:52PM 3 TOTAL --

01:52PM 4 THE COURT: DOES ANYBODY KNOW?

01:52PM 5 MS. DERMODY: TOTAL OPT OUTS? IT WAS IN THE LOW

01:53PM 6 HUNDREDS. WE CAN GET THAT RIGHT NOW.

01:53PM 7 THE COURT: IS THAT GOING TO COUNT TOWARDS THE 4

01:53PM 8 PERCENT OPT OUTS?

01:53PM 9 MS. DERMODY: IT'S NOT, YOUR HONOR, NO. THIS WOULD

01:53PM 10 BE 4 PERCENT ON TOP OF WHAT HAS ALREADY BEEN AN OPT OUT NUMBER.

01:53PM 11 AND GIVEN THE --

01:53PM 12 THE COURT: I GUESS I DON'T UNDERSTAND. 4 PERCENT ON

01:53PM 13 TOP OF IT --

01:53PM 14 MS. DERMODY: SO THERE ARE SOME PEOPLE THAT ARE NO

01:53PM 15 LONGER IN THE CLASS BECAUSE THEY'VE OPTED OUT. AS THE CASE IS

01:53PM 16 CURRENTLY COMPOSED, THOSE PEOPLE DO NOT EXIST IN THE CASE

01:53PM 17 ANYMORE.

01:53PM 18 THE COURT: UM-HUM.

01:53PM 19 MS. DERMODY: THE PRO RATA REDUCTION THAT YOU SAW,

01:53PM 20 YOUR HONOR, IN THE SETTLEMENT AGREEMENT WOULD ONLY KICK IN IF

01:53PM 21 THEY KNEW 4 PERCENT, SOMETHING IN EXCESS OF 2500 PEOPLE NOW, IN

01:53PM 22 ADDITION, OPTED OUT.

01:53PM 23 SO IT WOULD BE A SIGNIFICANTLY LARGER, EXPONENTIALLY

01:53PM 24 LARGER NUMBER OF PEOPLE THAN OPTED OUT THE FIRST TIME.

01:53PM 25 THE COURT: YOU KNOW, THE SETTLEMENT WITH LUCASFILM,

UNITED STATES COURT REPORTERS

6

01:53PM 1 PIXAR, AND INTUIT DIDN'T HAVE THIS 4 PERCENT REVERTER. WHY --

01:54PM 2 IN SOME SENSES, LUCASFILM AND PIXAR, AS WELL AS INTUIT, ARE

01:54PM 3 PAYING MORE OF THEIR -- A HIGHER PROPORTION OF THEIR LIABILITY

01:54PM 4 THAN GOOGLE, APPLE, INTEL, AND ADOBE. WHY IS THAT?

01:54PM 5 MS. DERMODY: THERE WAS A PRO RATA REDUCTION THAT

01:54PM 6 WOULD KICK IN THAT SET FORTH IN THOSE OTHER SETTLEMENT

01:54PM 7 AGREEMENTS. IT WAS A -- I THINK IT WAS 10 PERCENT OR SOMETHING

01:54PM 8 IN PIXAR, LUCAS, AND INTUIT. SO THE CONCEPT EXISTED IN THE

01:54PM 9 PRIOR SETTLEMENT AGREEMENTS.

01:54PM 10 HERE WE -- IT JUST WAS DIFFERENT DEFENDANTS, DIFFERENT

01:54PM 11 NEGOTIATIONS, DIFFERENT TERMS THAT WERE BEING DISCUSSED.

01:54PM 12 AND SO WE HAD THE SAME CONCEPT, THAT THERE BE SOME NUMBER

01:54PM 13 OF PEOPLE -- THERE WAS SOME PRICE POINT AT WHICH, FOR THE

01:54PM 14 DEFENDANTS TO HAVE TO PAY, FROM THEIR POINT OF VIEW, HAVE TO

01:54PM 15 PAY INTO A CLASS FUND WHILE LEAVING OPEN THE LIABILITY OF

01:54PM 16 THOUSANDS OF PEOPLE SEEMED TO BE, AS THEY EXPRESSED IT,

01:54PM 17 SOMETHING THAT SHOULD BE ACCOUNTED FOR.

01:55PM 18 SO IT WOULDN'T BE LESS CONSIDERATION TO THE CLASS. IT

01:55PM 19 WOULD BE JUST A PRO RATA REDUCTION THAT WOULD KICK IN. THE

01:55PM 20 SAME NUMBER OF PEOPLE WOULD HAVE THE SAME NET RESULT OF THE

01:55PM 21 CASE IF YOU HIT A CERTAIN THRESHOLD, AGAIN, ONE THAT I, AS

01:55PM 22 CLASS COUNSEL, DON'T THINK WILL BE REACHED, BUT WHICH IS KIND

01:55PM 23 OF A BACKSTOP FOR THE DEFENDANTS IN THE EVENT THAT IT IS.

01:55PM 24 THE COURT: OKAY. I'M UNCLEAR. YOU'RE SAYING THERE

01:55PM 25 WAS A 10 PERCENT REVERTER IN THE LUCASFILM, PIXAR, AND INTUIT

UNITED STATES COURT REPORTERS

7

01:55PM 1 SETTLEMENT?

01:55PM 2 MS. DERMODY: THERE WAS A --

01:55PM 3 THE COURT: I DON'T HAVE THAT.

01:55PM 4 MS. DERMODY: IT'S IN THE SETTLEMENT AGREEMENT, YOUR

01:55PM 5 HONOR. WE CAN PULL IT UP.

01:55PM 6 THE CONCEPT OF THERE BEING A PRO RATA REDUCTION FOR A

01:55PM 7 CERTAIN NUMBER OF OPT OUTS AND THE CONCEPT OF THERE BEING A

01:55PM 8 TERMINATION POSSIBILITY WITH A CERTAIN NUMBER OF OPT OUTS WAS

01:55PM 9 SOMETHING THAT HAPPENED IN THE PRIOR SETTLEMENT AGREEMENTS.

01:55PM 10 THE COURT: OH, OKAY. CAN I SEE THAT? BECAUSE I'M

01:55PM 11 SORRY, I DON'T RECALL THAT.

01:55PM 12 MS. DERMODY: YES, YOUR HONOR. WE'LL FIND THAT FOR

01:55PM 13 YOU. I'M AFRAID I DON'T HAVE IT IN FRONT OF ME. I DIDN'T

01:55PM 14 BRING THAT WITH ME TODAY.

01:56PM 15 THE COURT: OKAY.

01:56PM 16 MS. DERMODY: BUT WE'LL LOCATE IT.

01:56PM 17 THE COURT: OKAY.

01:56PM 18 MS. DERMODY: AND IF IT WOULD HELP YOUR HONOR --

01:56PM 19 THE COURT: IS PARVES SYED MOHAMED OBJECTING? I KNOW

01:56PM 20 YOU HAD A FOOTNOTE IN YOUR MOTION THAT YOU DIDN'T THINK THAT IT

01:56PM 21 WAS. WHAT DID YOU BASE THAT ON?

01:56PM 22 MS. DERMODY: A CONVERSATION WITH HIM, YOUR HONOR.

01:56PM 23 AT THE TIME THAT WE -- AFTER WE REVIEWED THAT LETTER, WE SPOKE

01:56PM 24 WITH HIM. IT WAS OUR UNDERSTANDING THAT HE HAD AN INTENT TO

01:56PM 25 WITHDRAW THAT OBJECTION.

UNITED STATES COURT REPORTERS

8

01:56PM 1 TO DATE THAT HASN'T HAPPENED. I DON'T KNOW WHETHER OR NOT

01:56PM 2 HE CONTINUES TO WANT TO WITHDRAW THAT OBJECTION OR CONTINUES TO

01:56PM 3 WANT TO SAY THAT HE WANTS THERE TO BE MORE MONEY IN THE

01:56PM 4 SETTLEMENT. I'M NOT SURE EITHER WAY.

01:56PM 5 THE COURT: OKAY. AND IS MR. MOHAMMED HERE TODAY?

01:56PM 6 ALL RIGHT. LET ME GIVE MR. GIRARD AN OPPORTUNITY TO

01:56PM 7 RESPOND TO THE PLAINTIFFS' REPLY.

01:56PM 8 I'D ALSO LIKE TO ASK WHETHER MR. DEVINE ACTUALLY SENT THAT

01:57PM 9 MAY 11, 2014 LETTER TO THE COURT, BECAUSE I NEVER GOT IT. DO

01:57PM 10 YOU KNOW IF HE ACTUALLY SENT IT?

01:57PM 11 MR. GIRARD: I DO NOT KNOW THE ANSWER TO THAT

01:57PM 12 QUESTION AS TO WHETHER IT WAS ACTUALLY SENT. I BELIEVE IT WAS

01:57PM 13 FROM SPEAKING WITH HIM. AND IF YOU'D LIKE TO SEE IT, WE WILL

01:57PM 14 PRODUCE IT TO THE COURT.

01:57PM 15 WE HAVE TALKED WITH MR. DEVINE AT LENGTH AND COUNSELLED

01:57PM 16 HIM ON THE ISSUES SURROUNDING THE APPROVAL OF CLASS ACTION

01:57PM 17 SETTLEMENTS, AND THE OPPOSITION TO THE MOTION FOR PRELIMINARY

01:57PM 18 APPROVAL THAT WAS FILED ON HIS BEHALF REFLECTS HIS POSITION IN

01:57PM 19 OPPOSITION AND IT SUPERSEDES THE LETTER.

01:57PM 20 SO THESE ARE THE ARGUMENTS THAT HE IS ELECTING TO PUT

01:57PM 21 FORWARD IN OPPOSITION TO THE SETTLEMENT, AND I'M PREPARED TO

01:57PM 22 SPEAK TO THOSE IF THIS IS THE RIGHT TIME FOR THAT.

01:57PM 23 THE COURT: YES. I WOULD LIKE TO HEAR YOUR RESPONSE

01:57PM 24 TO THE PLAINTIFFS' REPLY.

01:57PM 25 MR. GIRARD: SURE.

UNITED STATES COURT REPORTERS

**9**

01:57PM 1    THE COURT:  OKAY.

01:57PM 2    MR. GIRARD:  SO TO START WITH, THE ARGUMENT IS MADE

01:58PM 3  THAT THE SETTLEMENT IS LARGE, PUT IT THAT WAY, $324.5 MILLION,

01:58PM 4  AND IT IS INDISPUTABLY A VERY LARGE AMOUNT OF MONEY.

01:58PM 5    THE PERSPECTIVE THAT MR. DEVINE IS APPROACHING IS HIS

01:58PM 6  PERSPECTIVE AS AN INDIVIDUAL.  IT'S NOT LOOKING BACK AND

01:58PM 7  SAYING, "IS IT OR ISN'T IT A BIG AMOUNT OF MONEY?"

01:58PM 8    HIS PERSPECTIVE IS THAT WHAT THIS REPRESENTS FOR HIM IS

01:58PM 9  AROUND $3500 TO $3600, AND FOR THAT PRICE, IF YOU ASKED HIM,

01:58PM 10  "WOULD YOU BE WILLING TO GIVE THE DEFENDANTS THE RIGHT TO

01:58PM 11  MANIPULATE THE MARKET FOR THE SERVICES HE PROVIDES FOR FOUR

01:58PM 12  YEARS FOR $3600, OR WOULD YOU PREFER TO TAKE YOUR CHANCES,

01:58PM 13  KNOWING THAT YOU MIGHT LOSE THAT MONEY, BUT YOU MIGHT ALSO GET

01:58PM 14  A LOT MORE?"

01:58PM 15    AND SPECIFICALLY HERE WE THINK THAT IF THE PLAINTIFFS WIN

01:58PM 16  UNDER THEIR MODEL, THAT LOT MORE IS $144,000, APPROXIMATELY.

01:59PM 17    I THINK, IF HE'S RATIONAL, HIS ANSWER -- AND HE IS -- AND

01:59PM 18  HIS ANSWER IS, "WHAT ARE MY CHANCES?  ARE MY CHANCES 97 AND A

01:59PM 19  HALF PERCENT THAT I WILL DO WORSE THAN $3600?"

01:59PM 20    AND HE SAYS, "GIVEN THOSE ODDS, I DON'T THINK SO.  I'LL

01:59PM 21  TAKE MY CHANCES ON AN INDIVIDUAL LEVEL."

01:59PM 22    AND HE'S HERE SPEAKING FOR THAT PERSPECTIVE, WHICH IS THAT

01:59PM 23  HE'S PREPARED TO PUT THIS AMOUNT OF MONEY AT RISK BECAUSE THE

01:59PM 24  AMOUNT THAT HE GETS SPECIFICALLY INDIVIDUALLY, NOTWITHSTANDING

01:59PM 25  HOW BIG THE SETTLEMENT IS, IS INSUFFICIENT, IN HIS MIND, IN

UNITED STATES COURT REPORTERS

**10**

01:59PM 1  RELATION TO WHAT HE STANDS TO GAIN IF THIS CASE GOES FORWARD.

01:59PM 2    NOW, IT'S TRUE THAT THE AMOUNT OF MONEY THAT COUNSEL

01:59PM 3  OBTAINED -- AND TO BE CLEAR, THIS IS AN OBJECTION TO THE

01:59PM 4  SUFFICIENCY OF THE RECOVERY.  IT'S NOT AN OBJECTION TO THE

01:59PM 5  ADEQUACY OF REPRESENTATION.  SO WE'RE NOT CLAIMING THAT COUNSEL

01:59PM 6  WAS -- SOLD OUT THE CASE BECAUSE THEY GOT TOGETHER WITH THE

01:59PM 7  DEFENDANTS AND ENTERED INTO A COLLUSIVE SETTLEMENT.  THAT

02:00PM 8  WOULDN'T BE A SERIOUS CLAIM AND THAT'S NOT THE CLAIM BEING

02:00PM 9  MADE.  THE CLAIM GOES SOLELY TO THE SUFFICIENCY OF THE

02:00PM 10  RECOVERY.

02:00PM 11    AND THE ARGUMENT THAT MR. DEVINE MAKES IS THAT IF YOU LOOK

02:00PM 12  AT THIS SETTLEMENT, YES, IT'S TRUE THAT IT'S 325 MILLION, BUT I

02:00PM 13  CAN'T THINK OF ANY OTHER TYPE OF CASE THAT HAD THIS TYPE OF

02:00PM 14  EVIDENCE THAT WAS THIS CLOSE TO TRIAL.

02:00PM 15    SO, YES, IT'S A LOT OF MONEY.  BUT IT'S ALSO A VERY, VERY

02:00PM 16  STRONG CASE, AND WHERE WE ARE HERE IS PRELIMINARY APPROVAL.

02:00PM 17    AND WE KNOW WHAT'S GOING TO HAPPEN HERE.  IF THE COURT

02:00PM 18  ENTERS AN ORDER PRELIMINARILY APPROVING THE SETTLEMENT, NOTICE

02:00PM 19  WILL GO OUT AND SOME NUMBER OF CLASS MEMBERS WILL OBJECT TO THE

02:00PM 20  SETTLEMENT AND CLASS COUNSEL WILL SAY THAT NUMBER, WHATEVER IT

02:00PM 21  IS, IS SMALL IN RELATION TO THE TOTAL NUMBER OF CLASS MEMBERS,

02:00PM 22  AND THEY'LL PROBABLY BE RIGHT AND IT'S A LEGITIMATE ARGUMENT

02:00PM 23  AND I'VE MADE IT MANY TIMES AS CLASS COUNSEL.

02:00PM 24    BUT I THINK THE TREND IS TO TAKE THE HARD LOOK NOW RATHER

02:00PM 25  THAN DEFER TO FINAL APPROVAL, BECAUSE IF YOU ENTER PRELIMINARY

UNITED STATES COURT REPORTERS

**11**

02:00PM 1  APPROVAL NOW, THE WRITING IS ON THE WALL THAT WE'LL GET TO THAT

02:00PM 2  POINT AND THEY'LL SAY IT'S A SMALL AMOUNT AND, THEREFORE, THE

02:01PM 3  MOST -- MOST OF THE CLASS IS HAPPY WITH THE SETTLEMENT AND THE

02:01PM 4  COURT SHOULD APPROVE IT.

02:01PM 5    WHAT'S UNIQUE ABOUT THIS CASE, I THINK -- AND PLAINTIFFS'

02:01PM 6  COUNSEL POINTED OUT THAT MOST OF THE CASES WHERE THE COURTS ARE

02:01PM 7  PUSHING BACK AT PRELIMINARY APPROVAL, A NUMBER OF THOSE CASES

02:01PM 8  INVOLVE FAIRLY QUESTIONABLE SETTLEMENTS AND NOT THE BEST WORK

02:01PM 9  NECESSARILY DONE BY PLAINTIFFS' COUNSEL, AND THAT'S NOT THE

02:01PM 10  ARGUMENT WE'RE MAKING HERE.

02:01PM 11    BUT THIS COURT, IN THIS PARTICULAR CASE, IS UNIQUELY

02:01PM 12  SITUATED TO EXERCISE ITS DISCRETION AT THIS STAGE, AND THIS IS

02:01PM 13  REALLY WHAT PRELIMINARY APPROVAL IS, IS THE COURT ACTING AS A

02:01PM 14  GATEKEEPER.

02:01PM 15    YOU KNOW, WHAT'S INTERESTING ABOUT RULE 23 IS THERE'S

02:01PM 16  NOTHING IN THERE ABOUT PRELIMINARY APPROVAL.  WE COULDN'T FIND

02:01PM 17  A SINGLE CIRCUIT LEVEL DECISION WHERE A COURT SAYS THIS IS THE

02:01PM 18  STANDARD THAT YOU, AS A DISTRICT COURT, ARE REQUIRED TO APPLY.

02:01PM 19    THE DISTRICT COURTS REPEAT THE STANDARD GENERALLY THAT THE

02:02PM 20  COURT IS MAKING AN OVERALL ASSESSMENT OF THE FAIRNESS AND

02:02PM 21  LOOKING FOR SIGNS OF COLLUSION.

02:02PM 22    BUT AT THE SAME TIME, THE INSTRUCTION IS TO THIS COURT TO

02:02PM 23  LOOK HARD, AND IF YOU HAVE CONCERNS, TO EXPRESS THOSE CONCERNS

02:02PM 24  NOW.

02:02PM 25    SO WHAT MR. DEVINE'S POSITION IS IS THAT FROM THE

UNITED STATES COURT REPORTERS

**12**

02:02PM 1  PERSPECTIVE OF ANY INDIVIDUAL MEMBER OF THIS CLASS, IF YOU'RE

02:02PM 2  PRESENTED WITH THE BARGAIN OF CONSENTING TO THIS CONDUCT AND

02:02PM 3  ENTERING INTO A RELEASE, IF YOU LOOK AT IT FROM HIS INDIVIDUAL

02:02PM 4  PERSPECTIVE, LIKE A PERSONAL INJURY CASE, IF HE'S GIVEN THE

02:02PM 5  CHOICE OF TAKING $3600 OR PLAYING IT FORWARD FOR THE

02:02PM 6  POSSIBILITY OF DOING A LOT BETTER, AND WHEN YOU LOOK AT THE

02:02PM 7  CONDUCT INVOLVED AND YOU THINK ABOUT WHAT THE DEFENDANTS DID

02:02PM 8  HERE AND HOW THAT AFFECTED THE MARKET FOR THE SERVICES THAT HE

02:02PM 9  AND THE OTHER MEMBERS OF THE CLASS ARE PROVIDING, THAT THEY

02:02PM 10  WOULD PREFER TO TAKE THEIR CHANCES.

02:02PM 11    AND HE'S NOT SAYING -- HE'S NOT SAYING THAT THERE'S NO

02:03PM 12  SETTLEMENT EVER THAT COULD POSSIBLY BE SATISFACTORY TO HIM.

02:03PM 13  HE'S SAYING THAT HE LOOKS AT THIS AND HE THINKS THIS SETTLEMENT

02:03PM 14  IS SHORT OF THE MARK AND THAT IT WOULD BE WORTH IT --

02:03PM 15    THE COURT:  HOW MUCH SHORT OF THE MARK DOES HE THINK

02:03PM 16  IT IS?

02:03PM 17    MR. GIRARD:  I THINK HE -- HIS CONCERN WAS THAT HE

02:03PM 18  WAS CONCERNED WITH THE PROCESS, TO SOME EXTENT.

02:03PM 19    AND TO ANSWER THAT QUESTION, I GUESS I WOULD -- I WANT TO

02:03PM 20  GIVE A SPECIFIC RESPONSE RATHER THAN AN OVERLY GENERAL ONE.

02:03PM 21    I DON'T THINK WE'RE TALKING ABOUT MULTIPLES OF THIS

02:03PM 22  NUMBER.  ONE THOUGHT THAT WE HAD, IN TERMS OF WHAT THIS COURT

02:03PM 23  MIGHT CONSIDER DOING, IS IF THE COURT SHARES ANY OF THESE

02:03PM 24  CONCERNS ABOUT THE SUFFICIENCY OF THE SETTLEMENT, TO GIVE THE

02:03PM 25  PARTIES AN OPPORTUNITY TO GO BACK TO THE TABLE WITH MR. DEVINE

UNITED STATES COURT REPORTERS

13

02:03PM 1  REPRESENTED, ALONG WITH CLASS COUNSEL, AND SEE IF, IN THE
02:03PM 2  CONTEXT OF THE MEDIATION, THE DEFENDANTS ARE WILLING TO PAY ANY
02:03PM 3  MORE IN SETTLEMENT.
02:04PM 4      IF THE ANSWER IS NO, THEN THE COURT CAN RULE ON THIS
02:04PM 5  MOTION AS IT'S BEEN PRESENTED TO THE COURT.
02:04PM 6      IF WE'RE ABLE TO COME BACK WITH A SUBSTANTIALLY IMPROVED,
02:04PM 7  OR EVEN A MODESTLY IMPROVED SETTLEMENT, THE COURT WILL HAVE A
02:04PM 8  DIFFERENT CALCULUS IN FRONT OF IT AND PROBABLY A SETTLEMENT
02:04PM 9  THAT ALL THE CLASS REPRESENTATIVES SUPPORT.
02:04PM 10     THAT'S A PROCESS WE'D BE WILLING TO TAKE ON IF THE COURT
02:04PM 11 IS SO INCLINED.
02:04PM 12     AND --
02:04PM 13     THE COURT:  WHAT ABOUT MR. DEVINE JUST OPTING OUT AND
02:04PM 14 LITIGATING HIS OWN INDIVIDUAL CASE?
02:04PM 15     MR. GIRARD:  WELL, THAT'S A POSSIBILITY AND WE'VE
02:04PM 16 CERTAINLY TALKED WITH HIM ABOUT THAT.
02:04PM 17     THE SITUATION FROM HIS POINT OF VIEW, IT'S THE SAME
02:04PM 18 SITUATION THAT WAS DISCUSSED RECENTLY BY THE SUPREME COURT IN
02:04PM 19 THE ITALIAN COLORS CASE ON ARBITRATION.  HE'S GOING TO BE
02:04PM 20 LOOKING THEN AT A CLAIM THAT'S WORTH, ON AVERAGE, $140,000
02:04PM 21 TREBLED, AND HE'S GOING TO BE LOOKING AT EXPENSES FOR EXPERTS
02:05PM 22 THAT ARE GOING TO BE MANY MULTIPLES OF THAT.
02:05PM 23     SO THE OPT OUT RATE HERE IS A, YOU KNOW, RELATIVELY WEAK
02:05PM 24 EXPEDIENT UNLESS THE VOLUME OF OPT OUTS ARE SUCH THAT IT'S
02:05PM 25 POSSIBLE TO AGGREGATE SOME GROUP OF PEOPLE WHO SHARE THE SAME

UNITED STATES COURT REPORTERS

14

02:05PM 1  VIEW HE HAS AND WANT TO PROCEED.
02:05PM 2      THE COURT:  WHAT ABOUT THE -- WHAT ABOUT THE SPECIFIC
02:05PM 3  ARGUMENTS THAT THE PLAINTIFFS MAKE IN THEIR REPLY THAT, YOU
02:05PM 4  KNOW, MR. -- DR. LEAMER ONLY PROVIDED A DAMAGES ANALYSIS FOR
02:05PM 5  THE OVERARCHING CONSPIRACY, AND IF THE JURY WERE TO FIND THAT
02:05PM 6  ONE OF THE SEVEN DEFENDANTS DIDN'T ACTUALLY JOIN IN THAT
02:05PM 7  CONSPIRACY, THERE WOULDN'T BE SORT OF AN ALTERNATIVE DAMAGES
02:05PM 8  CALCULATION FOR THE JURY TO RELY ON.
02:05PM 9      MR. GIRARD:  SO THEY MADE A NUMBER OF ARGUMENTS LIKE
02:05PM 10 THAT.
02:05PM 11     THE COURT:  YEAH.
02:06PM 12     MR. GIRARD:  AND THERE WAS AN ISSUE ABOUT WHETHER THE
02:06PM 13 COURT WOULD ORDER THAT THE STANDARD IS GOING TO BE PER SE
02:06PM 14 VERSUS RULE OF REASON --
02:06PM 15     THE COURT:  UM-HUM.
02:06PM 16     MR. GIRARD:  -- A NUMBER OF EVIDENTIARY MOTIONS THAT
02:06PM 17 WERE BEFORE THE COURT, AND THE NEED FOR A UNANIMOUS JURY, ET
02:06PM 18 CETERA.
02:06PM 19     I MEAN, I PUT ALL OF THOSE UNDER THE UMBRELLA GENERALLY OF
02:06PM 20 TRIAL IS RISKY.
02:06PM 21     THE COURT:  UM-HUM.
02:06PM 22     MR. GIRARD:  BUT THIS IS NOT A SITUATION HERE WHERE
02:06PM 23 THE CASE IS, YOU KNOW, AT THE MOTION TO DISMISS STAGE, OR EVEN
02:06PM 24 AT THE SUMMARY JUDGMENT STAGE.  I MEAN, WE'RE HERE POST CLASS
02:06PM 25 CERTIFICATION, POST RULE 23, VERY CLOSE TO TRIAL, AND THOSE ARE

UNITED STATES COURT REPORTERS

15

02:06PM 1  ALL FAIR ARGUMENTS.
02:06PM 2      THE FLIP SIDE IS, WHAT ABOUT THE POSSIBILITY THAT THE
02:06PM 3  DEFENDANTS END UP HAVING TO PAY OVER A BILLION DOLLARS BEFORE
02:06PM 4  TREBLING?
02:06PM 5      THEY'RE EQUALLY LEGITIMATE POINTS TO CONSIDER.
02:06PM 6      SO WE'RE NOT -- I MEAN, THIS ISN'T THE OBJECTION WHERE
02:06PM 7  SOMEBODY COMES AND WAVES OFF ALL THE REALITIES AND RISKS OF
02:06PM 8  TRIAL.  WE HAVE A TREMENDOUS LEVEL OF APPRECIATION FOR THE WORK
02:07PM 9  THAT'S GONE INTO THIS PROCESS AND HOW HARD COUNSEL HAVE WORKED.
02:07PM 10     THIS IS REALLY A CLASS REPRESENTATIVE WHO'S SPEAKING UP,
02:07PM 11 DOING THE RIGHT THING IN TERMS OF COMING FORWARD TO THE COURT
02:07PM 12 WITH THE BENEFIT OF HIS EXPERIENCE AND THE THOUGHT AND, TO SOME
02:07PM 13 EXTENT, THE PERSONAL TRAVAIL ALL FOUR OF THESE CLASS
02:07PM 14 REPRESENTATIVES HAVE SUFFERED PROFESSIONALLY FROM HAVING TO
02:07PM 15 TAKE ON THIS INDUSTRY AND THESE DEFENDANTS, AND I THINK THE
02:07PM 16 COST THAT THEY PERCEIVE IN THAT TO THEM AS FAR AS THE
02:07PM 17 PROFESSIONAL CONSEQUENCES THAT THEY MAY SUFFER FOR HAVING
02:07PM 18 BROUGHT THESE CASES AND THAT, "SOMEHOW WE FEEL LIKE WE'VE
02:07PM 19 BEEN LEFT SHORT HERE, THAT THIS ISN'T THE KIND OF RESULT THAT
02:07PM 20 WE THOUGHT, WHEN WE GOT INTO THIS, WAS WHAT WE WERE LOOKING
02:07PM 21 FOR."
02:07PM 22     AND, YOU KNOW, YOU THINK ABOUT THIS -- AND I DON'T WANT TO
02:07PM 23 GET TOO PHILOSOPHICAL HERE, SO I'M GOING TO CUT TO THE POINT
02:08PM 24 HERE -- BUT YOU THINK ABOUT THIS COUNTRY AND HOW HARD PEOPLE
02:08PM 25 WORK TO GET THESE TYPES OF JOBS AND HOW IMPORTANT IT IS TO A

UNITED STATES COURT REPORTERS

16

02:08PM 1  LOT OF THE, THE GENERATION OF PEOPLE THAT ARE COMING UP,
02:08PM 2  ENTERING THE WORK FORCE, THE SACRIFICES SOMEBODY LIKE
02:08PM 3  MR. DEVINE MADE, THE LOANS THEY TOOK OUT TO BE EDUCATED AND SO
02:08PM 4  FORTH, AND ANYTHING ABOUT THE RHETORIC THAT IS BEING SOLD BY
02:08PM 5  THE PEOPLE WHO ENTERED INTO THESE AGREEMENTS ABOUT FREE
02:08PM 6  ENTERPRISE AND INDIVIDUAL RESPONSIBILITY AND ON AND ON, AND YOU
02:08PM 7  LOOK AT THE FACT THAT THEY WERE GETTING TOGETHER AND FIXING THE
02:08PM 8  PRICE FOR THESE SERVICES.
02:08PM 9      I MEAN, I THINK FROM THEIR POINT OF VIEW, IT'S VERY TOUGH
02:08PM 10 TO GIVE IT UP AT THIS POINT FOR THE TRADE THAT I REFERRED TO,
02:08PM 11 THE $3600 FOR THE RIGHT TO FIX THIS MARKET FOR FOUR YEARS.
02:08PM 12     AND SO THAT'S, THAT'S THE PERSPECTIVE IN WHICH HE IS
02:08PM 13 APPROACHING THE COURT TODAY.
02:08PM 14     THE COURT:  ALL RIGHT.  THANK YOU.
02:08PM 15 LET ME HEAR FROM THE PLAINTIFFS.
02:09PM 16     MS. DERMODY:  YOUR HONOR, DO YOU WANT TO HEAR THE
02:09PM 17 HOUSEKEEPING THINGS FIRST IN RESPONSE TO YOUR QUESTIONS?
02:09PM 18     THE COURT:  SURE.  HOW MANY CLASS
02:09PM 19     MS. DERMODY:  SO FROM --
02:09PM 20     THE COURT:  -- LITIGATION CLASS OPT OUTS WERE THERE?
02:09PM 21     MS. DERMODY:  SIXTY-ONE.
02:09PM 22     THE COURT:  OKAY.
02:09PM 23     MR. DERMODY:  AND IN BOTH THE PIXAR, LUCAS, AND
02:09PM 24 INTUIT SETTLEMENTS, THERE WAS AN ATTACHMENT 1.  SO IF YOUR
02:09PM 25 HONOR WAS LOOKING IN THE BODY OF THE SETTLEMENT AGREEMENTS, YOU

UNITED STATES COURT REPORTERS

17

02:09PM 1   MIGHT NOT HAVE SEEN IT.

02:09PM 2       BUT IF YOU LOOK TO THE FIRST ATTACHMENT, IT'S IN THERE.

02:09PM 3   IT TALKS ABOUT A PRO RATA REDUCTION, AND IN PIXAR/LUCASFILM IT

02:09PM 4   WAS 10 PERCENT WAS THE THRESHOLD, AND ONCE YOU HAD 10 PERCENT

02:09PM 5   OPT OUTS, THEN YOU WOULD START HAVING A PRO RATA REDUCTION OF

02:09PM 6   THE CLASS CONSIDERATION.

02:09PM 7       THE COURT:  WHY IS IT SO MUCH LOWER HERE?

02:09PM 8       MS. DERMODY:  I THINK IT'S A DIFFERENT POINT IN THE

02:09PM 9   CASE, DIFFERENT ISSUES IN THE CASE IN TERMS OF CONCERNS ABOUT

02:09PM 10  OPT OUTS, YOUR HONOR.

02:09PM 11      I THINK THAT WAS REALLY ALL THAT WAS GOING ON.  I MEAN --

02:09PM 12      THE COURT:  OKAY.  THE POINT IN THE CASE WOULD

02:09PM 13  ACTUALLY DICTATE FOR A HIGHER NUMBER, RIGHT?  I MEAN THE --

02:09PM 14      MS. DERMODY:  NOT IF YOU --

02:09PM 15      THE COURT:  -- THE LUCASFILM/PIXAR/INTUIT FOLKS

02:10PM 16  SETTLED WHEN I HAD DENIED THE CLASS CERTIFICATION MOTION.

02:10PM 17      SO THESE DEFENDANTS SETTLED AFTER I HAD CERTIFIED THE

02:10PM 18  CLASS, AFTER THE NINTH CIRCUIT HAD REFUSED TO REVIEW MY CLASS

02:10PM 19  CERTIFICATION ORDER, AFTER I HAD DENIED SUMMARY JUDGMENT, AFTER

02:10PM 20  I HAD DENIED THE DAUBERT EXCLUDING DR. LEAMER'S DAMAGES

02:10PM 21  ANALYSIS.

02:10PM 22      MS. DERMODY:  RIGHT.

02:10PM 23      THE COURT:  SO IF ANYTHING, THAT NUMBER SHOULD BE

02:10PM 24  GOING UP AND NOT GOING DOWN.

02:10PM 25      MS. DERMODY:  YOU WOULD THINK, IN GENERAL, THAT WOULD

UNITED STATES COURT REPORTERS

---

18

02:10PM 1   BE TRUE FOR A LOT OF TERMS, YOUR HONOR.

02:10PM 2       THE COURT:  UM-HUM.

02:10PM 3       MS. DERMODY:  BUT ON THAT PARTICULAR ONE, AT THE TIME

02:10PM 4   OF THE PIXAR/LUCAS SETTLEMENT, AS YOU MIGHT REMEMBER, THERE WAS

02:10PM 5   NO PRIOR PRELIMINARY APPROVAL INFORMATION THAT ANYONE IN THE

02:10PM 6   CLASS MIGHT OBJECT TO THAT SETTLEMENT.

02:10PM 7       WE HAD A DIFFERENT SCENARIO HERE.  SO IT WAS A

02:10PM 8   DIFFERENT -- IT WAS JUST A DIFFERENT -- THE PLACE WAS SET

02:10PM 9   DIFFERENTLY FOR THAT PARTICULAR TERM TO BE NEGOTIATED THAN IT

02:10PM 10  WAS AT THE TIME OF THE PIXAR/LUCAS SETTLEMENT, DIFFERENT FACTS

02:10PM 11  IN THE GROUND.

02:10PM 12      THE COURT:  OKAY.  SO TELL ME THEN WHAT YOU KNEW AT

02:10PM 13  THE TIME YOU SETTLED, BECAUSE MY UNDERSTANDING IS YOU DIDN'T

02:10PM 14  GET THESE OBJECTIONS UNTIL AFTER PEOPLE, SOMEBODY AT "THE

02:11PM 15  NEW YORK TIMES" LEAKED THE 324 MILLION NUMBER.

02:11PM 16      MS. DERMODY:  RIGHT.  I DON'T KNOW HOW THAT --

02:11PM 17      THE COURT:  RIGHT.  SO I GUESS I'M UNCLEAR.  HOW ARE

02:11PM 18  OBJECTIONS THAT POST-DATED THE ANNOUNCEMENT OF THE SETTLEMENT

02:11PM 19  AMOUNT, THE ONES THAT MOTIVATED THE NUMBER DURING THE

02:11PM 20  SETTLEMENT NEGOTIATIONS THAT PRECEDED THAT NUMBER COMING OUT?

02:11PM 21      MS. DERMODY:  WELL, AT THE --

02:11PM 22      THE COURT:  DOES THAT MAKE SENSE TO YOU?

02:11PM 23      MS. DERMODY:  YES, YOUR HONOR.

02:11PM 24      THE COURT:  THAT DOESN'T MAKE SENSE TO ME.

02:11PM 25      MS. DERMODY:  I UNDERSTAND THE QUESTION COMPLETELY.

UNITED STATES COURT REPORTERS

---

19

02:11PM 1   I JUST WANT TO MAKE VERY CLEAR TO THE COURT THAT THE

02:11PM 2   PARTIES AGREED THAT THEY WOULD NOT RELEASE ANY OF THE TERMS

02:11PM 3   UNTIL THEY PRESENTED THEM TO YOUR HONOR.  NO ONE ON THE

02:11PM 4   PLAINTIFFS' SIDE SPOKE TO ANY MEDIA ABOUT ANY OF THE SPECIFIC

02:11PM 5   TERMS OF THE SETTLEMENT.  I DON'T KNOW WHERE "THE NEW YORK

02:11PM 6   TIMES" GOT THEIR INFORMATION.  TO THIS DAY, I'M PERSONALLY VERY

02:11PM 7   UPSET THAT THAT INFORMATION WAS OUT THERE BECAUSE THE PARTIES

02:11PM 8   WERE STILL NEGOTIATING THE TERMS OF THE SETTLEMENT AGREEMENT.

02:11PM 9       SO THAT WAS STILL IN PLAY, THAT PARTICULAR TERM, AND THAT

02:11PM 10  PARTICULAR TERM WAS INFORMED BY FEEDBACK THAT HAPPENED, IN PART

02:11PM 11  FROM "THE NEW YORK TIMES," RIGHT AFTERWARDS.

02:11PM 12      SO YOU HAVE TO DEAL WITH THE FACTS IN THE GROUND THAT

02:12PM 13  HAPPENED AT THE TIME YOU'RE NEGOTIATING THOSE TERMS AND THAT IS

02:12PM 14  THE DIFFERENCE.

02:12PM 15      IF THAT TERM ITSELF IS THE STICKING POINT FOR YOUR HONOR,

02:12PM 16  ABSOLUTELY WE'RE GOING TO HAVE TO SORT OF GO AND ADDRESS THAT.

02:12PM 17      BUT I WANT YOUR HONOR TO UNDERSTAND THAT WE WEREN'T

02:12PM 18  DEALING WITH THE EXACT SAME INFORMATION ABOUT OPT OUTS THAT WE

02:12PM 19  WERE WHEN WE NEGOTIATED THE PIXAR/LUCASFILM --

02:12PM 20      THE COURT:  I GUESS IT STILL DOESN'T MAKE SENSE TO

02:12PM 21  ME.  YOUR JUSTIFICATION FOR THE NUMBER GOING DOWN IS BASED ON

02:12PM 22  OBJECTIONS THAT OCCURRED AFTER YOU HAD ALREADY AGREED TO THE

02:12PM 23  NUMBER.

02:12PM 24      MS. DERMODY:  YOUR HONOR, IT'S A -- IT'S A FUNNY

02:12PM 25  POSITION --

UNITED STATES COURT REPORTERS

---

20

02:12PM 1       THE COURT:  BECAUSE YOU ANNOUNCED -- YOU SENT THE

02:12PM 2   LETTER TO ME THAT YOU HAD REACHED A SETTLEMENT AT ABOUT THE

02:12PM 3   EXACT SAME TIME.

02:12PM 4       MS. DERMODY:  YES, YOUR HONOR.

02:12PM 5       THE COURT:  SO I ASSUME WHEN YOU SENT THAT LETTER TO

02:12PM 6   ME, YOU HAD THIS 4 PERCENT NUMBER.

02:12PM 7       MS. DERMODY:  NO.  WE HAD THE -- I MEAN, YOUR HONOR

02:12PM 8   IS SORT OF ASKING ME TO REVEAL A LOT OF SETTLEMENT PRIVILEGES,

02:12PM 9   SO I'M HAVING A HARD TIME WITH THIS.

02:12PM 10      BUT I WILL TELL YOU THAT --

02:12PM 11      THE COURT:  WELL, YOU'RE THE ONE THAT OPENED THE

02:12PM 12  DOOR.  YOU'RE THE ONE THAT GAVE THAT AS THE JUSTIFICATION FOR

02:12PM 13  WHY THE NUMBER IS LOWER THAN 10 PERCENT TO 4 PERCENT, RIGHT?  I

02:12PM 14  MEAN, IF YOU HADN'T OPENED THE DOOR, I WOULDN'T BE FOLLOWING

02:12PM 15  THIS LINE OF INQUIRY.

02:12PM 16      MS. DERMODY:  I WANT TO MAKE SURE THE COURT

02:12PM 17  UNDERSTANDS, BECAUSE I APPRECIATE THE QUESTION.  IT'S A

02:13PM 18  COMPLETELY FAIR QUESTION.

02:13PM 19      THE COURT:  I GUESS I DON'T UNDERSTAND.

02:13PM 20      MS. DERMODY:  THE 324. --

02:13PM 21      THE EARLIER DEFENDANTS SETTLED AT A POINT

02:13PM 22  WHEN THEY HAD MUCH MORE LEVERAGE.

02:13PM 23      THESE DEFENDANTS SETTLED AFTER THEIR LEVERAGE WAS LARGELY

02:13PM 24  GONE.  AS SOON AS THE NINTH CIRCUIT SAID, "WE'RE NOT GOING TO

02:13PM 25  REVIEW THIS CLASS CERT ORDER," THEY WERE GOING TO BE FORCED TO

UNITED STATES COURT REPORTERS

21

```
02:13PM  1   GO TO TRIAL, AND I SUSPECT THEY WOULD HAVE WON, IN WHICH CASE
02:13PM  2   THERE WOULD HAVE BEEN AUTOMATIC TREBLING.
02:13PM  3       NOW, GRANTED, I UNDERSTAND THE APPEAL RISKS.
02:13PM  4       BUT IT'S STILL -- FROM A NEGOTIATING STANDPOINT, THESE
02:13PM  5   DEFENDANTS SHOULD HAVE HAD LESS LEVERAGE THAN THE
02:13PM  6   LUCASFILM/PIXAR/INTUIT DEFENDANTS WHO SETTLED WHEN THE ONLY
02:13PM  7   ORDER WAS DENYING THE CLASS CERT MOTION.
02:13PM  8       MS. DERMODY:  SO, YOUR HONOR --
02:13PM  9       THE COURT:  SO WHY ARE THEY PAYING -- WHY ARE THE
02:13PM 10   EARLIER SETTLING DEFENDANTS BEING PENALIZED BY PAYING A HIGHER
02:13PM 11   PROPORTION OF THEIR DAMAGES LIABILITY THAN THESE DEFENDANTS?
02:13PM 12       MS. DERMODY:  WELL, LET ME MAKE IT TOTALLY CLEAR.
02:13PM 13       THE COURT:  YEAH.
02:14PM 14       MS. DERMODY:  THE PRIOR DEFENDANTS PAID A HUNDRED
02:14PM 15   PERCENT, 100 PERCENT OF WHAT WAS IN THE SETTLEMENT AGREEMENT.
02:14PM 16       WE EXPECT THESE DEFENDANTS WILL PAY 100 PERCENT OF WHAT IS
02:14PM 17   PROMISED IN THE SETTLEMENT AGREEMENT.
02:14PM 18       THE ONLY TIME THAT THERE'S ANY POSSIBILITY THAT THERE WILL
02:14PM 19   BE A PRO RATA REDUCTION IS IF YOU HIT A THRESHOLD OF OVER 2500
02:14PM 20   NEW OPT OUTS AFTER WE HAD 61 THE LAST TIME AROUND.
02:14PM 21       SO THIS IS TALK -- THIS IS SORT OF EXPECTING THE WORST
02:14PM 22   POSSIBLE CASE SCENARIO THAT, BASED ON THE PRIOR SETTLEMENTS --
02:14PM 23   WE DIDN'T KNOW, PRIOR TO THOSE SETTLEMENTS, WHO WOULD OPT OUT.
02:14PM 24       NOW WE HAVE BETTER INFORMATION THAT VERY FEW PEOPLE OPTED
02:14PM 25   OUT LAST TIME AND IT WAS A VERY SMALL SETTLEMENT AMOUNT.
```

UNITED STATES COURT REPORTERS

22

```
02:14PM  1       THIS TIME, IT'S A MUCH GREATER SETTLEMENT AMOUNT.  WE
02:14PM  2   DON'T HAVE ANY EXPECTATION THAT MORE PEOPLE WILL SUDDENLY
02:14PM  3   DECIDE TO EXERCISE THAT OPTION.
02:14PM  4       SO I'M -- I JUST WANT TO MAKE SURE YOUR HONOR UNDERSTANDS
02:14PM  5   THAT THEY'RE NOT GOING TO PAY LESS, NOT UNLESS YOU HAVE A VERY,
02:14PM  6   VERY LARGE NUMBER OF PEOPLE SUDDENLY COMING OUT OF THE WOODWORK
02:14PM  7   TO OPT OUT, WHICH WE HAVE NO REASON TO BELIEVE IS GOING TO BE
02:15PM  8   THE CASE.
02:15PM  9       THE COURT:  OKAY.  SEPARATE FROM THIS REVERTER,
02:15PM 10   SEPARATE FROM THIS REVERTER, IT DOES APPEAR THAT THESE LATER
02:15PM 11   SETTLING DEFENDANTS ARE PAYING A LOWER PROPORTION OF THEIR
02:15PM 12   POTENTIAL DAMAGES LIABILITY THAN THE EARLIER SETTLING
02:15PM 13   DEFENDANTS, AND IT DOESN'T MAKE SENSE TO ME BECAUSE THEY SHOULD
02:15PM 14   HAVE HAD LESS LEVERAGE THAN THE EARLIER SETTLING DEFENDANTS.
02:15PM 15       MS. DERMODY:  I THINK I WOULD DISAGREE WITH THE FIRST
02:15PM 16   ASSUMPTION, YOUR HONOR.
02:15PM 17       THE COURT:  OKAY.
02:15PM 18       MS. DERMODY:  I DO THINK THAT THERE IS A SIMILAR
02:15PM 19   RATIO IN TERMS OF THE EARLIER DEFENDANTS AND THESE DEFENDANTS,
02:15PM 20       AND I CAN APPRECIATE WHY YOUR HONOR WOULD ASK THE QUESTION THAT
02:15PM 21   YOUR HONOR IS ASKING.
02:15PM 22       AND I THINK FROM OUR PERSPECTIVE, I WANT IT TO BE REALLY
02:15PM 23   CLEAR WHAT WE WERE LOOKING AT AND WHY WE THINK IT WOULD BE
02:15PM 24   MALPRACTICE FOR US, AS CLASS COUNSEL, NOT TO GIVE THE CLASS A
02:15PM 25   CHANCE TO HEAR THAT THEY COULD GET $324.5 MILLION.
```

UNITED STATES COURT REPORTERS

23

```
02:15PM  1       HERE'S HOW WE SAW THE LAY OF THE LAND, YOUR HONOR.  SO
02:15PM  2   WHILE THE NINTH CIRCUIT DID NOT GRANT THE 23(F), AND WE WERE
02:16PM  3   DELIGHTED THAT THAT HAPPENED, THE NINTH CIRCUIT DID NOT GRANT
02:16PM  4   23(F) AND THEN RULE FOR US, AFFIRM ON THE MERITS.
02:16PM  5       SO FROM OUR PERSPECTIVE, THE ISSUE OF CLASS CERTIFICATION
02:16PM  6   IS STILL AN OPEN ISSUE ON APPEAL.  SO THAT ISSUE DOESN'T GET
02:16PM  7   TAKEN OFF THE TABLE BECAUSE OF 23(F) BEING DENIED.  THAT'S
02:16PM  8   STILL OUT THERE.
02:16PM  9       THE COURT:  RIGHT.  BUT WHAT IS YOUR NEGOTIATING
02:16PM 10   POSITION IF YOU HAD GONE TO TRIAL AND YOU HAD WON AND THEN YOU
02:16PM 11   HAD THE APPEAL PROCESS PENDING?  YOUR NEGOTIATION LEVERAGE
02:16PM 12   WOULD HAVE INCREASED.
02:16PM 13       MS. DERMODY:  ABSOLUTELY, YOUR HONOR.
02:16PM 14       THE COURT:  IT WOULD HAVE INCREASED.
02:16PM 15       MS. DERMODY:  SO LET'S TALK ABOUT THE TRIAL.
02:16PM 16       THE COURT:  LET'S TALK ABOUT THE NINTH CIRCUIT.  YOU
02:16PM 17   DON'T THINK, EN BANC, THERE WOULD HAVE BEEN A GOOD -- EN
02:16PM 18   BANC -- THERE WOULD HAVE BEEN A GOOD POSSIBILITY THAT THE CLASS
02:16PM 19   CERT ORDER WOULD HAVE BEEN AFFIRMED?
02:16PM 20       MS. DERMODY:  I THINK IT'S A POSSIBILITY.
02:16PM 21       AND THEN WHAT ARE YOUR ODDS IN THE SUPREME COURT, YOUR
02:16PM 22   HONOR?
02:16PM 23       THE COURT:  WELL, I THINK IF YOU WANT TO DO AN ORDER
02:16PM 24   THAT RESTRICTS CLASS ACTIONS, I DON'T KNOW IF THIS IS THE
02:16PM 25   POSTER CHILD FOR DOING THAT.
```

UNITED STATES COURT REPORTERS

24

```
02:16PM  1       WHAT DO YOU THINK?  DO YOU THINK THE SUPREME COURT WOULD
02:17PM  2   HAVE WANTED TO DO IT IN THIS CASE?  YOU DON'T THINK PERHAPS
02:17PM  3   THERE MIGHT HAVE BEEN A LEGISLATIVE FIX?  THIS WOULD HAVE BEEN
02:17PM  4   LIKE A LILLY LEDBETTER SITUATION WHERE THERE MAY HAVE BEEN A
02:17PM  5   LEGISLATIVE RESPONSE?
02:17PM  6       I MEAN, I JUST DON'T THINK THAT THIS IS THE -- IF THERE
02:17PM  7   WERE GOING TO BE A GOOD CASE FOR FURTHER RESTRICTING CLASS
02:17PM  8   ACTIONS, I'M NOT SURE THIS IS THE ONE.
02:17PM  9       MS. DERMODY:  IT SOUNDS -- WHAT YOU'RE SAYING, YOUR
02:17PM 10   HONOR, SOUNDS LIKE CONVERSATIONS THAT ME AND MY PARTNERS HAVE
02:17PM 11   AROUND THE CONFERENCE ROOM TABLE ABOUT CASES ALL THE TIME,
02:17PM 12   INCLUDING THIS CASE, AND WHY IT'S SO HARD, WITH A CASE LIKE
02:17PM 13   THIS, TO KNOW WHAT'S THE RIGHT THING TO DO FOR A BUNCH OF
02:17PM 14   ABSENT CLASS MEMBERS WHOSE RIGHTS YOU HOLD IN YOUR HAND BY YOUR
02:17PM 15   NEGOTIATION.
02:17PM 16       AND WHEN YOU HAVE A CASE WHERE YOU CAN RECOGNIZE THAT
02:17PM 17   THERE IS A RISK, YOU HAVE TO TAKE THAT RISK SERIOUSLY.  EVEN IF
02:17PM 18   YOU THINK YOU HAVE A GREAT CASE AND IT'S THE MOST WONDERFUL
02:17PM 19   CASE, YOU HAVE TO AT LEAST ACKNOWLEDGE THAT THE RISK EXISTS.
02:17PM 20       THAT'S ONLY ONE RISK.  IT IS A RISK.  IT MAY NOT BE EVEN
02:17PM 21   THE RISK THAT WE THOUGHT WAS THE GREATEST RISK.
02:17PM 22       I THINK YOUR HONOR MAY HAVE ASSUMED MORE THAN WE DID ABOUT
02:18PM 23   THE LACK OF RISK AT TRIAL, AND WE HAVE DONE JURY TESTING, AS I
02:18PM 24   KNOW THE DEFENDANTS HAVE DONE JURY TESTING -- AS ANYONE I'M
02:18PM 25   SURE THAT COMES BEFORE YOUR HONOR DOES IN A COMPLEX LITIGATION
```

UNITED STATES COURT REPORTERS

25

02:18PM 1    IN THIS COURT -- TO FIND OUT WHAT JURORS THINK ABOUT THIS

02:18PM 2    EVIDENCE, WHAT JURORS THINK ABOUT THESE CLASS MEMBERS, WHAT

02:18PM 3    JURORS THINK ABOUT CERTAIN THEMES THAT ARE IN THIS CASE.

02:18PM 4        AND YOU HAVE TO BE SOBERED WHEN YOU DO THAT KIND OF

02:18PM 5    TESTING TO UNDERSTAND THAT WHILE YOU MIGHT HAVE GREAT EVIDENCE,

02:18PM 6    YOU HAVE TO OVERCOME A NUMBER OF HURDLES.

02:18PM 7        IN THIS CASE, AS THE COURT WELL KNOWS, WE HAD SEVERAL.  WE

02:18PM 8    HAVE JURORS HAVE TO FIND UNANIMOUSLY THERE WAS AN OVERARCHING

02:18PM 9    CONSPIRACY AMONG ALL SEVEN COMPANIES:  WE HAVE JURORS HAVE TO

02:18PM 10   FIND THAT THERE WAS IMPACT UNANIMOUSLY:  AND JURORS HAVE TO COME

02:18PM 11   UP WITH A DAMAGES FIGURE THAT'S GOING TO RIVAL WHAT WE'VE

02:18PM 12   SECURED HERE, THAT IS, A SUM CERTAIN.

02:18PM 13       AND WHEN WE EXPLORE ALL OF THOSE THINGS, THOSE ARE VERY,

02:18PM 14   VERY REAL RISKS FOR PLAINTIFFS, VERY REAL RISKS.

02:18PM 15       AND THE PROBLEM FOR US, AS WE LOOK AT WHAT'S HAPPENED IN

02:19PM 16   OTHER ANTITRUST TRIALS IN THE LAST DECADE, IS THAT IT'S VERY,

02:19PM 17   VERY TOUGH.

02:19PM 18       THE COURT:  LET ME ASK YOU A QUESTION.  IN YOUR

02:19PM 19   PAPERS, YOU SAY AT LEAST TWICE, OR AT LEAST ONCE, THAT IF ONE

02:19PM 20   OF THE SEVEN DEFENDANTS WAS FOUND NOT TO HAVE PARTICIPATED IN

02:19PM 21   AN OVERARCHING CONSPIRACY, THE DAMAGES WOULD HAVE BEEN ZERO.

02:19PM 22   DO YOU REALLY THINK THAT'S THE CASE?  IT WOULD HAVE BEEN ZERO?

02:19PM 23       MS. DERMODY:  IF THE -- THAT'S NOT OUR POSITION.  I'M

02:19PM 24   SAYING WHAT WE KNOW THE DEFENDANTS WOULD ARGUE, AND WE WOULD

02:19PM 25   HAVE TO PRESENT OUR POSITIONS AGAINST THAT.  WE WOULD DISAGREE

UNITED STATES COURT REPORTERS

---

26

02:19PM 1    WITH THAT.

02:19PM 2        BUT THEY WOULD HAVE ARGUMENTS ABOUT THAT BECAUSE OUR

02:19PM 3    THEORY OF THE CASE IS OVERARCHING CONSPIRACY.  OUR DAMAGES

02:19PM 4    MODEL REFLECTS AN OVERARCHING CONSPIRACY.

02:19PM 5        THE DEFENDANTS WOULD MAKE ARGUMENTS THAT WE HAVE TO

02:19PM 6    CREDIT, YOUR HONOR.

02:19PM 7    I UNDERSTAND THE COURT'S SKEPTICISM BECAUSE THE COURT

02:19PM 8    KNOWS, AS WE KNOW, WHAT WE'VE UNCOVERED IN THIS CASE.

02:19PM 9        THE COURT:  I'VE LOOKED AT -- THROUGH ALL THOSE

02:19PM 10   SEALING REQUESTS, I'VE LOOKED AT MUCH OF THESE DOCUMENTS

02:19PM 11   MYSELF, ALL THE E-MAILS, ALL OF THE REPORTS.

02:20PM 12   SO I'M ASKING YOU, HAVING GONE THROUGH A LOT OF THOSE

02:20PM 13   SEALING REQUESTS, WHICH WAS NOT VERY MUCH FUN, AND KNOWING WHAT

02:20PM 14   A LOT OF THE DOCUMENTS ARE IN THIS CASE, YOU REALLY THINK THE

02:20PM 15   DAMAGES WOULD HAVE BEEN ZERO IF THIS HAD GONE TO TRIAL?

02:20PM 16   I MEAN, I JUST FEEL LIKE THAT IS SUCH A STRETCH.

02:20PM 17       MS. DERMODY:  WHAT I'M SAYING TO YOU, YOUR HONOR --

02:20PM 18       THE COURT:  YEAH.

02:20PM 19       MS. DERMODY:  -- IS THAT THERE IS A RISK.

02:20PM 20       THE COURT:  UM-HUM.

02:20PM 21       MS. DERMODY:  THERE IS A RISK.  THERE'S A RISK THAT A

02:20PM 22   JURY MIGHT FIND THAT THERE WAS NO OVERARCHING CONSPIRACY, AND

02:20PM 23   YET, THEY MIGHT THINK THERE WAS AN IMPACT.

02:20PM 24       A JURY MIGHT FIND THAT THERE WAS AN OVERARCHING CONSPIRACY

02:20PM 25   AND NO IMPACT BECAUSE THE JURY MIGHT CONCLUDE THAT THESE

UNITED STATES COURT REPORTERS

---

27

02:20PM 1    WORKERS ARE AMONG THE MOST DESIRABLE IN THE WORLD AND THEY HAD

02:20PM 2    PLENTY OF OTHER OPPORTUNITY TO GO OTHER PLACES BESIDES THESE

02:20PM 3    SEVEN COMPANIES.  JURORS MIGHT CONCLUDE THAT.

02:20PM 4        JURORS MIGHT SAY THERE WAS AN OVERARCHING CONSPIRACY AND

02:20PM 5    THERE WAS SOME IMPACT, BUT WE DON'T LIKE PLAINTIFFS' DAMAGES

02:20PM 6    MODEL, THAT WE ACTUALLY LISTENED TO WHAT THE DEFENDANTS'

02:21PM 7    EXPERTS, SIX ECONOMISTS, ARE GOING TO SAY, AND WE THINK THAT IT

02:21PM 8    WASN'T $3 BILLION.  WE THINK IT WAS LESS THAN $1 BILLION.  WE

02:21PM 9    THINK IT WAS SOME SMALL FRACTION.

02:21PM 10       THE COURT:  WELL THEN, WHY DIDN'T YOU ALL PROPOSE,

02:21PM 11   THEN, A BETTER, MORE ACCURATE, MORE PERSUASIVE DAMAGES MODEL?

02:21PM 12   I MEAN, YOU'RE ALMOST NOW A VICTIM OF YOUR OWN SUCCESS.

02:21PM 13   YOU'RE THE ONES THAT PUT OUT THE 3 BILLION NUMBER.  THAT'S WHAT

02:21PM 14   HAS GOTTEN EVERYONE'S EXPECTATIONS SO HIGH.  IF YOU ALL HAD NOT

02:21PM 15   BEEN SO AGGRESSIVE WITH YOUR DAMAGES MODEL AND THEORY, PERHAPS

02:21PM 16   WE WOULDN'T BE IN THIS SITUATION, RIGHT?  YOU ARE THE ONES WHO

02:21PM 17   HAVE CREATED THE VERY HIGH EXPECTATIONS OF THIS CLASS.

02:21PM 18       MS. DERMODY:  WELL, I THINK THAT'S INTERESTING

02:21PM 19   FEEDBACK, YOUR HONOR.

02:21PM 20   WE PUT TOGETHER THE MODEL THAT OUR EXPERT, INDEPENDENTLY,

02:21PM 21   DECIDED WAS THE MODEL TO REFLECT WHAT OUR EXPERT BELIEVED TO BE

02:21PM 22   THE BUT FOR WORLD IF THESE AGREEMENTS HAD NOT EXISTED.  THAT

02:21PM 23   WAS OUR EXPERT'S POINT OF VIEW.  FULL STOP.

02:22PM 24   WE HAVE TO ACKNOWLEDGE THE RISK THAT A JURY, HEARING A

02:22PM 25   WHOLE BUNCH OF DIFFERENT EXPERTS, EVEN AS WE THINK WE HAVE THE

UNITED STATES COURT REPORTERS

---

28

02:22PM 1    BEST ONE, MIGHT COME TO A DIFFERENT PERSPECTIVE.

02:22PM 2        AND WHILE I WOULD LOVE IT IF I WAS TRYING THIS CASE TO

02:22PM 3    "THE NEW YORK TIMES" EDITORIAL BOARD, THE FACT OF THE MATTER

02:22PM 4    IS, WE WOULD BE TRYING THIS CASE TO THE JURORS THAT ARE HERE

02:22PM 5    AND WE HAVE TO DEAL WITH THE REALITY THAT THOSE JURORS MIGHT

02:22PM 6    NOT SEE IT THE WAY WE SEE IT, OR EVEN HOW YOUR HONOR HAS SEEN

02:22PM 7    THE EVIDENCE.  THAT IS JUST A REALITY.

02:22PM 8        SO WHEN WE LOOK AT THOSE THINGS AND WE UNDERSTAND THAT

02:22PM 9    THERE IS SOME RISK AT EACH STEP OF THE WAY THAT WE'RE NOT GOING

02:22PM 10   TO EITHER PREVAIL, OR IF WE PREVAIL, NOT GET THAT AMOUNT OF

02:22PM 11   MONEY, AND WE HAVE IN HAND $324 AND A HALF MILLION ON TOP OF 20

02:22PM 12   MILLION WE'VE ALREADY RECOVERED, AND WE CAN LOOK AT OTHER CASES

02:22PM 13   THAT HAVE BEEN TRIED IN THIS DISTRICT RECENTLY WHERE PEOPLE GOT

02:22PM 14   LESS THAN WHAT WE'RE GETTING AS A PERCENTAGE OF EXPOSURE --

02:22PM 15       THE COURT:  OKAY.  BUT THAT -- YOU KNOW, UNLESS YOU

02:23PM 16   SHOW ME THE DOCUMENTS IN THOSE LCD-TFD CASES, I JUST DON'T

02:23PM 17   THINK THAT'S USEFUL.  THAT'S NOT USEFUL.  THAT'S A TOTALLY

02:23PM 18   DIFFERENT CASE.

02:23PM 19       MS. DERMODY:  BUT THERE WERE 14 GUILTY PLEAS IN THAT

02:23PM 20   CASE.

02:23PM 21   WE HAD NO GUILTY PLEAS HERE.  IN SOME WAYS THAT CASE WAS

02:23PM 22   MUCH MORE COMPELLING ON THE EVIDENCE.

02:23PM 23   I MEAN, THEY'RE APPLES AND ORANGES IN SO MANY RESPECTS,

02:23PM 24   YOUR HONOR.

02:23PM 25   BUT I JUST WANT TO SAY THAT --

UNITED STATES COURT REPORTERS

---

---

29

02:23PM 1    THE COURT: DO YOU REALLY THINK THAT PRICE FIXING ON

02:23PM 2    TV'S IS MORE COMPELLING THAN THE FACTS OF THIS CASE?

02:23PM 3    MS. DERMODY: WELL, I WILL USE A DIFFERENT CASE THAT,

02:23PM 4    AT LEAST FOR ME, COMPETES WITH THIS ONE FOR BEING COMPELLING,

02:23PM 5    AND THAT'S THE ABBOTT CASE, THE SMITHKLINE BEECHAM CASE THAT

02:23PM 6    WAS BEFORE JUDGE WILKEN THAT WAS A DRUG PRICE FIXING CASE FOR

02:23PM 7    AN AIDS DRUG, AND IN THAT CASE YOU HAVE A HISTORY OF ALLEGED

02:23PM 8    PRACTICE OF PEOPLE ELEVATING --

02:23PM 9    THE COURT: WELL, I STILL DON'T THINK --

02:23PM 10   MS. DERMODY: -- THE PRICE OF AN AIDS DRUG. THE JURY

02:23PM 11   GOT --

02:23PM 12   THE COURT: UNLESS YOU'RE GOING TO GIVE ME ALL THE

02:23PM 13   DOCUMENTATION SO I CAN FAMILIARIZE MYSELF WITH THE FACTS OF

02:23PM 14   THOSE CASES, I JUST DON'T THINK RANDOMLY PULLING OUT OTHER

02:23PM 15   VERDICTS OF OTHER CASES IS REALLY USEFUL.

02:24PM 16   MS. DERMODY: OKAY, YOUR HONOR. I MEAN, IF THERE'S

02:24PM 17   SOMETHING THAT WE COULD SUBMIT TO YOUR HONOR THAT WOULD BE MORE

02:24PM 18   HELPFUL, I WOULD BE MORE THAN HAPPY TO DO IT.

02:24PM 19   I THINK WHAT WE'RE STRUGGLING WITH IS THAT THE STANDARD

02:24PM 20   HERE IS NOT, YOU KNOW, WHAT MIGHT BE THE BEST POSSIBLE

02:24PM 21   SCENARIO.

02:24PM 22   THE STANDARD HERE IS SORT OF THE RANGE OF REASONABLENESS

02:24PM 23   BASED ON THE RISK IN THIS CASE. AND FROM OUR PERSPECTIVE, AS

02:24PM 24   PEOPLE THAT LIVED AND BREATHED AND SWEATED AND SACRIFICED FOR

02:24PM 25   THIS CASE, AND JUST 100 PERCENT DID EVERYTHING WE COULD FOR

UNITED STATES COURT REPORTERS

---

30

02:24PM 1    THESE CLASS MEMBERS -- I MEAN, HONESTLY, YOUR HONOR, WE HAVE

02:24PM 2    DONE EVERYTHING WE COULD TO DO THIS CASE RIGHT -- WE BELIEVE

02:24PM 3    THAT THIS IS THE RIGHT THING TO DO FOR THE CLASS.

02:24PM 4    WE THINK IT WOULD BE ABSOLUTELY UNETHICAL FOR US TO SEE

02:24PM 5    THAT THERE WAS THIS MUCH MONEY AVAILABLE FOR THE CLASS ON THESE

02:24PM 6    CLAIMS AND TO IGNORE THAT AND GO TO TRIAL KNOWING THAT THERE

02:24PM 7    MIGHT BE A VERY STRONG RISK THAT THE CLASS GETS NOTHING.

02:24PM 8    THAT DID NOT SEEM AT ALL TENABLE TO US, YOUR HONOR, AND WE

02:24PM 9    JUST HAVE PROVIDED THE COURT VARIOUS BENCHMARKS WE THOUGHT

02:25PM 10   WOULD BE USEFUL TO SEE THAT THIS RISK IS SOMETHING THAT OTHER

02:25PM 11   GOOD LAWYERS, OTHER EXPERIENCED LAWYERS HAVE COME TO SIMILAR

02:25PM 12   RISK CALCULATIONS.

02:25PM 13   I MEAN, ONE OF THE MOST INTERESTING COMPARISONS, PERHAPS

02:25PM 14   TO US ONLY, IS WHAT WE PUT FORWARD IN THAT --

02:25PM 15   THE COURT: WASN'T THE LCD-TFT YOUR CASE? WASN'T

02:25PM 16   THAT LEIFF CABRASER?

02:25PM 17   MS. DERMODY: IT WAS OUR CASE.

02:25PM 18   THE COURT: OKAY. WHICH ONE, THE TOSHIBA OR BEST BUY

02:25PM 19   VERSUS HANNSTAR --

02:25PM 20   MS. DERMODY: TOSHIBA. WE TRIED THAT CASE, YOUR

02:25PM 21   HONOR.

02:25PM 22   THE COURT: UM-HUM.

02:25PM 23   MS. DERMODY: AND IN EXHIBIT A TO OUR REPLY BRIEF, WE

02:25PM 24   PUT FORWARD ALL OF THE ANTITRUST EMPLOYEE CLASS ACTIONS THAT WE

02:25PM 25   COULD FIND, AND WE PUT FORWARD WHAT WE UNDERSTAND TO BE THE

UNITED STATES COURT REPORTERS

---

31

02:25PM 1    RESULTS IN THESE CASES SO YOUR HONOR CAN SEE THEM.

02:25PM 2    AND I THINK WHAT IS INTERESTING IS TO LOOK AT EVEN THE

02:25PM 3    EBAY CASE, WHICH THE CALIFORNIA ATTORNEY GENERAL'S OFFICE

02:25PM 4    PROSECUTED, SOME OF THE BEST LAWYERS IN THE STATE ARE IN THAT

02:25PM 5    OFFICE, REALLY SMART, TALENTED PEOPLE, AND THE RECOVERY IN THAT

02:25PM 6    CASE WAS 1/23RD OF WHAT WE GOT HERE, AND THIS IS 20 -- I SHOULD

02:25PM 7    SAY THIS IS 23 TIMES WHAT THEY GOT THERE.

02:26PM 8    THESE --

02:26PM 9    THE COURT: WELL, UNLESS YOU'RE GOING TO SHOW ME THE

02:26PM 10   DOCUMENTS IN THAT CASE -- I DON'T BELIEVE THERE WAS CLASS CERT

02:26PM 11   IN THAT CASE. I DON'T BELIEVE THERE WAS SUMMARY JUDGMENT IN

02:26PM 12   THAT CASE. I DON'T THINK IT HAD GONE THROUGH THE DAUBERT

02:26PM 13   MOTIONS IN THAT CASE.

02:26PM 14   BUT REGARDLESS, I DON'T FIND IT VERY HELPFUL, UNLESS

02:26PM 15   YOU'RE REALLY GOING TO GIVE ME DEEP INFORMATION ABOUT THOSE

02:26PM 16   CASES, TO SAY, "ALL OF THESE OTHER CASES, BECAUSE I'VE SLAPPED

02:26PM 17   ANTITRUST LABELS ON THEM, ARE COMPARABLE TO THIS."

02:26PM 18   BECAUSE IF WE'RE JUST GOING TO TALK ABOUT RANDOM TRIALS, I

02:26PM 19   CAN DO THAT, TOO. I JUST DON'T THINK -- UNLESS WE GO DEEPLY

02:26PM 20   INTO WHAT THE FACTS ARE TO REALLY SEE IF IT'S COMPARABLE OR

02:26PM 21   NOT, IT'S TOO GENERAL, I THINK.

02:26PM 22   MS. DERMODY: OKAY, YOUR HONOR. WHAT WOULD BE

02:26PM 23   HELPFUL TO THE COURT?

02:26PM 24   THE COURT: SO EXPLAIN TO ME -- I MEAN, YOUR POSITION

02:26PM 25   APPEARS TO BE THAT IF ONE DEFENDANT WAS NOT FOUND TO HAVE

UNITED STATES COURT REPORTERS

---

32

02:27PM 1    PARTICIPATED IN THE OVERARCHING CONSPIRACY, THEN DAMAGES WOULD

02:27PM 2    HAVE BEEN ZERO AND THE CLASS WOULD HAVE GOTTEN NOTHING.

02:27PM 3    BUT I DON'T THINK THAT'S TRUE. YOU ALSO WOULD HAVE THE

02:27PM 4    LEVERAGE TO APPEAL OR, YOU KNOW, THERE WOULD HAVE BEEN ANOTHER

02:27PM 5    SETTLEMENT. IT JUST WOULD HAVE BEEN LATER IN THE PROCESS.

02:27PM 6    MS. DERMODY: SO --

02:27PM 7    THE COURT: AND YOUR LEVERAGE -- ANYWAY, I JUST HAVE

02:27PM 8    CONCERNS ABOUT WHETHER THIS IS REALLY FAIR TO THE CLASS, AND I

02:27PM 9    HAVEN'T MADE A DECISION YET ABOUT WHAT I'M GOING TO DO. I'D

02:27PM 10   LIKE TO THINK ABOUT IT FURTHER.

02:27PM 11   BUT I DO HAVE A CONCERN ABOUT WHETHER THIS IS A SUFFICIENT

02:27PM 12   RECOVERY FOR THE CLASS. I -- YOU KNOW, I AM NOT AT ALL SAYING

02:27PM 13   THAT THE PLAINTIFFS HAVEN'T BEEN ZEALOUS ADVOCATES IN DOING

02:27PM 14   EVERYTHING POSSIBLE FOR THE CLASS, BUT I JUST DO HAVE A

02:27PM 15   QUESTION AND I NEED TO THINK ABOUT IT FURTHER.

02:27PM 16   MS. DERMODY: OKAY, YOUR HONOR.

02:27PM 17   THE COURT: SO IF THERE'S NOTHING MORE THAT YOU WANT

02:28PM 18   TO SAY?

02:28PM 19   NOW, YOU'RE GOING FOR $81 MILLION. WHAT'S YOUR LODESTAR,

02:28PM 20   AND WHY SHOULD THAT GO TO YOU INSTEAD OF THE CLASS?

02:28PM 21   MS. DERMODY: YOUR HONOR, ALL WE'VE SAID IS TO NOTICE

02:28PM 22   THE CLASS THAT WE MIGHT REQUEST UP TO THAT. LAST TIME WE

02:28PM 23   NOTICED THE CLASS AND WE REQUESTED LESS THAN WHAT WE NOTICED.

02:28PM 24   IT'S THE BENCHMARK IN THE NINTH CIRCUIT. WE WOULD THINK

02:28PM 25   IT WOULD BE WARRANTED HERE GIVEN THE WORK IN THIS CASE.

UNITED STATES COURT REPORTERS

33

02:28PM 1    THE COURT: WHAT'S YOUR LODESTAR? BECAUSE FROM THE
02:28PM 2  FIRST SETTLEMENT, IT LOOKED LIKE LEIFF CABRASER'S WAS, WHAT,
02:28PM 3  ABOUT 8 MILLION THROUGH OCTOBER OF, YOU KNOW, OCTOBER 30TH OF
02:28PM 4  2013, 8.4 MILLION.
02:28PM 5    SO WHAT'S THE LODESTAR IF YOU ADD UP ALL THE DIFFERENT LAW
02:28PM 6  FIRMS THAT ARE INVOLVED IN THIS LITIGATION?
02:28PM 7    MS. DERMODY: I DON'T HAVE THAT INFORMATION FOR YOUR
02:28PM 8  HONOR. I'M SORRY.
02:28PM 9    THE COURT: ALL RIGHT. SO FOR THE FIRST SETTLEMENT,
02:28PM 10  NOBODY LOOKED AT THAT FOR THE SETTLEMENT WITH LUCAS FILM,
02:28PM 11  PIXAR, AND INTUIT?
02:28PM 12    MS. DERMODY: I JUST DON'T HAVE THE NUMBERS HANDY FOR
02:28PM 13  YOUR HONOR. I'M SORRY. I DON'T WANT TO MISLEAD THE COURT.
02:29PM 14    THE COURT: OKAY. WELL, YOU KNOW, MR. SAVERI SAID
02:29PM 15  THAT HE WOULD FILE HIS FEES DOCUMENTS FOR THE FIRST SETTLEMENT.
02:29PM 16  I DON'T BELIEVE I GOT THAT.
02:29PM 17    WHAT ARE YOUR LAW FIRM'S -- WHAT'S YOUR LAW FIRM'S --
02:29PM 18    MR. SAVERI: AS OF THE TIME OF THAT, OF THE PRIOR
02:29PM 19  SETTLEMENT, MY FIRM'S LODESTAR WAS APPROXIMATELY $4 MILLION.
02:29PM 20    THE COURT: OKAY. SO -- AND I BELIEVE THAT
02:29PM 21  SETTLEMENT WAS REACHED IN, WHAT, APRIL OF 2013? IS THAT
02:29PM 22  SOMEWHERE AROUND THERE? OR, NO, WHEN WAS THAT? SEPTEMBER?
02:29PM 23    MS. DERMODY: IT WAS APPROVED IN OCTOBER, YOUR HONOR.
02:29PM 24    THE COURT: RIGHT. BUT I -- I GUESS I'M TRYING TO
02:29PM 25  FIGURE OUT, YOU'RE SAYING UP TO THE POINT OF SETTLEMENT, SO

UNITED STATES COURT REPORTERS

34

02:29PM 1  WHAT LINE ARE YOU DRAWING HERE? WHAT'S THE DATE,
02:29PM 2  APPROXIMATELY?
02:29PM 3    MR. SAVERI: I BELIEVE IT WAS OCTOBER OF LAST YEAR.
02:29PM 4    THE COURT: OKAY. SO THROUGH -- ALSO THROUGH SOME
02:29PM 5  POINT IN OCTOBER?
02:29PM 6    MR. SAVERI: YEAH.
02:29PM 7    THE COURT: OKAY.
02:29PM 8    MR. SAVERI: AND, YOUR HONOR, SINCE THAT POINT IN
02:29PM 9  TIME, I MEAN, WE DID A LOT OF ADDITIONAL WORK IN THE CASE.
02:29PM 10    THE COURT: SURE.
02:29PM 11    MR. SAVERI: THE LIEFF CABRASER FOLKS DID A LOT OF
02:29PM 12  WORK.
02:29PM 13    THE COURT: SURE.
02:29PM 14    MR. SAVERI: MY OFFICE DID. SO THERE'S ADDITIONAL
02:29PM 15  LODESTAR. I JUST WANT TO BE --
02:29PM 16    THE COURT: YES, I COMPLETELY UNDERSTAND THAT.
02:29PM 17    BUT YOU HAVE NO IDEA WITH REGARD TO -- I BELIEVE THERE
02:30PM 18  ARE, WHAT, AT LEAST THREE OTHER LAW FIRMS?
02:30PM 19    MS. DERMODY: TWO OTHER FIRMS, YOUR HONOR.
02:30PM 20    THE COURT: TWO OTHER FIRMS.
02:30PM 21    MR. SAVERI: I THINK IT'S FAIR TO SAY THAT BETWEEN
02:30PM 22  THE TWO OF US, WE HAVE THE GREAT MAJORITY OF THE TIME IN THIS
02:30PM 23  CASE.
02:30PM 24    THE COURT: SURE, SURE.
02:30PM 25    MR. SAVERI: I MEAN, AND THAT'S CONSISTENT WITH WHAT

UNITED STATES COURT REPORTERS

35

02:30PM 1  YOU'VE SEEN IN THE CASE.
02:30PM 2    MS. DERMODY: YEAH. WE CAN GET THE ACTUAL NUMBER.
02:30PM 3  WE HAVE THEIRS.
02:30PM 4    THE COURT: OKAY. THE SETTLEMENT AGREEMENT SAYS THE
02:30PM 5  DEFENDANTS TAKE NO POSITION ON THE SERVICE AWARDS IF THE AWARDS
02:30PM 6  ARE $25,000 OR LESS.
02:30PM 7    NOW, THE PROPOSED SERVICE AWARDS ARE 80,000. DOES THAT
02:30PM 8  MEAN THE DEFENDANTS ARE GOING TO TAKE A POSITION? OR YOU'RE
02:30PM 9  GOING TO REMAIN SILENT?
02:30PM 10    MR. VAN NEST: WE'RE GOING TO REMAIN SILENT, YOUR
02:30PM 11  HONOR.
02:30PM 12    THE COURT: OKAY.
02:30PM 13    MR. VAN NEST: THAT'S UP TO YOUR HONOR'S DISCRETION.
02:30PM 14    THE COURT: OKAY.
02:30PM 15    MR. VAN NEST: I WOULD LIKE TO COMMENT ON THE
02:30PM 16  SETTLEMENT OVERALL WHEN YOUR HONOR GETS TO US THOUGH.
02:30PM 17    THE COURT: ACTUALLY, WHY DON'T WE GO AHEAD AND DO
02:30PM 18  THAT NOW? I HAVE SOME OTHER MORE MECHANICAL QUESTIONS ABOUT
02:30PM 19  THE SETTLEMENT. THOSE CAN WAIT.
02:31PM 20    MR. VAN NEST: SURE.
02:31PM 21    THE COURT: SO -- YEAH.
02:31PM 22    MR. VAN NEST: JUST A COUPLE OF QUICK POINTS.
02:31PM 23    THE COURT: YES.
02:31PM 24    MR. VAN NEST: I THINK YOUR HONOR STARTED WITH THE
02:31PM 25  PREMISE SOMEHOW THAT THE SETTLING DEFENDANTS HERE ARE PAYING A

UNITED STATES COURT REPORTERS

36

02:31PM 1  HIGHER PERCENTAGE THAN THE EARLIER -- A LOWER PERCENTAGE.
02:31PM 2  WE DON'T LOOK AT IT THAT WAY AT ALL.
02:31PM 3    THE COURT: OKAY.
02:31PM 4    MR. VAN NEST: AS A MATTER OF FACT, WE THINK WE'RE
02:31PM 5  PAYING A PREMIUM IN THAT IF YOU LOOK AT THE SETTLEMENTS THAT
02:31PM 6  YOU'VE ALREADY APPROVED, YOU APPROVED $20 MILLION SETTLEMENTS.
02:31PM 7  THAT'S ABOUT 8 PERCENT OF THE CLASS.
02:31PM 8    I MEAN, IF YOU DO THE MATH, OUR SETTLEMENT SHOULD HAVE
02:31PM 9  BEEN BELOW $300 MILLION. I MEAN, IF IT'S JUST COMPARABLE, IF
02:31PM 10  WE'RE JUST PAYING WHAT, THE SAME BASIS THAT THAT 20 MILLION
02:31PM 11  PAID, WE WOULD HAVE BEEN IN THE 250 TO 270 TO 280 RANGE.
02:31PM 12    AND BELIEVE ME, AS I THINK YOU KNOW --
02:31PM 13    THE COURT: HOW ARE YOU CALCULATING THAT?
02:31PM 14    MR. VAN NEST: OH, IF YOU JUST -- IF 8 PERCENT OF THE
02:31PM 15  CLASS IS WORTH 20 MILLION, WHAT'S THE OTHER 92 PERCENT WORTH?
02:31PM 16  IT'S NOT 324 MILLION. IT'S A NUMBER SOUTH OF 300.
02:32PM 17    SO OUR POINT IS, AND WE MADE IT REPEATEDLY IN DISCUSSIONS
02:32PM 18  WITH PLAINTIFFS, THAT, YOU KNOW, WE'RE PAYING MORE -- AT THE
02:32PM 19  NUMBERS WE'RE NEGOTIATING NOW, WE'RE PAYING MORE THAN THE FOLKS
02:32PM 20  THAT SETTLED OUT EARLIER, AND IN OUR SITUATION, WE FELT THAT
02:32PM 21  THE BIGGEST RISK IN THIS CASE WAS THE TRIAL ITSELF.
02:32PM 22    AND IF I COULD MAKE JUST A COUPLE OF POINTS ABOUT THIS
02:32PM 23  TRIAL, YOUR HONOR, THAT I THINK ARE SIGNIFICANT?
02:32PM 24    THE COURT: OKAY.
02:32PM 25    MR. VAN NEST: IT IS TRUE THAT DR. LEAMER BASED HIS

UNITED STATES COURT REPORTERS

37

02:32PM 1  DAMAGE MODEL ON AN ALL-IN APPROACH.  IT WAS ALL SEVEN

02:32PM 2  DEFENDANTS PARTICIPATING.  IF YOU TOOK OUT ONE OR MORE

02:32PM 3  DEFENDANTS, HIS MODEL FELL APART AND IN SOME CASES SHOWED THAT

02:32PM 4  SOME DEFENDANTS HAD OVERCOMPENSATED PEOPLE.

02:32PM 5         IN OTHER WORDS, HIS MODEL ONLY WORKED -- AND HE CONCEDED

02:32PM 6  THIS, WE'D BE HAPPY TO SUBMIT A SHORT BRIEF ON IT -- HE

02:32PM 7  CONCEDED THAT HIS MODEL WOULDN'T WORK IF NOT ALL DEFENDANTS

02:32PM 8  WERE FOUND TO BE PARTICIPANTS.

02:33PM 9         NOW, YOUR HONOR RECOGNIZES, AND COUNSEL SAID IT IN HER

02:33PM 10  BRIEF, THAT OBVIOUSLY THESE BILATERAL AGREEMENTS WERE ENTERED

02:33PM 11  INTO OVER A WIDE PERIOD OF TIME, SOME IN DIFFERENT INDUSTRIES,

02:33PM 12  AND SO ONE OF THE BIG RISKS IN THE TRIAL WAS THAT ONE DEFENDANT

02:33PM 13  WOULD BE OUT.

02:33PM 14         THE COURT:  YES.

02:33PM 15         MR. VAN NEST:  THE OTHER BIG RISK --

02:33PM 16         THE COURT:  OKAY.  BUT LET'S PLAY THAT OUT.  SO WHAT

02:33PM 17  WOULD HAVE HAPPENED?  YOU DON'T THINK THE JURORS, ONE

02:33PM 18  POSSIBILITY COULD HAVE BEEN TO TAKE OUT OF DR. LEAMER'S DAMAGES

02:33PM 19  MODEL, OR SOME PERCENTAGE OF THAT MODEL, TAKE OUT THAT

02:33PM 20  PERCENTAGE OF THAT DEFENDANT'S EMPLOYEES?  OR YOU'RE SAYING

02:33PM 21  THAT -- YOU'RE SAYING THE JURY COULD HAVE COME UP WITH NOTHING?

02:33PM 22         MR. VAN NEST:  YEAH.

02:33PM 23         THE COURT:  IF THEY DIDN'T ACCEPT IT WHOLE HOG, THEY

02:33PM 24  WOULD COME UP WITH ZERO?

02:33PM 25         MR. VAN NEST:  TWO THINGS.

UNITED STATES COURT REPORTERS

38

02:33PM 1         THE COURT:  IS THAT -- I JUST WANT TO KNOW --

02:33PM 2         MR. VAN NEST:  YEAH.

02:33PM 3         THE COURT:  -- WHAT ARE YOU SAYING?

02:33PM 4         MR. VAN NEST:  ABSOLUTELY.

02:33PM 5         THE COURT:  IF THE JURY FOUND THAT ONE, THEY WOULD GO

02:33PM 6  WITH ZERO?  BECAUSE I -- I FIND THAT A LITTLE BIT DIFFICULT TO

02:33PM 7  BELIEVE.

02:33PM 8         MR. VAN NEST:  I DON'T.

02:33PM 9         THE COURT:  YOU THINK THAT THE JURY WOULD COME UP

02:33PM 10  WITH ZERO?

02:33PM 11         MR. VAN NEST:  BUT HERE'S THE POINT.  THEY HAD AN

02:33PM 12  EXPERT REPORT THAT WAS ONE FLAVOR.

02:33PM 13         THE COURT:  UM-HUM.

02:33PM 14         MR. VAN NEST:  ALL SEVEN IN, HERE'S THE NUMBER.

02:34PM 15         THE COURT:  UM-HUM.

02:34PM 16         MR. VAN NEST:  DR. LEAMER CONCEDED, IN DEPOSITION,

02:34PM 17  "IF YOU TAKE ONE DEFENDANT OUT, MY MODEL DOESN'T WORK."

02:34PM 18         THEY THEN -- WE THEN WOULD BE ARGUING TO YOUR HONOR, UNDER

02:34PM 19  COMCAST AND ALL THE RECENT SUPREME COURT CASES, THAT THEY DON'T

02:34PM 20  HAVE A DAMAGE MODEL TO GIVE TO THE JURY TO PRODUCE ANYTHING

02:34PM 21  OTHER THAN SPECULATION.

02:34PM 22         THE COURT:  UM-HUM.

02:34PM 23         MR. VAN NEST:  SO DO I THINK I HAD A CHANCE TO

02:34PM 24  PERSUADE THE JURY, GIVEN THAT, THAT THEY SHOULDN'T AWARD

02:34PM 25  DAMAGES BECAUSE THERE WASN'T A BASIS?  YOU BET I DO.

UNITED STATES COURT REPORTERS

39

02:34PM 1  BUT I THINK EVEN IF I HADN'T --

02:34PM 2         THE COURT:  YOU WOULD HAVE A JMOL MOTION?

02:34PM 3         MR. VAN NEST:  I WOULD HAVE A GOOD MOTION UNDER

02:34PM 4  COMCAST.

02:34PM 5         NOW, I DON'T, FRANKLY, THINK THAT THAT'S THE BIGGEST RISK.

02:34PM 6         THE COURT:  YEAH.

02:34PM 7         MR. VAN NEST:  I'LL TELL YOU, I THINK THE BIGGEST

02:34PM 8  RISK IN THIS CASE --

02:34PM 9         THE COURT:  YEAH.

02:34PM 10         MR. VAN NEST:  -- IS THAT THEY HAD A HUGE NUMBER,

02:34PM 11  $3 BILLION, AND THE FACTS ON THE GROUND WERE THAT TECH

02:34PM 12  EMPLOYEES IN THE CLASS WERE PAID WAY ABOVE BOTH THE NATIONAL

02:34PM 13  AND THE REGIONAL AVERAGE, AND THEIR PAY WENT UP, NOT BY A

02:34PM 14  LITTLE, BUT EVERY YEAR IT WENT UP BY MORE THAN IT HAD EITHER

02:35PM 15  BEFORE OR AFTER THE CLASS PERIOD.

02:35PM 16         SO THERE'S A VERY STRONG ARGUMENT THAT THAT $3 BILLION

02:35PM 17  NUMBER EVERYBODY IS TALKING ABOUT WAS ABSOLUTELY INCONSISTENT

02:35PM 18  WITH THE FACTS ON THE GROUND.

02:35PM 19         AND WHY DO YOU THINK THAT HE COULD HAVE --

02:35PM 20         THE COURT:  BUT YOU'RE COMPARING THEM, WHAT, LIKE THE

02:35PM 21  PLAINTIFFS JUST TO THE AVERAGE INCOME IN SANTA CLARA COUNTY?

02:35PM 22         MR. VAN NEST:  NO, NO, NO, NO.

02:35PM 23         THE COURT:  BECAUSE THAT'S WHAT THEY DO IN THEIR

02:35PM 24  REPLY BRIEF.

02:35PM 25         MR. VAN NEST:  THEY DO.

UNITED STATES COURT REPORTERS

40

02:35PM 1         THE COURT:  THEY JUST SAY, WELL, SANTA CLARA COUNTY,

02:35PM 2  AVERAGE INCOME IS THIS:  THEREFORE, THERE WOULD HAVE BEEN A LOT

02:35PM 3  OF RESENTMENT THAT THESE ARE TECH WORK WORKERS THAT ARE MAKING

02:35PM 4  MORE THAN THE AVERAGE INCOME.

02:35PM 5         MR. VAN NEST:  WHAT WE SAID IN OUR DAUBERT --

02:35PM 6         THE COURT:  YEAH.

02:35PM 7         MR. VAN NEST:  -- WAS THAT THEY ARE ABOVE THE

02:35PM 8  NATIONAL AND THE REGIONAL AVERAGE FOR TECH WORKERS.  IF YOU

02:35PM 9  LOOK AT TECH WORKERS ON AVERAGE, IN THE NATION OR REGIONALLY

02:35PM 10  HERE, THESE CLASS MEMBERS WERE PAID WAY -- I'M NOT TALKING 1 OR

02:35PM 11  2 PERCENT -- BUT WAY ABOVE THAT AVERAGE AND THEIR PAY WENT UP.

02:35PM 12         THE COURT:  BUT ISN'T THIS WHERE YOU COME IF YOU ARE

02:35PM 13  A TOP TECH WORKER?

02:35PM 14         MR. VAN NEST:  SURE.

02:35PM 15         THE COURT:  WOULDN'T YOU BE IN SILICON VALLEY --

02:35PM 16         MR. VAN NEST:  ABSOLUTELY.

02:35PM 17         THE COURT:  -- VERSUS IN BROKEN ARROW, OKLAHOMA?

02:36PM 18         MR. VAN NEST:  SURE.  MY POINT IS THAT THEIR WHOLE

02:36PM 19  CASE WAS PREMISED ON SOMEHOW PAY BEING SUPPRESSED; AND, YET, IN

02:36PM 20  THE CLASS PERIOD, PAY WENT UP MORE EVERY YEAR THAN IT HAD GONE

02:36PM 21  UP BEFORE OR AFTER.

02:36PM 22         THE COURT:  BUT THE THEORY IS IT COULD HAVE GONE UP

02:36PM 23  EVEN MORE.

02:36PM 24         MR. VAN NEST:  SURE.

02:36PM 25         THE COURT:  AND I DON'T THINK THAT'S INCONSISTENT

UNITED STATES COURT REPORTERS

41

02:36PM 1   WITH SAYING TECH WORKERS HERE MAKE MORE THAN TECH WORKERS IN
02:36PM 2   ALABAMA, MAINE, WHEREVER YOU WANT TO TALK ABOUT IT, AND THAT
02:36PM 3   THEIR SALARIES COULD HAVE BEEN EVEN HIGHER.
02:36PM 4          MR. VAN NEST:  BUT YOU AND I --
02:36PM 5          THE COURT:  I JUST DON'T THINK THAT'S INCONSISTENT.
02:36PM 6          MR. VAN NEST:  BUT HOW MUCH DO YOU WANT TO GAMBLE ON
02:36PM 7   THAT?  I MEAN, THERE HAVE BEEN A LOT OF BILLION DOLLAR CLAIMS
02:36PM 8   MADE IN OUR DISTRICT.
02:36PM 9          THE COURT:  WELL, HOW MUCH DID YOU ALL WANT TO GAMBLE
02:36PM 10  WITH ALL OF THAT INFORMATION COMING OUT?  HOW MUCH DID YOU ALL
02:36PM 11  WANT TO GO TO TRIAL ON THIS?
02:36PM 12         MR. VAN NEST:  WE BELIEVE --
02:36PM 13         THE COURT:  I MEAN, YOU'VE SEEN HOW OUR JURY POOLS
02:36PM 14  ARE HERE IN SAN JOSE.  I THINK THEY WOULD HAVE FOUND THESE
02:36PM 15  DOCUMENTS VERY SIGNIFICANT AND PRETTY COMPELLING.
02:36PM 16         MR. VAN NEST:  I'M NOT DISAGREEING WITH THAT.
02:36PM 17         THE COURT:  THEY WOULD HAVE FOUND A LOT OF THE
02:36PM 18  TESTIMONY VERY COMPELLING.  THEY WOULD HAVE FOUND A LOT OF THE
02:36PM 19  E-MAILS VERY COMPELLING.
02:37PM 20         HOW MUCH -- YOU KNOW, I UNDERSTAND WE'RE ALL FOCUSED ON
02:37PM 21  HOW MUCH THE PLAINTIFFS DIDN'T WANT TO GO TO TRIAL.
02:37PM 22         LET'S TALK ABOUT HOW MUCH THE DEFENDANTS DIDN'T WANT TO GO
02:37PM 23  TO TRIAL.  HOW MUCH WAS THAT WORTH?
02:37PM 24         MR. VAN NEST:  YOU CAN PRICE IT.
02:37PM 25         THE COURT:  HOW COME YOU'RE NOT REALLY FOCUSSING ON

UNITED STATES COURT REPORTERS

42

02:37PM 1   THAT?
02:37PM 2          MR. VAN NEST:  WE PRICED IT.  IT'S $324.5 MILLION.
02:37PM 3          IN OTHER WORDS, GIVEN ALL THE RISKS AND GIVEN MONTHS OF
02:37PM 4   WORK WITH JUDGE PHILLIPS, THAT'S WHAT WE -- THAT'S WHAT WE
02:37PM 5   CONCLUDED.
02:37PM 6          THE COURT:  IT'S NOT JUST FINANCIAL RISKS.  IT'S
02:37PM 7   OTHER DAMAGE THAT YOUR COMPANIES WOULD GET IN TRYING TO RECRUIT
02:37PM 8   OTHER EMPLOYEES AND WHAT THAT WOULD DO TO YOUR IMAGE, TO YOUR
02:37PM 9   GOOD WILL.  I MEAN, IT WOULD HAVE HAD A LOT OF COST OTHER THAN
02:37PM 10  JUST STRICTLY MONETARY.
02:37PM 11         MR. VAN NEST:  I'M NOT DENYING THAT ONE BIT.
02:37PM 12         BUT YOUR HONOR'S QUESTION, WHAT'S IT WORTH TO US, WE PUT
02:37PM 13  OUR MONEY WHERE OUR MOUTH IS, RIGHT?  WE NEGOTIATED FOR A
02:37PM 14  SETTLEMENT AND ACHIEVED A SETTLEMENT THAT IS FAIR AND
02:37PM 15  REASONABLE TO THE CLASS IN LIGHT OF ALL THE RISKS.
02:37PM 16         I'M JUST POINTING OUT THAT THERE ARE LOTS OF RISKS ON THE
02:38PM 17  PLAINTIFFS' SIDE THAT MEAN THERE'S A REAL POSSIBILITY OF EITHER
02:38PM 18  A LOW VERDICT OR NO VERDICT OR A VERDICT THAT DOESN'T REACH THE
02:38PM 19  SETTLEMENT THAT WE'VE ACHIEVED.
02:38PM 20         FOR EXAMPLE, FOR EXAMPLE, WE ALL KNOW THAT YOU CAN COME
02:38PM 21  INTO COURT WITH A BILLION DOLLAR CLAIM AND END UP WITH A LOT
02:38PM 22  LESS MONEY, RIGHT?  I MEAN, THAT HAPPENS ALL THE TIME.
02:38PM 23         AND IN THIS PARTICULAR CASE, THE FOCUS THAT YOUR HONOR
02:38PM 24  HAD, BECAUSE THAT'S WHAT WAS PRESENTED, WAS ON THE LIABILITY
02:38PM 25  SIDE, WE HAD SUMMARY JUDGMENT MOTIONS AND ALL THAT, AND A

UNITED STATES COURT REPORTERS

43

02:38PM 1   LITTLE BIT ON THE DAMAGES SIDE IN THE DAUBERTS.
02:38PM 2          BUT THE REAL RISK IN THE CASE WAS --
02:38PM 3          THE COURT:  WELL, THE DAMAGES ALSO CAME UP A LOT IN
02:38PM 4   THE TWO CLASS CERT ISSUES -- MOTIONS, EXCUSE ME.
02:38PM 5          MR. VAN NEST:  TO SOME DEGREE, THEY DID.
02:38PM 6          THE COURT:  YEAH.
02:38PM 7          MR. VAN NEST:  BUT THAT'S WHERE THERE'S A HUGE RANGE
02:38PM 8   OF RISK, WHICH IS WHY I SAY THE NUMBER THAT WE ACHIEVED IS
02:38PM 9   ABSOLUTELY IN LINE, A LITTLE BETTER FOR THE PLAINTIFFS,
02:38PM 10  THAN THE NUMBER THAT WAS ACHIEVED IN THE FIRST SETTLEMENT.
02:38PM 11         SO GIVEN -- GIVEN THAT THAT'S 8 TO 10 PERCENT OF THE CLASS
02:39PM 12  THAT PAID $20 MILLION, IT IS ABSOLUTELY FAIR AND REASONABLE FOR
02:39PM 13  THE REST OF THE -- FOR THE DEFENDANTS EMPLOYING THE REST OF THE
02:39PM 14  CLASS TO PAY THE 324.5 MILLION.  IT'S IN LINE WITH IT, IT'S A
02:39PM 15  PREMIUM OVER IT, AND MAYBE THAT'S CONSISTENT WITH THE FACT THAT
02:39PM 16  THE CASE WAS A LITTLE MORE WELL DEVELOPED BY THE TIME IT GOT
02:39PM 17  THERE.
02:39PM 18         BUT I DO THINK THAT WHAT COUNSEL HAS SAID ABOUT THE RISK
02:39PM 19  OF A NO OR LOW VERDICT IS -- CANNOT BE IGNORED OR OVERLOOKED IN
02:39PM 20  THIS CASE GIVEN THE ECONOMIC FACTS ON THE GROUND, AND GIVEN
02:39PM 21  THAT EVEN YOUR HONOR RECOGNIZED THAT DR. LEAMER'S RESULTS AT
02:39PM 22  THAT T-SCORE WEREN'T STATISTICALLY SIGNIFICANT BY ANY MEASURE
02:39PM 23  THAT ANY ECONOMIST, MATHEMATICIAN, OR SCIENTIST HAS EVER
02:39PM 24  APPROVED.
02:39PM 25         AND ALTHOUGH THAT PASSED DAUBERT, IT MIGHT NOT PASS A JURY

UNITED STATES COURT REPORTERS

44

02:39PM 1   TO HEAR THAT THIS GUY'S REPORT -- WHICH IS THE ONLY THING THAT
02:40PM 2   GIVES THEM A NUMBER -- WAS NOT STATISTICALLY SIGNIFICANT BY ANY
02:40PM 3   TRADITIONAL MEASURE OF SIGNIFICANCE IN ANY SORT OF SCIENTIFIC,
02:40PM 4   ACADEMIC, MATHEMATIC, OR EVEN INDUSTRIAL COMMUNITY.
02:40PM 5          AND THAT WAS A HUGE, SIGNIFICANT FACT FOR US FOR
02:40PM 6   PRESENTATION TO THE JURY AND, FRANKLY, THE ONLY -- THE ONLY
02:40PM 7   EVIDENCE, IF YOU WANT TO CALL IT THAT, THEY HAD OF THAT NUMBER
02:40PM 8   WAS DR. LEAMER'S OPINION.
02:40PM 9          THERE WASN'T ANY OTHER INTRINSIC EVIDENCE THAT LEADS TO
02:40PM 10  THAT NUMBER.  THE INTRINSIC EVIDENCE LEADS TO A SHOWING THAT I
02:40PM 11  MENTIONED OF PAY GOING UP AND BEING ABOVE AVERAGE.
02:40PM 12         SO IF HE DOESN'T HAVE A SIGNIFICANTLY SIGNIFICANT RESULT,
02:40PM 13  WOULD YOU HANG YOUR HAT ON A JURY TRIAL IN THAT SITUATION WHEN
02:40PM 14  YOU HAVE ONE EXPERT PRESENTING DAMAGES WHOSE T-SCORE IS HIGHER
02:40PM 15  THAN ANY OTHER COURT OR VERDICT THAT WE WERE ABLE TO FIND HAS
02:40PM 16  EVER SUPPORTED?
02:40PM 17         I MEAN, THAT'S ANOTHER FACTOR, I THINK, THAT CAUSED, YOU
02:41PM 18  KNOW, THE PARTIES TO COME WHERE THEY DID.
02:41PM 19         NOW, I WILL SAY THAT THIS SETTLEMENT WAS ACHIEVED OVER A
02:41PM 20  QUITE LONG PERIOD OF TIME.  IT STARTED WITH MEETINGS, BUT IT
02:41PM 21  CONTINUED FOR MONTHS WITH JUDGE PHILLIPS ACTIVELY INVOLVED AND
02:41PM 22  JUDGE PHILLIPS GUIDING THE PARTIES TO WHERE WE ULTIMATELY ENDED
02:41PM 23  UP.
02:41PM 24         AND WHILE, OF COURSE, THE SETTLEMENT DISCUSSIONS ARE
02:41PM 25  CONFIDENTIAL, I DON'T THINK THERE'S ANY QUESTION THAT YOU HAD

UNITED STATES COURT REPORTERS

45

02:41PM 1  KNOWLEDGEABLE, EXPERIENCED COUNSEL ON BOTH SIDES, AND A VERY
02:41PM 2  KNOWLEDGEABLE, EXPERIENCED MEDIATOR WHO WAS WELL AWARE OF ALL
02:41PM 3  OF THESE RISKS AND WHAT'S BEEN HAPPENING AT TRIALS HERE AND
02:41PM 4  AROUND THE COUNTRY.
02:41PM 5        AND, YOU KNOW, TO COME UP WITH THIS NUMBER, WHICH IS, I
02:41PM 6  GUESS, THE SECOND BIGGEST NUMBER IN HISTORY FOR A SETTLEMENT OF
02:41PM 7  THIS KIND, I THINK THAT'S A PRETTY SIGNIFICANT ACHIEVEMENT AND
02:41PM 8  I THINK THAT THE PARTIES DIDN'T COME TO IT OVERNIGHT.  IT TOOK
02:41PM 9  A WHOLE LOT OF WORK AND A WHOLE LOT OF TIME AND EFFORT BY A LOT
02:42PM 10 OF PEOPLE TO GET THAT NUMBER DONE.
02:42PM 11       THE ONLY OTHER COMMENT I'LL MAKE IS THAT I THINK YOUR
02:42PM 12 HONOR'S COMMENTS ON THE SO-CALLED PRO RATA, IT -- THIS
02:42PM 13 SETTLEMENT IS A LITTLE BIT DIFFERENT IN THAT THERE'S NO CLAIMS
02:42PM 14 PROCESS.  WE'RE JUST GOING TO WRITE CHECKS.  WE HAVE THE
02:42PM 15 ADDRESSES.  WE HAVE THE IDENTITIES.  THERE'S NO CLAIMS PROCESS.
02:42PM 16 SO IT'S NOT A REVERTER IN THE SENSE THAT WE THINK OF
02:42PM 17 REVERSIONS.  IT'S A SAFETY VALVE, IF A REALLY HIGH NUMBER OF
02:42PM 18 PEOPLE OPT OUT, TO GIVE THE DEFENDANTS THE FUNDS TO DEAL WITH
02:42PM 19 THOSE OPT OUTS.
02:42PM 20       NOW, I DON'T THINK ANY OF US EXPECT OPT OUTS AT THIS
02:42PM 21 LEVEL.  THERE WERE 61 OPT OUTS FROM THE LITIGATION CLASS AND
02:42PM 22 NOT VERY MANY FROM THE SETTLEMENT CLASS.
02:42PM 23       AND SO I THINK THAT THIS REALLY IS A SAFETY VALVE, AND I
02:42PM 24 DON'T THINK IT'S FAIR TO THE PLAINTIFFS, OR US, TO SAY, "WELL,
02:42PM 25 THESE OTHER GUYS, THEIR PRO RATA STARTED AT THIS NUMBER."

UNITED STATES COURT REPORTERS

46

02:42PM 1        YOU HAVE TO TAKE THE SETTLEMENT IN ITS ENTIRETY.  IN OTHER
02:43PM 2  WORDS, WE DIDN'T NEGOTIATE ONE LITTLE PIECE AT A TIME.  THIS
02:43PM 3  WAS ONE SETTLEMENT WITH A LOT OF MOVING PARTS AND A LOT OF
02:43PM 4  ELEMENTS, AND SO MAYBE WE GOT A LITTLE BETTER BLOW PROVISION,
02:43PM 5  YOU KNOW, IN TERMS OF A PRO RATA.
02:43PM 6        BUT WHEN YOU'RE PAYING 324 MILLION, MAYBE YOU'RE ENTITLED
02:43PM 7  TO IT.  THOSE GUYS PAID 20 MILLION, AND SO THEIR RISK OF OPT
02:43PM 8  OUTS, WHATEVER IT WAS, YOU KNOW, THEY DIDN'T -- THAT AMOUNT OF
02:43PM 9  MONEY IS SO VASTLY DIFFERENT THE MONEY THAT THESE
02:43PM 10 DEFENDANTS PAID THAT IT'S QUITE NATURAL TO SAY, AND TO EXPECT,
02:43PM 11 THAT A PRO RATA TYPE SAFETY VALVE MIGHT BE DIFFERENT.
02:43PM 12       AND WE DIDN'T NEGOTIATE THIS DEAL FROM THE EARLIER DEAL.
02:43PM 13 THIS SETTLEMENT WAS ACHIEVED BY THESE DEFENDANTS WITH THE
02:43PM 14 PLAINTIFFS BASED ON THE FACTS THAT WE HAD FROM OUR CASE.
02:43PM 15       AND SO WE -- I, FRANKLY, WASN'T EVEN AWARE OF WHAT THEIR
02:43PM 16 PERCENTAGE PRO RATA IN THE LUCASFILM DEAL WAS UNTIL IT CAME UP
02:43PM 17 THIS MORNING.  I JUST KNEW THAT, GIVEN THE AMOUNT OF MONEY WE
02:44PM 18 WERE SPENDING TO RESOLVE THIS, AND THE POSSIBILITY THAT I WOULD
02:44PM 19 BE LEFT IN AN EXTREME CASE -- AND IT IS EXTREME -- WITH A LARGE
02:44PM 20 NUMBER OF OPT OUTS, I WANTED, ASKED FOR, AND NEGOTIATED HARD
02:44PM 21 FOR THE RIGHT TO GET SOME SMALL AMOUNT OF MONEY BACK TO DEAL
02:44PM 22 WITH THOSE SO THAT I COULD EITHER TRY OR RESOLVE THOSE CASES.
02:44PM 23       AND THAT'S ALL IT IS.  IT'S -- IT'S ONE SMALL PIECE OF A
02:44PM 24 BIGGER RESOLUTION, AND I DON'T THINK IT'S FAIR TO COMPARE, YOU
02:44PM 25 KNOW, THAT PRO RATA TO ANY OTHER BECAUSE OUR SETTLEMENT WAS SO

UNITED STATES COURT REPORTERS

47

02:44PM 1  MUCH BIGGER AND MORE SIGNIFICANT THAN THE ONE THAT YOUR HONOR
02:44PM 2  APPROVED A COUPLE OF MONTHS AGO.  IT TOOK CARE OF 90-PLUS
02:44PM 3  PERCENT OF THE CLASS, SO IT'S A MUCH BIGGER DEAL FROM THAT
02:44PM 4  PERSPECTIVE.
02:44PM 5        SO I JUST THINK YOU HAVE TO TAKE ALL OF THESE ELEMENTS IN
02:44PM 6  CONTEXT OF THE OVERALL GLOBAL DEAL.
02:44PM 7        THE COURT:  WHAT WAS THE NUMBER OF OPT OUTS IN THE
02:44PM 8  LUCASFILM/PIXAR/INTUIT?  DO YOU HAVE THAT NUMBER NOW?
02:45PM 9        MR. VAN NEST:  SIXTY-ONE --
02:45PM 10       THE COURT:  WAS FOR THE LITIGATION CLASS.
02:45PM 11       MR. VAN NEST:  -- OPTED OUT OF THE LITIGATION CLASS.
02:45PM 12       THE COURT:  YEAH.  SO THAT WOULD HAVE BEEN --
02:45PM 13       MR. VAN NEST:  IT'S MORE FOR THE SETTLEMENT CLASS,
02:45PM 14 BUT IT'S LESS THAN 200, I THINK.
02:45PM 15       MS. DERMODY:  IT'S 147, YOUR HONOR.
02:45PM 16       THE COURT:  OKAY.  AND THEY ARE THE ONES WHO OPTED
02:45PM 17 OUT OF BOTH THE LUCASFILM, PIXAR, AND INTUIT CLASSES, RIGHT?
02:45PM 18       MS. DERMODY:  IT'S THE SETTLEMENT CLASS.
02:45PM 19       THE COURT:  THE SETTLEMENT CLASSES.
02:45PM 20       MS. DERMODY:  RIGHT.  AND THEN 61 JUST OPTED OUT OF
02:45PM 21 THE LITIGATION --
02:45PM 22       THE COURT:  OF THE LITIGATION CLASS.  OKAY.
02:45PM 23       ALL RIGHT.  AND THERE WAS A CLAIM FORM IN THAT SETTLEMENT?
02:45PM 24       MS. DERMODY:  THAT'S RIGHT, YOUR HONOR.
02:45PM 25       THE COURT:  OKAY.  WELL, I WAS HAPPY TO SEE THAT

UNITED STATES COURT REPORTERS

48

02:45PM 1  THERE'S NO CLAIM FORM HERE.
02:45PM 2        MR. VAN NEST:  WE THINK IT'S BETTER FOR OUR MEMBERS.
02:45PM 3        MS. DERMODY:  YEAH.  AND WE'VE NOW TESTED THE
02:45PM 4  ADDRESSES, SO WE KNOW WE HAVE VERY GOOD ADDRESSES.  WE'VE
02:45PM 5  UPDATED ALL OF THEM ONE TIME ALREADY, SO WE HAVE A GREAT DEAL
02:45PM 6  OF CONFIDENCE WE'LL REACH EVERYONE.
02:45PM 7        THE COURT:  SO LET ME -- I HAVE SOME MECHANICAL
02:45PM 8  QUESTIONS.
02:45PM 9        YOU STOOD UP -- MR. GIRARD, LET ME DO MY MECHANICAL
02:45PM 10 QUESTIONS AND THEN I'LL GIVE EVERYBODY AN OPPORTUNITY.
02:45PM 11       MR. GIRARD:  OKAY.
02:45PM 12       THE COURT:  OKAY.  THERE'S A PROVISION IN THE
02:45PM 13 SETTLEMENT AGREEMENT THAT SAYS THE NON-CASHED CHECKS GO TO
02:46PM 14 EITHER A CY PRES RECIPIENT OR FOR FURTHER CLASS DISTRIBUTION,
02:46PM 15 AND I WANTED TO GET A SENSE OF HOW THAT WAS LIKELY TO PROCEED.
02:46PM 16 WOULD THERE BE A CERTAIN AMOUNT -- I MEAN, CERTAINLY IF IT'S A
02:46PM 17 REALLY LARGE NUMBER, AT SOME POINT IT SHOULD GO TO THE CLASS
02:46PM 18 FOR FURTHER DISTRIBUTION.
02:46PM 19       MS. DERMODY:  RIGHT.
02:46PM 20       THE COURT:  -- VERSUS GOING TO A CY PRES RECIPIENT.
02:46PM 21 BUT HOW WERE YOU PLANNING TO APPROACH THAT QUESTION?
02:46PM 22       MS. DERMODY:  YOUR HONOR, CAN YOU DIRECT ME TO WHERE
02:46PM 23 YOU ARE IN THE SETTLEMENT?
02:46PM 24       THE COURT:  YEAH, SURE.
02:46PM 25       MS. DERMODY:  I'D BE HAPPY TO TAKE A LOOK AT THAT

UNITED STATES COURT REPORTERS

49

```
02:46PM  1   CLAUSE.
02:46PM  2            THE COURT:  NO PROBLEM.
02:46PM  3            MS. DERMODY:  OKAY.
02:46PM  4            THE COURT:  I'M LOOKING AT -- ON PAGE 18 --
02:46PM  5            MS. DERMODY:  THANK YOU.
02:46PM  6            THE COURT:  -- IT'S PARAGRAPH 8 OF 4A IS THE SECTION.
02:47PM  7            MS. DERMODY:  OH.  YES, YOUR HONOR.
02:47PM  8         WE INTENDED TO COME BACK TO THE COURT SO THAT THE COURT
02:47PM  9   WOULD EITHER BLESS THE APPROACH OF CY PRES, OR WE COULD HAVE A
02:47PM 10   CONVERSATION WITH THE COURT TO DETERMINE WHETHER IT MADE SENSE
02:47PM 11   FROM AN ECONOMIC STANDPOINT TO PAY FOR THE MAIL TO
02:47PM 12   REDISTRIBUTE.
02:47PM 13         IT'S NOT EXPECTED, WITH THIS TYPE OF PROCESS, THAT WE
02:47PM 14   WOULD HAVE THAT MUCH MONEY AT THE END OF THE DAY BECAUSE IT
02:47PM 15   WOULD ONLY BE PEOPLE WHO RECEIVED CHECKS THAT THEY DIDN'T CASH,
02:47PM 16   AND IN A TYPICAL CASE, THAT MIGHT BE $10,000 OR SOMETHING LIKE
02:47PM 17   THAT, MAYBE EVEN $20,000.
02:47PM 18         BUT YOU DON'T TEND TO SEE A MILLION DOLLARS OF UNCASHED
02:47PM 19   CHECKS.  THAT WOULD BE VERY RARE.
02:47PM 20            THE COURT:  SO IS YOUR THINKING ABOUT THIS QUESTION
02:47PM 21   THAT IF IT TURNS OUT THAT THE AMOUNT IS EFFECTIVELY DE MINIMIS
02:47PM 22   AND WOULDN'T ACTUALLY PAY FOR ITSELF IN TERMS OF THE
02:47PM 23   ADMINISTRATIONS COSTS, TO THEN GIVE IT TO A CY PRES RECIPIENT?
02:47PM 24            MS. DERMODY:  THAT'S RIGHT, YOUR HONOR.
02:47PM 25            THE COURT:  BUT IF IT EXCEEDS THE COST OF
```

UNITED STATES COURT REPORTERS

50

```
02:47PM  1   DISTRIBUTION AND ADMINISTRATION, THEN TO SEND IT TO THE CLASS?
02:47PM  2            MS. DERMODY:  ABSOLUTELY, YES.
02:48PM  3            THE COURT:  OKAY.  ALL RIGHT.  THAT'S FINE.
02:48PM  4         THIS DISPUTE FUND ISN'T DEFINED ANYWHERE AND IT'S NOT IN
02:48PM  5   THE NOTICE.  THIS IS PARAGRAPH 6 ON THE SAME PAGE.
02:48PM  6            MS. DERMODY:  YES, YOUR HONOR.
02:48PM  7            THE COURT:  I WAS UNCLEAR ON IS THIS FUND MONEY THAT
02:48PM  8   GOES TO THE CLAIMS ADMINISTRATOR TO RESOLVE DISPUTES AND PAY
02:48PM  9   FOR ADMINISTRATION COSTS?  OR IS THIS SORT OF A FUND THAT WILL
02:48PM 10   BE PAID TO ANY CLASS MEMBER WHO SUCCESSFULLY DISPUTES THEIR
02:48PM 11   PAYMENT AMOUNT?
02:48PM 12            MS. DERMODY:  THE LATTER, YOUR HONOR, YES.  IT'S --
02:48PM 13   WITH THE -- IT'S JUST TO MAKE SURE THAT THERE'S MONEY LEFT OVER
02:48PM 14   IN CASE THERE'S A CLASS MEMBER WHO EITHER HAS A RECORD KEEPING
02:48PM 15   ISSUE WITH THE DATA AND BELIEVES, AND CORRECTLY BELIEVES, THAT
02:48PM 16   HE OR SHE SHOULD HAVE HAD A HIGHER FORMULA PAY OUT, OR IF THERE
02:48PM 17   IS A PERSON WHO, FOR SOME REASON, DOESN'T RECEIVE A CHECK AND
02:48PM 18   THEY'RE IN THE CLASS DATA AND IT'S JUST A MISTAKE, EITHER ON
02:49PM 19   THE ADMINISTRATOR'S STANDPOINT OR IN THE DEFENDANTS' DATA
02:49PM 20   KEEPING OF PEOPLE IN THIS CLASS, THAT WE HAVE MONEY TO PAY
02:49PM 21   THOSE FOLKS WHO MIGHT SHOW UP JUST AFTER CHECKS ARE ISSUED.
02:49PM 22            THE COURT:  AND NEITHER THIS DISPUTE FUND NOR THE
02:49PM 23   REVERTER OR THE CY PRES ISSUE ARE ACTUALLY IN THE NOTICE.  WAS
02:49PM 24   THERE A REASON WHY THOSE WEREN'T INCLUDED IN THERE?
02:49PM 25            MS. DERMODY:  NO, YOUR HONOR.  BUT WE CAN CERTAINLY
```

UNITED STATES COURT REPORTERS

51

```
02:49PM  1   ADD THEM.
02:49PM  2            THE COURT:  OKAY.  IF I APPROVE THIS SETTLEMENT, I
02:49PM  3   WOULD WANT IT TO BE ON A PRETTY TIGHT TIMEFRAME.
02:49PM  4            MS. DERMODY:  YES.
02:49PM  5            THE COURT:  AND THIS IS THE SCHEDULE I WOULD
02:49PM  6   RECOMMEND AND I WANTED TO SEE IF THAT WOULD BE FEASIBLE FOR THE
02:49PM  7   PARTIES AND FOR THE CLAIMS ADMINISTRATOR.
02:49PM  8         SO SUBMISSION OF REVISED NOTICE AND PROPOSED ORDER --
02:50PM  9   ACTUALLY, MOST LIKELY -- WE MAY JUST MAKE THE CHANGES OURSELVES
02:50PM 10   TO THE NOTICE.
02:50PM 11         BUT -- I GUESS THE TRANSFERRING OF THE MATERIALS FROM THE
02:50PM 12   PRIOR SETTLEMENT ADMINISTRATOR TO THE NEW ONE BY JUNE 30TH;
02:50PM 13   NOTICE MAILED AND POSTED TO THE INTERNET, JULY 14TH.
02:50PM 14            MS. DERMODY:  YOUR HONOR, I'M SORRY.  CAN I STOP YOU
02:50PM 15   ON THE VERY FIRST ONE?
02:50PM 16            THE COURT:  YES.  IS THAT TOO TIGHT?
02:50PM 17            MS. DERMODY:  YES, I'M SORRY.  HEFFLER AND GILARDI I
02:50PM 18   THINK HAVE TALKED ABOUT 20 DAYS FROM THE ORDER.  IF THE ORDER
02:50PM 19   WAS TODAY, 20 DAYS WOULD BE JULY 9.
02:50PM 20            THE COURT:  FOR, WHAT, THE TRANSFERRING OF MATERIALS?
02:50PM 21            MS. DERMODY:  THE TRANSFER, YES.
02:50PM 22            THE COURT:  OH.  THEY NEED 20 DAYS?
02:50PM 23            MS. DERMODY:  BECAUSE THERE'S SOME SECURITY ISSUES
02:50PM 24   AROUND THE DATA.  IT'S NOT SOMETHING THAT CAN BE DONE SIMPLY.
02:50PM 25   I JUST WANT TO MAKE SURE THEY HAVE ENOUGH TIME TO DO IT
```

UNITED STATES COURT REPORTERS

52

```
02:50PM  1   SECURELY AND THE RIGHT WAY.
02:51PM  2            THE COURT:  ALL RIGHT.  WELL, THEN, I ASSUME THAT
02:51PM  3   THAT WOULD PUSH EVERYTHING ELSE BACK.
02:51PM  4            MS. DERMODY:  THAT'S WHY I STOPPED YOUR HONOR.  I'M
02:51PM  5   SORRY.
02:51PM  6            THE COURT:  OKAY.  SO --
02:51PM  7            MS. DERMODY:  IF IT WOULD HELP YOUR HONOR, I COULD
02:51PM  8   GIVE YOU A LIST I WROTE OUT IF WE USED JULY 9.
02:51PM  9            THE COURT:  WELL, WHAT IF THAT WOULD BE JULY 14TH?
02:51PM 10   THAT WOULD BE THE DATE OF THE TRANSFER, ROUGHLY 20 DAYS FROM
02:51PM 11   MONDAY, JUNE 23RD.
02:51PM 12         THEN HOW MUCH TIME WOULD YOU NEED TO MAIL THE NOTICE AND
02:51PM 13   POST IT TO THE INTERNET?
02:51PM 14            MS. DERMODY:  TWO WEEKS, YOUR HONOR.  SO THAT WOULD
02:51PM 15   BE JULY 28, AND THAT'S A MONDAY.
02:52PM 16            THE COURT:  OKAY.  AND THEN THE MOTION FOR ATTORNEYS'
02:52PM 17   FEES AND COSTS, YOU'RE SAYING 31 DAYS FROM THE NOTICE DATE, SO
02:52PM 18   THAT WOULD BE ROUGHLY --
02:52PM 19            MS. DERMODY:  AUGUST 28.
02:52PM 20            THE COURT:  THAT WOULD BE AUGUST 28 OF 2014.
02:52PM 21         OKAY.  AND THEN I GUESS I'M UNCLEAR.  SOME OF THE DATES
02:52PM 22   ARE OFF THE -- THEY KIND OF SWITCH FROM THE NOTICE DATE BEING
02:52PM 23   THE ANCHOR DATE TO THE FINAL APPROVAL HEARING BEING THE ANCHOR
02:52PM 24   DATE.
02:52PM 25            MS. DERMODY:  YES.  I'M SORRY, YOUR HONOR.
```

UNITED STATES COURT REPORTERS

53

02:52PM 1    THE COURT: WHAT -- I GUESS FOR THE MOTION FOR FINAL
02:52PM 2  APPROVAL, THAT WOULD BE 70 DAYS FROM THE NOTICE DATE, WHICH
02:53PM 3  WOULD HAVE BEEN JULY 28.
02:53PM 4    MS. DERMODY: SO IT MIGHT BE EASIER TO SET THE OPT
02:53PM 5  OUT OBJECTION DEADLINE, WHICH I THINK UNDER THIS WOULD BE
02:53PM 6  SEPTEMBER 11TH.
02:53PM 7    AND THEN WE MIGHT WANT TO HAVE TWO WEEKS FOR THE OPENING
02:53PM 8  BRIEF FOR FINAL APPROVAL, AND THAT WOULD THEN BE THREE WEEKS
02:53PM 9  BEFORE THE HEARING DATE.
02:53PM 10    THE COURT: YOU MEAN TWO WEEKS AFTER SEPTEMBER 11TH?
02:53PM 11    MS. DERMODY: CORRECT. THANK YOU.
02:53PM 12    (PAUSE IN PROCEEDINGS.)
02:53PM 13    THE COURT: HOW MUCH TIME AFTER THE MOTION FOR FINAL
02:53PM 14  APPROVAL IS NEEDED FOR THE CLAIMS ADMINISTER AFFIDAVIT OF
02:53PM 15  COMPLIANCE WITH THE NOTICE REQUIREMENTS?
02:53PM 16    MS. DERMODY: I THINK THAT THAT CAN BE 30 DAYS BEFORE
02:54PM 17  THE FINAL APPROVAL HEARING, YOUR HONOR. SO IF THAT HEARING WAS
02:54PM 18  ON OCTOBER 16, IT WOULD BE THE 30 DAYS BEFORE THAT. I THINK
02:54PM 19  THAT WOULD BE SEPTEMBER 16.
02:54PM 20    THE COURT: AND THE REPLIES WOULD BE?
02:54PM 21    MS. DERMODY: A WEEK BEFORE THE HEARING IF THAT WORKS
02:54PM 22  FOR YOUR HONOR.
02:54PM 23    THE COURT: I NEED TO CHECK -- MS. PARKER BROWN, CAN
02:54PM 24  YOU TAKE A LOOK AT OCTOBER 16?
02:54PM 25    OR WE COULD DO IT EVEN SOONER, OCTOBER -- HOW -- WHAT IS

UNITED STATES COURT REPORTERS

54

02:54PM 1  THE EARLIEST DATE WE COULD DO IT THAT WOULD GIVE YOU ENOUGH
02:54PM 2  TIME TO GET EVERYTHING DONE?
02:54PM 3    MS. DERMODY: WELL, IF WE ARE FILING OUR OPENING
02:54PM 4  FINAL APPROVAL BRIEF ON SEPTEMBER 25, AND IF THERE'S GOING TO
02:54PM 5  BE ANY OBJECTOR BRIEFING THAT'S GOING TO FOLLOW THAT, THEN WE
02:54PM 6  MIGHT ACTUALLY KIND OF HAVE TO HAVE A BRIEFING SCHEDULE OF
02:54PM 7  SEPTEMBER 25, WITH THE EXPECTATION THAT SOMETHING GETS FILED BY
02:54PM 8  OBJECTORS A WEEK LATER, AND WE REPLY TO THAT BY THE 9TH.
02:54PM 9    SO THAT'S THE TROUBLE OF TRYING TO MOVE SOMETHING EARLIER
02:54PM 10  THAN THE 16TH I THINK, YOUR HONOR.
02:55PM 11    THE COURT: OKAY. SO THIS WOULD SAY THE REPLIES THEN
02:55PM 12  WOULD BE DUE OCTOBER 9, AND THE HEARING DATE WILL THEN BE
02:55PM 13  OCTOBER 16TH.
02:55PM 14    THE CLERK: ON OCTOBER 16TH, WE CURRENTLY HAVE --
02:55PM 15  YESTERDAY YOU SET DISPOSITIVE MOTIONS ON BRAZIL V. DOLE FOR THE
02:55PM 16  16TH.
02:55PM 17    THE COURT: UM-HUM.
02:55PM 18    (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE
02:55PM 19  CLERK.)
02:55PM 20    MR. VAN NEST: YOUR HONOR, IN LIGHT OF THE PROBLEMS
02:55PM 21  WE'VE HAD ON THESE EARLIER ONES JUST WITH PAPERWORK AND
02:55PM 22  WHATNOT, I WOULD JUST SUGGEST MOVING IT BACK A WEEK OR TWO SO
02:55PM 23  WE DON'T HAVE TO COME BACK AND MOVE IT AGAIN.
02:55PM 24    THE COURT: YOU MEAN MOVE THE 16TH A WEEK?
02:55PM 25    MR. VAN NEST: MOVE IT BACK A WEEK. THE NOTICES

UNITED STATES COURT REPORTERS

55

02:55PM 1  SLIP, THE NOTICES DON'T GET OUT, THE DATE IS NOT QUITE RIGHT.
02:55PM 2  WE'VE HAD THIS HAPPEN. WE THINK WE'VE GOT IT CLEARED UP, BUT
02:55PM 3  WE DON'T KNOW.
02:55PM 4    WHY NOT GIVE OURSELVES AN EXTRA WEEK AND THEN WE HAVE SOME
02:56PM 5  FLEXIBILITY?
02:56PM 6    THE COURT: LET'S SEE WHAT WE HAVE ON THE 23RD AND
02:56PM 7  THE 30TH.
02:56PM 8    MR. VAN NEST: YEAH.
02:56PM 9    (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE
02:56PM 10  CLERK.)
02:56PM 11    THE COURT: WELL, NEITHER OF THOSE DATES ARE GREAT
02:56PM 12  FOR US, BUT I'M HAPPY TO --
02:56PM 13    THE CLERK: NOVEMBER 6TH MIGHT WORK.
02:56PM 14    THE COURT: WHAT'S ON NOVEMBER 6TH?
02:56PM 15    (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE
02:56PM 16  CLERK.)
02:56PM 17    THE COURT: I -- YOU KNOW, IF I'M GOING TO APPROVE
02:57PM 18  THIS, I DON'T WANT TO DELAY PAYMENT FURTHER THAN NECESSARY.
02:57PM 19  YOU KNOW, I GUESS NOVEMBER 6TH IS PROBABLY SLIGHTLY
02:57PM 20  BETTER, BUT I'M FINE WITH ALSO HAVING THIS ON THE 23RD OR THE
02:57PM 21  30TH.
02:57PM 22    MR. VAN NEST: EITHER ONE IS FINE WITH US. ANY ONE
02:57PM 23  OF THOSE THREE DATES IS FINE, YOUR HONOR.
02:57PM 24    MS. DERMODY: SAME FOR US, YOUR HONOR.
02:57PM 25    THE COURT: OKAY.

UNITED STATES COURT REPORTERS

56

02:57PM 1    (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE
02:57PM 2  CLERK.)
02:58PM 3    THE COURT: I'LL GO AHEAD AND SET THIS ON
02:58PM 4  NOVEMBER 6TH IF I'M GOING TO APPROVE IT, AND THAT WAY WE CAN
02:58PM 5  EVEN BUILD IN A LITTLE TIME THROUGHOUT -- I ASSUME EVERYONE IS
02:58PM 6  AVAILABLE ON THE 6TH? IS THAT DATE OKAY?
02:58PM 7    MS. DERMODY: YES, YOUR HONOR.
02:58PM 8    MR. VAN NEST: YES, YOUR HONOR.
02:58PM 9    THE COURT: OKAY. I THINK THAT WAS IT. I MEAN,
02:59PM 10  THERE ARE SOME NITS ON THE NOTICE, BUT I DON'T THINK THEY'RE
02:59PM 11  IMPORTANT ENOUGH TO TAKE UP YOUR TIME.
02:59PM 12    I'LL GIVE EVERYONE A LAST OPPORTUNITY TO BE HEARD, AND
02:59PM 13  THEN WE'RE GOING TO TAKE A BREAK BEFORE I CALL MY LAST CASE.
02:59PM 14    MR. GIRARD: FINAL COMMENTS, YOUR HONOR.
02:59PM 15    THE COURT: OKAY.
02:59PM 16    MR. GIRARD: ON THE AMOUNT THAT THE DEFENDANTS ARE
02:59PM 17  PAYING, THE COURT REFERRED SEVERAL TIMES TO THE IMPLICIT, I
02:59PM 18  THINK I'LL CALL IT MARKET SHARE, IMPLIED BY THE EARLIER
02:59PM 19  SETTLEMENT, THE 20 MILLION, AND MR. VAN NEST POINTED TO 8
02:59PM 20  PERCENT.
02:59PM 21    THE COLLOQUY THAT OCCURRED BETWEEN THE COURT AND COUNSEL
02:59PM 22  AT PRELIMINARY APPROVAL ON THE EARLIER SETTLEMENTS --
02:59PM 23    THE COURT: UM-HUM.
02:59PM 24    MR. GIRARD: -- WAS THAT THE AMOUNT BEING PAID,
03:00PM 25  WHAT -- WHAT THE DISCUSSION WAS, WAS THAT THEY HAD 8 PERCENT OF

UNITED STATES COURT REPORTERS

57

```
03:00PM   1    THE WORK FORCE, BUT THE AMOUNT THEY PAID AMOUNTED TO 5 PERCENT
03:00PM   2    OF THE TOTAL AMOUNT PAID.
03:00PM   3       SO THE IMPLICIT NUMBER, IF YOU USE 20 PERCENT AS A
03:00PM   4    BENCHMARK FOR THESE REMAINING DEFENDANTS, I COME UP WITH IS 400
03:00PM   5    MILLION, SO WE WOULD BE 75 MILLION SHORT IF WE WERE USING THAT
03:00PM   6    AS A BENCHMARK.
03:00PM   7       AND THE REFERENCE IS THE TRANSCRIPT OF THE PRELIMINARY --
03:00PM   8    PRELIMINARY APPROVAL HEARING AT PAGE 16, AND AT LINE 18,
03:00PM   9    THERE'S A DISCUSSION BETWEEN MS. DERMODY AND YOUR HONOR IN
03:00PM   10   WHICH THESE NUMBERS ARE BEING DISCUSSED AND THE 20 PERCENT --
03:00PM   11   OR 20 MILLION AND HOW THAT REPRESENTS 8 PERCENT OF THE WORK
03:00PM   12   FORCE NUMERICALLY, BUT 5 PERCENT FROM THE POINT OF VIEW OF THE
03:00PM   13   AMOUNT THEY PAID IN RELATION TO THE TOTAL AMOUNT OF SALARIES
03:00PM   14   PAID.
03:00PM   15      SO TO THE EXTENT I HEARD THE COURT TO BE SAYING THIS
03:00PM   16   NUMBER SEEMED LIGHT, I THINK THAT'S THE ANSWER.
03:01PM   17      SECOND, THE DISTRICT COURT -- THE COURT MADE A NUMBER OF
03:01PM   18   COMMENTS THAT, IN MY EXPERIENCE, THE COMMENTS HAVE BEEN PRETTY
03:01PM   19   EFFECTIVE IN FOCUSSING THE MIND OF DECISION MAKERS ABOUT
03:01PM   20   SETTLEMENT, AND IF THE COURT DECIDED NOT TO APPROVE THIS AT
03:01PM   21   THIS STAGE AND SENT THE PARTIES BACK TO TRY AGAIN, I THINK
03:01PM   22   YOU'VE MADE IT PRETTY CLEAR, AND I HAVE A SENSE FROM THE
03:01PM   23   DISCUSSION WHERE THAT BENCHMARK IS, AND I HAVE A FEELING THAT
03:01PM   24   THAT -- THAT THE COURT'S COMMENTS ARE GOING TO ELICIT A
03:01PM   25   FAVORABLE RESPONSE.  BUT THE ONLY WAY TO FIND THAT OUT IS TO
```

UNITED STATES COURT REPORTERS

58

```
03:01PM   1    TRY.
03:01PM   2       A COMMENT ABOUT THE ROLE OF JUDGE PHILLIPS.  I AGREE HE'S
03:01PM   3    A HIGHLY RESPECTED MEDIATOR AND VERY WELL EXPERIENCED.
03:01PM   4       HE WAS ALSO THE MEDIATOR IN THAT NFL CONCUSSION SETTLEMENT
03:01PM   5    WE CITED TO THE COURT THAT JUDGE BRODY DECLINED TO
03:01PM   6    PRELIMINARILY APPROVE AND HE, LIKE THIS CASE, HAD CONCLUDED
03:01PM   7    THAT SETTLEMENT WAS FAIR.
03:01PM   8       THE JUDGE DID NOT GRANT PRELIMINARY APPROVAL BECAUSE OF
03:01PM   9    HER CONCERNS WITH THE AMOUNT OF THE RECOVERY, AND IT'S NOT
03:02PM   10   BECAUSE JUDGE PHILLIPS WASN'T DOING HIS JOB.  HIS JOB IS TO
03:02PM   11   BRING THE PARTIES TOGETHER TO AGREE ON THE NUMBER.
03:02PM   12      IT'S NOW THE JOB THIS COURT HAS TO DECIDE WHETHER THE
03:02PM   13   SETTLEMENT IS FAIR OR NOT.
03:02PM   14      SO I DON'T THINK IT'S ANY DETRACTION ON THE PERFORMANCE OF
03:02PM   15   JUDGE PHILLIPS TO POINT OUT THAT THE FACT THAT A MEDIATOR
03:02PM   16   BRINGS THE PARTIES TOGETHER DOESN'T MEAN THAT THE RESULTING
03:02PM   17   SETTLEMENT WAS FAIR, AND THE COURTS HAVE NOT TREATED THE ROLE
03:02PM   18   OF A MEDIATOR AS DISPOSITIVE ON THAT QUESTION.
03:02PM   19      LAST POINT.  IF YOU DO DECIDE TO GO FORWARD AND GRANT
03:02PM   20   PRELIMINARY APPROVAL, OUR SUGGESTION WOULD BE THAT THE NOTICE
03:02PM   21   INCLUDE THE NUMBERS THAT WE'VE BEEN DISCUSSING IN THE SENSE
03:02PM   22   SPECIFICALLY OF THE POTENTIAL RECOVERY, THE RECOVERY PER
03:02PM   23   PERSON, AND WHAT THE RECOVERY WOULD BE ON THE THEORY OF DAMAGE
03:02PM   24   IF THE CASE WERE TO BE WON AT TRIAL SO THAT FROM THE
03:02PM   25   PERSPECTIVE OF A CLASS MEMBER -- AND FINALLY, THE AMOUNT OF
```

UNITED STATES COURT REPORTERS

59

```
03:02PM   1    PERSONS IN THE CLASS -- SO THAT THE NUMBERS ARE RIGHT THERE AND
03:02PM   2    SOMEBODY DOESN'T HAVE TO GO DO THE MATH, BECAUSE I THINK THE
03:03PM   3    AVERAGE PERSON IS NOT GOING TO JUMP TO THE CONCLUSION THAT THEY
03:03PM   4    CAN DO THAT MATH AND THAT THAT'S GOING TO BE HOW THEY KNOW.
03:03PM   5       SO IT'S EASY ENOUGH TO DO THAT LANGUAGE.  IF YOU APPROVE,
03:03PM   6    I WOULD PROPOSE LANGUAGE TO CLASS COUNSEL.  I'M SURE WE COULD
03:03PM   7    AGREE ON AN INSERTION TO THE NOTICE THAT WOULD ADD THAT
03:03PM   8    INFORMATION.
03:03PM   9       AND SO IF YOU'RE GOING FORWARD, IT'S, I THINK, CONSISTENT
03:03PM   10   WITH THE NORTHERN DISTRICT'S RECENT GUIDELINES.  THOSE CALL FOR
03:03PM   11   THIS INFORMATION IN THE MOVING PAPERS, AND A NUMBER OF COURTS
03:03PM   12   HAVE REQUIRED THAT INFORMATION IN THE NOTICE.  IT'S REQUIRED
03:03PM   13   UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT, AND IT'S
03:03PM   14   EASY ENOUGH TO DO FROM A PRACTICAL PERSPECTIVE.
03:03PM   15      AND IF YOU WANT TO PROCEED WITH THIS SETTLEMENT, IT'S ONE
03:03PM   16   WAY OF GIVING THE CLASS MEMBERS THE INFORMATION THAT MR. DEVINE
03:03PM   17   WAS CONCERNED ABOUT.
03:03PM   18      THE COURT:  YOU MEAN PUTTING IN THE $141,331?
03:04PM   19      MR. GIRARD:  YEAH.  AND TO THE EXTENT THE CONCERN IS
03:04PM   20   THAT'S A TREBLED NUMBER, IT CAN BE CLARIFIED THAT THAT WOULD BE
03:04PM   21   AFTER TREBLING.
03:04PM   22      BUT I THINK, YEAH, THE SHORT ANSWER IS YES.
03:04PM   23      THE COURT:  WHY DON'T I HAVE MR. VAN NEST, WHY DON'T
03:04PM   24   YOU RESPOND?  I MEAN, IT IS TRUE THAT THE FIRST SETTLEMENT, THE
03:04PM   25   PERCENTAGE OF THE CLASS COMPENSATION WAS 5 PERCENT, AND THE
```

UNITED STATES COURT REPORTERS

60

```
03:04PM   1    PERCENTAGE OF CLASS MEMBERSHIP WAS 8 PERCENT, AND IF WE DID
03:04PM   2    THAT STRAIGHT CALCULATION, IT WOULD HAVE BEEN HIGHER.
03:04PM   3       MR. VAN NEST:  NO.  THE NUMBER -- IT CONFIRMS
03:04PM   4    ABSOLUTELY THAT THE SETTLEMENT IS RIGHT IN THE SWEET SPOT.
03:04PM   5       IF 8 PERCENT IS THE BENCHMARK, AND THAT'S WHAT WE THOUGHT
03:04PM   6    WAS FAIR AND WHAT WE ARGUED IN THE MEDIATION, THEN OUR SHARE OF
03:04PM   7    THE SETTLEMENT WOULD HAVE BEEN 230 MILLION, BECAUSE IF 8
03:04PM   8    PERCENT OF THE CLASS -- IF THOSE DEFENDANTS, EMPLOYING 8
03:04PM   9    PERCENT, PAID 20 MILLION, THEN THE FULL VALUE OF THAT
03:04PM   10   SETTLEMENT IS 250 MILLION, ABSOLUTELY.
03:05PM   11      THE COURT:  NO, NO, NO.  THE PERCENTAGE -- OKAY, 8
03:05PM   12   PERCENT.  BUT WHY SHOULD YOU GET THE SAME DEAL --
03:05PM   13      MR. VAN NEST:  WE DIDN'T.
03:05PM   14      THE COURT:  -- AS THOSE --
03:05PM   15      MR. VAN NEST:  WE DIDN'T.  WE GOT A DEAL THAT WAS 50
03:05PM   16   PERCENT MORE EXPENSIVE.
03:05PM   17      THE COURT:  OKAY.  LET ME HAVE MR. GIRARD -- OKAY.
03:05PM   18   TELL ME AGAIN -- AND I'M SORRY I DIDN'T WORK OUT THE NUMBERS IN
03:05PM   19   ADVANCE.  I AGREE WITH YOU THE PERCENTAGE OF CLASS COMPENSATION
03:05PM   20   WAS 5 PERCENT.  THE PERCENTAGE OF CLASS MEMBERSHIP WAS 8
03:05PM   21   PERCENT FOR THE INTUIT, LUCASFILM, PIXAR FILM.
03:05PM   22      WHAT WOULD THE NUMBER HAVE BEEN?  I'M SORRY I DIDN'T
03:05PM   23   CALCULATE THIS IN ADVANCE.
03:05PM   24      MR. GIRARD:  SO I'M DOING THE SAME DIVISION THAT
03:05PM   25   MR. VAN NEST IS DOING, BUT WITH 5 PERCENT INSTEAD OF 8 PERCENT,
```

UNITED STATES COURT REPORTERS

61

03:05PM 1   WHICH GIVES YOU 400 MILLION.  SO WE'RE --

03:05PM 2          THE COURT:  OKAY.  SO TELL ME WHAT YOU'RE DOING AND

03:05PM 3   WHY YOU ALL ARE COMING OUT WITH DIFFERENT NUMBERS.  GO AHEAD.

03:05PM 4          MR. VAN NEST:  NO, NO.  WE'RE COMING OUT WITH THE

03:05PM 5   SAME NUMBERS, YOUR HONOR.

03:05PM 6          IF YOU LOOK AT IT AS 5 PERCENT OF THE COMPENSATION PAID --

03:05PM 7          THE COURT:  UM-HUM.

03:05PM 8          MR. VAN NEST:  -- IF THAT GROUP PAID 20, THEN THE

03:05PM 9   TOTAL VALUE OF THAT IS 400.

03:05PM 10         IF, HOWEVER, YOU LOOK AT IT AS 8 PERCENT OF THE CLASS THAT

03:05PM 11  YOU EMPLOYED, THEN THE TOTAL SETTLEMENT IS 250.

03:06PM 12         THIS NUMBER IS RIGHT IN THE MIDDLE OF THAT, WHICH IS WHY I

03:06PM 13  SAY IT'S AN ABSOLUTELY FAIR NUMBER.  IT'S -- YOU COULD LOOK AT

03:06PM 14  IT ONE WAY OR THE OTHER.  I THINK, AND I THINK THE DEFENDANTS

03:06PM 15  BELIEVE, THE FAIR WAY TO LOOK AT IT IS, WHAT PERCENTAGE OF THE

03:06PM 16  CLASS DID YOU FOLKS EMPLOY THAT PAID?  AND WHO -- IF THAT'S --

03:06PM 17  THAT'S A WAY TO DIVIDE IT UP.

03:06PM 18         YOU COULD ALSO DIVIDE IT UP BASED ON THE PERCENTAGE OF

03:06PM 19  PAY.

03:06PM 20         BUT EITHER WAY YOU DO IT, THIS NUMBER IS RIGHT IN THE

03:06PM 21  SWEET SPOT OF WHAT IS NOT ONLY FAIR, BUT IN MANY WAYS A PREMIUM

03:06PM 22  OVER THE SETTLEMENT THAT YOUR HONOR APPROVED A COUPLE OF MONTHS

03:06PM 23  AGO.  THAT'S ALL.

03:06PM 24         THE COURT:  ALL RIGHT.  LET ME HEAR FROM MR. GIRARD.

03:06PM 25  WHY SHOULD IT BE A PERCENTAGE OF THE CLASS COMPENSATION VERSUS

UNITED STATES COURT REPORTERS

62

03:06PM 1   THE PERCENTAGE OF THE CLASS MEMBERSHIP?

03:06PM 2          MR. GIRARD:  BECAUSE DAMAGES ARE AWARDED BASED ON

03:06PM 3   COMPENSATION, ONE.

03:06PM 4          TWO, BECAUSE THE EARLIER SETTLEMENTS TYPICALLY ARE FIRST

03:06PM 5   OUT SETTLEMENTS THAT ARE USED TO FUND THE LATER LITIGATION WITH

03:06PM 6   THE UNDERSTANDING THAT LATER SETTLING DEFENDANTS ARE GOING TO

03:07PM 7   PAY MORE.

03:07PM 8          AS YOUR HONOR ACKNOWLEDGED, THESE DEFENDANTS WERE FACING A

03:07PM 9   TRIAL.  THE EARLIER DEFENDANTS SETTLED AT A TIME WHEN THERE WAS

03:07PM 10  LESS RISK IN THE CASE.

03:07PM 11         BUT EVEN IF IT'S A PURE APPLES TO APPLES COMPARISON, SINCE

03:07PM 12  DAMAGES ARE AWARDED BASED ON COMPENSATION, THE BENCHMARK NUMBER

03:07PM 13  IS 400, NOT THE NUMBER MR. VAN NEST SUGGESTED.

03:07PM 14         THE COURT:  BUT DO YOU AGREE WITH HIM, IF THE

03:07PM 15  BENCHMARK WAS 8 PERCENT, THE NUMBER WOULD BE 250?  DO YOU AGREE

03:07PM 16  WITH HIM ON THAT?

03:07PM 17         MR. GIRARD:  WHATEVER THE MATH IS.  I AGREE WITH HIM

03:07PM 18  ON THE MATHEMATICAL CALCULATION, SO IF YOU USE THAT, YES.

03:07PM 19         THE COURT:  OKAY.

03:07PM 20         MR. GIRARD:  IT DOESN'T ADDRESS THE ARGUMENTS ABOUT

03:07PM 21  THE HEIGHTENED RISK TO THE DEFENDANTS BECAUSE OF THE STAGE AT

03:07PM 22  WHICH THEY'RE SETTLING AND THE FACT THAT THEY CHOSE TO PLAY ON

03:07PM 23  THE HOPES THAT THEY WOULD GET OUT, THAT THEY WOULD GET THE

03:07PM 24  CLASS CERTIFICATION ORDER REVERSED, DIDN'T GET THAT, AND

03:07PM 25  TYPICALLY THEY PAY A PRICE FOR THAT BY HAVING TO PAY A HIGHER

UNITED STATES COURT REPORTERS

63

03:07PM 1   PERCENTAGE.

03:07PM 2          MS. DERMODY:  AND, YOUR HONOR, I JUST WANTED TO SAY

03:07PM 3   THAT CLASS COUNSEL, AT THE START OF THIS HEARING, ACKNOWLEDGED

03:07PM 4   THAT WHERE WE ARE RIGHT NOW IS PRICED IN A RATIO THAT'S VERY

03:07PM 5   SIMILAR TO THE FIRST TIME AROUND AND THAT WE BASED OUR DECISION

03:08PM 6   NOT ON THIS IDEA OF HAVING, YOU KNOW, EVEN MORE MONEY AND THIS

03:08PM 7   IS WHY WE'RE TRYING TO SELL THIS TO THE COURT, BUT ON THIS RISK

03:08PM 8   THAT WE THINK IS VERY REAL.

03:08PM 9          YOU KNOW, WHEN WE HAD THE FIRST SETTLEMENT, AS THE COURT

03:08PM 10  MAY RECALL, THE ONLY CORPORATE ADMISSIONS IN THIS CASE WERE

03:08PM 11  FROM THE PIXAR/LUCAS CORPORATE EXECUTIVES.  THOSE ARE THE -- IN

03:08PM 12  SOME WAYS, THOSE WERE THE STRONGEST PIECES OF EVIDENCE IN THE

03:08PM 13  CASE, AND THEY CASHED OUT.

03:08PM 14         THERE WAS DIFFERENT EVIDENCE, SOME VERY GOOD EVIDENCE, BUT

03:08PM 15  DIFFERENT TYPES OF EVIDENCE PUTTING TOGETHER THE PIECES WITH

03:08PM 16  THE OTHER DEFENDANTS.  SO YOU HAVE TO WEIGH SOME OF THOSE

03:08PM 17  ISSUES AS WELL.

03:08PM 18         AND I THINK, YOUR HONOR, THAT IF YOU WOULD TALK TO OUR

03:08PM 19  TEAM ABOUT WHO HAS BEEN DRINKING THE KOOL-AID ON THIS CASE THE

03:08PM 20  MOST, THEY PROBABLY WOULD NAME ME AS THAT PERSON WHO HAS BEEN

03:08PM 21  ZEALOUS ABOUT TAKING THIS CASE TO TRIAL.

03:08PM 22         BUT WHEN YOU GO THROUGH JURY TESTING AND YOU ACTUALLY SHOW

03:08PM 23  JURORS IN THIS DISTRICT THIS EVIDENCE AND TEST WITH THEM THEIR

03:08PM 24  ATTITUDES ABOUT THESE CLAIMS AND THESE CLASS MEMBERS, YOU HAVE

03:08PM 25  TO BE SOBERED ABOUT WHAT THE RISKS ARE WITH THIS JURY POOL,

UNITED STATES COURT REPORTERS

64

03:09PM 1   WITH THIS EVIDENCE.

03:09PM 2          IT IS NOT WITHOUT, YOU KNOW, GREAT CONCERN THAT WE WOULD

03:09PM 3   EVER TAKE THIS CASE TO TRIAL, AND THAT'S WHY WE THINK THIS IS

03:09PM 4   AN EXCELLENT DEAL AND IT WOULD BE WRONG FOR US NOT TO PRESENT

03:09PM 5   IT TO THE CLASS.

03:09PM 6          THE COURT:  OKAY.  BUT WHY -- I MEAN, I WAS THINKING

03:09PM 7   OF THE 5 PERCENT, NOT THE 8 PERCENT.  WHY SHOULDN'T YOU HAVE AT

03:09PM 8   LEAST GOTTEN THE SAME COMPENSATION AS THE EARLIER CASE?

03:09PM 9          YOU'RE SAYING BECAUSE YOUR CASE AGAINST THESE DEFENDANTS

03:09PM 10  WAS WEAKER THAN YOUR CASE AGAINST LUCASFILM AND PIXAR?  I FIND

03:09PM 11  THAT KIND OF HARD CONSIDERING WHO THE KEY PEOPLE WERE, LIKE

03:09PM 12  STEVE JOBS.  YOU HAVE THE -- YOU HAVE MR. CAMPBELL WITH GOOGLE,

03:09PM 13  YOU HAVE THE WHOLE FACEBOOK SOLICITATION, YOU HAVE THE

03:09PM 14  SOLICITATION WITH EBAY.  I MEAN, BOTH MR. CAMPBELL AND

03:09PM 15  MR. SCHMIDT WERE INVOLVED IN THAT.

03:09PM 16         I MEAN, I SEE WHAT YOU'RE SAYING.  CERTAINLY THE QUOTES OF

03:09PM 17  THE CEOS FOR LUCASFILM AND PIXAR WERE VERY GOOD FOR YOU.

03:10PM 18         MS. DERMODY:  ESPECIALLY ABOUT THEIR MOTIVATION FOR

03:10PM 19  WHY THEY ENTERED INTO THE AGREEMENTS.  THERE'S NO ONE ELSE WHO

03:10PM 20  HAS SAID THE THINGS THAT THEY SAID.

03:10PM 21         THE COURT:  BUT I WOULD -- WELL, ANYWAY, YOU TELL ME.

03:10PM 22  SO WHY DO THESE DEFENDANTS GET A DISCOUNT?  BECAUSE YOU THINK

03:10PM 23  YOUR CASE WAS WEAKER AGAINST STEVE JOBS?

03:10PM 24         MS. DERMODY:  I DON'T THINK THAT THEY GOT A DISCOUNT.

03:10PM 25         THE COURT:  YOU THINK YOUR CASE WAS WEAKER AGAINST

UNITED STATES COURT REPORTERS

65

```
03:10PM  1   ERIC SCHMIDT?
03:10PM  2       MS. DERMODY:  I THINK THE RATIO IS VERY SIMILAR IN
03:10PM  3   TERMS OF WHAT HAPPENED BEFORE AND WHAT HAPPENED NOW.  AND I
03:10PM  4   UNDERSTAND.  IT'S WHAT WE WRESTLED WITH OURSELVES ABOUT THIS
03:10PM  5   SETTLEMENT, YOUR HONOR.
03:10PM  6       IT'S BECAUSE, AT THE END OF THE DAY, THE RISK OF LOSING AT
03:10PM  7   TRIAL NEVER CHANGED.
03:10PM  8       AT THE END OF THE DAY, THE RISK OF LOSING CERTAIN PRETRIAL
03:10PM  9   ORDERS ON APPEAL NEVER CHANGED.
03:10PM 10       THE COURT:  YOU KNOW, I WISH YOU HAD TOLD ME HOW WEAK
03:10PM 11   YOUR CASE WAS FOR CLASS CERT AND ON ALL THOSE DAUBERT MOTIONS.
03:10PM 12   I MEAN, THAT WOULD HAVE BEEN HELPFUL INFORMATION.
03:10PM 13       I WAS CERTAINLY HEARING A DIFFERENT TUNE --
03:10PM 14       MS. DERMODY:  I DON'T THINK YOU --
03:10PM 15       THE COURT:  -- FROM YOUR SIDE OF THE COURTROOM DURING
03:10PM 16   ALL THE PREVIOUS MOTIONS IN THIS CASE.
03:10PM 17       IF I HAD KNOWN WHAT A LOSER THIS WAS, PERHAPS, YOU KNOW --
03:10PM 18   THE COURT, YOU KNOW, DID 90-PAGE ORDERS.
03:11PM 19       MS. DERMODY:  YOUR HONOR, I THINK WE'RE --
03:11PM 20       THE COURT:  AND IF I HAD KNOWN WHAT A WEAK CASE THIS
03:11PM 21   WAS, PERHAPS THIS SHOULDN'T HAVE GOTTEN AS MUCH OF THE COURT'S
03:11PM 22   RESOURCES AS IT DID.
03:11PM 23       MS. DERMODY:  BUT, YOUR HONOR, I THINK THAT --
03:11PM 24       THE COURT:  YEAH.
03:11PM 25       MS. DERMODY:  -- HOW THE COURT FEELS ABOUT IT IS
                     UNITED STATES COURT REPORTERS
```

66

```
03:11PM  1   MAYBE, I THINK, IN FAIRNESS, NOT LOOKING AT THE FULL PICTURE.
03:11PM  2       THE COURT:  OKAY.
03:11PM  3       MS. DERMODY:  THIS HONESTLY IS ONE OF THE BIGGEST
03:11PM  4   SETTLEMENTS, ONE OF THE BIGGEST RESULTS EVER IN A CASE LIKE
03:11PM  5   THIS.  IT IS THE SINGLE BIGGEST RESULT EVER IN AN ANTITRUST
03:11PM  6   EMPLOYMENT CASE, EVER, BY FAR, ON AN AGGREGATE BASIS OR ON A
03:11PM  7   PER CAPITA CLASS MEMBER BASIS.
03:11PM  8       IT IS A HUGE RESULT BY EXPONENTIALLY MORE THAN OTHER
03:11PM  9   RESULTS THAT HAVE BEEN ACHIEVED, INCLUDING THE EBAY/INTUIT
03:11PM 10   AGREEMENT, AND YOUR HONOR DOES KNOW A LOT ABOUT THAT ONE, IN
03:11PM 11   THIS DISTRICT.
03:11PM 12       ALSO, IN THE EMPLOYMENT CLASS ACTION WORLD, THERE HAVE
03:11PM 13   BEEN TONS OF EMPLOYMENT CLASS ACTIONS.  THERE IS ONLY ONE THAT
03:11PM 14   HAD A GREATER RESULT THAN THIS.  IT TOOK 23 YEARS AGAINST THE
03:11PM 15   U.S. GOVERNMENT.
03:11PM 16       THIS IS A HUGE ACHIEVEMENT.  IT'S VERY SUBSTANTIAL.  IT
03:12PM 17   MAY FEEL LIKE IT'S NOT THE WHOLE THING, THAT WE COULD HAVE
03:12PM 18   GOTTEN MORE.
03:12PM 19       AND, YES, I THINK IN EVERY SETTLEMENT, IT'S THE VIRTUE OF
03:12PM 20   SETTLING IS YOU'RE COMPROMISING WHAT WAS POSSIBLE.
03:12PM 21       THE COURT:  BUT ANSWER MY QUESTION.  DO YOU BELIEVE
03:12PM 22   YOUR CASE WAS WEAKER AGAINST GOOGLE, APPLE, ADOBE, AND INTEL
03:12PM 23   THAN AGAINST LUCASFILM, PIXAR, AND INTUIT?
03:12PM 24       MS. DERMODY:  NO.
03:12PM 25       THE COURT:  BECAUSE THEY PAID A HIGHER PROPORTION OF
                     UNITED STATES COURT REPORTERS
```

67

```
03:12PM  1   THEIR LIABILITY --
03:12PM  2       MS. DERMODY:  THIS IS --
03:12PM  3       THE COURT:  -- AND THEY SETTLED EARLY.
03:12PM  4       MS. DERMODY:  RIGHT.  THIS IS THE MARKET TESTING,
03:12PM  5   YOUR HONOR.
03:12PM  6       THE COURT:  OKAY.
03:12PM  7       MS. DERMODY:  WHEN YOU HAVE JURORS LOOKING AT
03:12PM  8   EVIDENCE, JURORS THINK VERY HIGHLY OF WHAT PEOPLE SAY AS
03:12PM  9   ADMISSIONS.  THEY DON'T NEED TO CONNECT ANY DOTS.  THEY CAN
03:12PM 10   TAKE IT AT FACE VALUE BECAUSE A PERSON SAID IT.
03:12PM 11       AND SO FROM A JUROR PERSPECTIVE, THERE ARE CERTAIN TYPES
03:12PM 12   OF EVIDENCE THAT ARE, THAT ARE VERY HOT.  THEY'RE TOXIC, YOU
03:12PM 13   KNOW?  THEY'RE -- THEY'RE ATOMIC.
03:12PM 14       AND THERE ARE OTHER TYPES OF EVIDENCE THAT REQUIRE LEAPS
03:12PM 15   OF LOGIC AND CONNECTING DOTS AND YOU HAVE TO HAVE JURORS THAT
03:13PM 16   ARE WILLING TO ROLL UP THEIR SLEEVES AND REALLY PUT THOSE DOTS
03:13PM 17   TOGETHER IN ORDER TO UNDERSTAND.
03:13PM 18       AND YOU MIGHT NOT GET THE JURORS THAT DO THE LATTER, BUT
03:13PM 19   YOU MIGHT GET JURORS THAT DO THE FORMER ALL DAY LONG BECAUSE
03:13PM 20   IT'S QUITE SIMPLE TO DO.
03:13PM 21       AND SO FROM A JUROR PERSPECTIVE, I DON'T KNOW IF I COULD
03:13PM 22   SAY THAT IT WAS STRONGER WITH THE LUCASFILM AND PIXAR -- I
03:13PM 23   DON'T KNOW THAT I WOULD SAY THAT.
03:13PM 24       BUT I WOULD SAY THAT SOME OF THE EVIDENCE WAS MUCH EASIER
03:13PM 25   FOR THEM, MUCH MORE ACCESSIBLE FOR THEM, AND IN THAT WAY, WE
                     UNITED STATES COURT REPORTERS
```

68

```
03:13PM  1   HAD TO FIGURE OUT WHAT WOULD BE THE REACTION IN COMPARISON TO
03:13PM  2   THAT EVIDENCE WITH SOME OF THE OTHER DEFENDANTS.
03:13PM  3       IT IS A RISK, YOUR HONOR.  IT'S A RISK WE HAD TO
03:13PM  4   ACKNOWLEDGE.
03:13PM  5       THE COURT:  BECAUSE THE DOCUMENTARY EVIDENCE IN TERMS
03:13PM  6   OF E-MAILS I THINK WAS STRONGER AGAINST THESE DEFENDANTS THAN
03:13PM  7   AGAINST LUCASFILM AND PIXAR, EVEN IF THEIR CEO STATEMENTS WERE
03:13PM  8   MORE INFLAMMATORY.
03:13PM  9       MS. DERMODY:  THERE WAS A TREMENDOUS RECORD IN THIS
03:13PM 10   CASE, YOUR HONOR, ABSOLUTELY.
03:13PM 11       AND IF I PERSONALLY BELIEVED THAT I COULD GO TO TRIAL
03:13PM 12   RIGHT NOW AND DO BETTER THAN WHAT WE'RE GIVING TO YOUR HONOR
03:13PM 13   TODAY, I WOULD DO IT.  I WOULD DO IT A HUNDRED TIMES IN A ROW.
03:14PM 14       THE REASON WE'RE COMING HERE TODAY, YOUR HONOR, IS
03:14PM 15   BECAUSE, IN OUR BEST JUDGMENT, THIS IS THE RIGHT THING TO DO
03:14PM 16   FOR THIS CLASS.  IF WE DIDN'T THINK THAT, WE WOULD NOT BE HERE
03:14PM 17   BEFORE YOU.
03:14PM 18       MR. VAN NEST:  YOUR HONOR, COULD I MAKE ONE OTHER
03:14PM 19   COMMENT?
03:14PM 20       THE COURT:  YEAH.  I MEAN, YOU KNOW, THE RATIONALE
03:14PM 21   GIVEN IN THE BRIEFS IS, OH, THIS SAVES COURT RESOURCES.  WELL,
03:14PM 22   YOU'VE ALREADY SPENT THIS COURT'S RESOURCES.  THAT IS NOT A
03:14PM 23   RATIONALE.
03:14PM 24       THIS NEEDS TO BE THE FAIREST COMPENSATION, YOU KNOW, A
03:14PM 25   FAIR RESOLUTION FOR THE CLASS.  THIS COURT WAS COMPLETELY
                     UNITED STATES COURT REPORTERS
```

### 69

03:14PM 1  PREPARED TO GO TO TRIAL ON THIS CASE.

03:14PM 2  SO WHEN I HEAR, "OH, BUT WE SAVED YOU TIME," I'M SORRY,

03:14PM 3  THAT'S NOT COMPELLING TO ME. THAT'S NOT A GOOD REASON TO ADOPT

03:14PM 4  THIS. IT'S IN THE MOTION, IT'S IN THE REPLY, AND IT'S NOT

03:14PM 5  PERSUASIVE.

03:14PM 6  BUT GO AHEAD.

03:14PM 7  MR. VAN NEST: TWO OTHER POINTS.

03:14PM 8  YOUR HONOR, YOU TALK ABOUT WEIGHING EVIDENCE.

03:14PM 9  THE COURT: YEAH.

03:14PM 10  MR. VAN NEST: TWO THINGS. REMEMBER THAT THE EARLIER

03:14PM 11  PARTIES THAT SETTLED WERE PAYING GENERALLY LOWER SALARIES. THE

03:14PM 12  PARTIES THAT ARE SETTLING HERE, PARTICULARLY GOOGLE AND APPLE,

03:14PM 13  WERE AT THE VERY TOP OF THE MARKET.

03:15PM 14  ALSO, LIKE I SAY --

03:15PM 15  THE COURT: BUT WHICH WAY DOES THAT CUT?

03:15PM 16  MR. VAN NEST: IT CUTS --

03:15PM 17  THE COURT: WHICH WAY DOES THAT CUT?

03:15PM 18  MR. VAN NEST: FOR JURORS --

03:15PM 19  THE COURT: I MEAN, THAT MEANS THAT THE EMPLOYEES

03:15PM 20  COULD POTENTIALLY HAVE EARNED EVEN MORE AND YOU SHOULDN'T BE

03:15PM 21  PAYING LESS THAN YOUR PROPORTION THAN LUCASFILM AND PIXAR.

03:15PM 22  MR. VAN NEST: IT CUTS IN THIS WAY: PEOPLE DO NOT

03:15PM 23  FEEL AS THOUGH THOSE EMPLOYEES WERE TREATED UNFAIRLY WHEN THEIR

03:15PM 24  PAY WAS 50 OR MORE PERCENT HIGHER THAN THE AVERAGE TECH WORKER.

03:15PM 25  IT'S HARD TO GET A JUROR TO AGREE THAT THAT'S

UNITED STATES COURT REPORTERS

### 70

03:15PM 1  UNDERCOMPENSATION WHEN THOSE FOLKS ARE MAKING SUCH A PREMIUM

03:15PM 2  OVER EVERYBODY ELSE IN THE BUSINESS. THAT'S ONE THING.

03:15PM 3  THE OTHER KEY FACT IS THAT INTEL EMPLOYED 60 PERCENT OF

03:15PM 4  THE CLASS. SO 60 PERCENT OF THE CLASS -- YOUR HONOR KNOWS THIS

03:15PM 5  FROM THE EARLIER BRIEFING. THE EVIDENCE AGAINST INTEL WAS

03:15PM 6  RELATIVELY THIN, RIGHT? ONE BILATERAL AGREEMENT, VERY LITTLE

03:15PM 7  E-MAIL TRAFFIC. THAT WASN'T THE BARN BURNER OF THE CASE.

03:16PM 8  THE CASE THAT YOUR HONOR SAW EARLIER WITH COMMENTS BY

03:16PM 9  MR. CATMULL AND MR. LUCAS AND OTHERS WHERE THEY WERE INDICATING

03:16PM 10  THEY WANTED TO SUPPRESS PAY, THERE WAS NONE OF THAT IN THIS

03:16PM 11  GROUP OF FOUR.

03:16PM 12  AND IN PARTICULAR WITH RESPECT TO INTEL WHERE THERE WAS

03:16PM 13  ONLY A SINGLE AGREEMENT WITH A COMPANY THAT IT WAS DOING A LOT

03:16PM 14  OF BUSINESS WITH, I DO THINK THERE'S A REAL QUESTION --

03:16PM 15  THE COURT: RIGHT, OKAY. BUT THERE WAS MR. SCHMIDT'S

03:16PM 16  TESTIMONY AND SERGEY BRIN'S TESTIMONY THAT MR. OTELLINI OF

03:16PM 17  INTEL KNEW ABOUT THE APPLE/GOOGLE AGREEMENT, RIGHT?

03:16PM 18  MR. VAN NEST: BUT --

03:16PM 19  THE COURT: I MEAN, THERE WAS CERTAINLY EVIDENCE.

03:16PM 20  INTEL'S OWN EXPERT TESTIFIED THAT MR. OTELLINI WAS LIKELY AWARE

03:16PM 21  OF GOOGLE'S OTHER BILATERAL AGREEMENTS BY VIRTUE OF

03:16PM 22  MR. OTELLINI'S MEMBERSHIP ON GOOGLE'S BOARD.

03:16PM 23  I MEAN, I THINK THERE WAS -- INTEL CONCEDES THAT

03:16PM 24  MR. OTELLINI KNEW THE CONTENTS OF GOOGLE'S DO NOT COLD CALL

03:16PM 25  LIST, WHICH INCLUDED APPLE AND INTEL.

UNITED STATES COURT REPORTERS

### 71

03:16PM 1  I MEAN, I --

03:16PM 2  MR. VAN NEST: BUT, AGAIN --

03:17PM 3  THE COURT: I THINK THERE WAS CERTAINLY EVIDENCE THAT

03:17PM 4  THE PLAINTIFFS COULD POINT TO THAT INTEL WAS AWARE OF OTHER

03:17PM 5  DEFENDANTS' AGREEMENTS AND THE COLD CALL AGREEMENTS OF OTHER

03:17PM 6  COMPANIES THAT INCLUDED OTHER COMPANIES, EVEN IF THEY DIDN'T

03:17PM 7  HAVE A DIRECT BILATERAL AGREEMENT WITH INTEL.

03:17PM 8  MR. VAN NEST: BUT, YOUR HONOR, THE ARGUMENT IS, IS

03:17PM 9  IT A FAIR SETTLEMENT? WE'RE TALKING ABOUT $324 MILLION.

03:17PM 10  THAT'S ALL PRICED INTO THAT.

03:17PM 11  AND YOU HAVE MR. DEVINE SAYING, "WELL, IT SHOULD HAVE BEEN

03:17PM 12  A LITTLE BIT MORE." BALONEY. THAT'S ALL WITHIN THE RANGE OF

03:17PM 13  JUDGMENT AND THE RANGE OF EXPERIENCE AND THE RANGE OF RISK.

03:17PM 14  IT'S NOT AS THOUGH WE'RE LOOKING AT A 15 OR $20 MILLION

03:17PM 15  SETTLEMENT. WE'RE LOOKING AT A $324 MILLION SETTLEMENT WHICH,

03:17PM 16  NO MATTER HOW YOU CALCULATE IS, IS MANY, MANY FACTORS HIGHER

03:17PM 17  THAN WHAT THE EARLIER GUYS SETTLED FOR.

03:17PM 18  SO THIS IS ALL WITHIN THE RANGE OF DISCRETION AND

03:17PM 19  JUDGMENT. THAT'S WHY I THINK THIS IS NOT A CLOSE CALL MYSELF

03:17PM 20  GIVEN THE RISKS ON BOTH SIDES, GIVEN THE AMOUNT OF MONEY THAT

03:18PM 21  WAS ACHIEVED, GIVEN THE --

03:18PM 22  THE COURT: OKAY. BUT LET ME ASK YOU, IF YOU USE THE

03:18PM 23  5 PERCENT, THEN THIS IS ABOUT 76,000 -- 76 MILLION SHORT. WHAT

03:18PM 24  IS THAT?

03:18PM 25  MR. VAN NEST: WHY WOULD --

UNITED STATES COURT REPORTERS

### 72

03:18PM 1  THE COURT: DO YOU AGREE WITH THE PLAINTIFFS THAT

03:18PM 2  THEIR CASE AGAINST YOU WAS WEAKER THAN THE CASE AGAINST

03:18PM 3  LUCASFILM AND PIXAR? OR WHAT'S YOUR VIEW?

03:18PM 4  MR. VAN NEST: NO, I DON'T THINK IT WAS

03:18PM 5  THE COURT: NO, I'M JUST SAYING -- I UNDERSTAND YOUR

03:18PM 6  POINT THAT IF YOU USE THE PERCENTAGE OF CLASS MEMBERSHIP, THIS

03:18PM 7  LOOKS LIKE IT'S A NEGOTIATED AMOUNT.

03:18PM 8  MR. VAN NEST: EVEN --

03:18PM 9  THE COURT: BUT JUST --

03:18PM 10  MR. VAN NEST: LET'S USE YOUR NUMBER.

03:18PM 11  THE COURT: -- LOOKING AT THE 5 PERCENT.

03:18PM 12  MR. VAN NEST: LET'S USE YOUR NUMBER. IT'S A

03:18PM 13  QUESTION OF JUDGMENT. YOU CAN'T JUST MULTIPLY THE NUMBER OUT.

03:18PM 14  IT'S A QUESTION -- YOU'VE GOT A LOT MORE MONEY AT STAKE. THEY

03:18PM 15  HAS A SETTLEMENT OF $20 MILLION.

03:18PM 16  THE COURT: OKAY. THAT'S WHY I WANTED TO KNOW, WHAT

03:18PM 17  IS IT THAT MAKES A DIFFERENCE?

03:18PM 18  MR. VAN NEST: WHAT MAKES IT --

03:18PM 19  THE COURT: IS IT BECAUSE WE'RE TALKING ABOUT LARGER

03:18PM 20  AMOUNTS OF MONEY? IS THAT SORT OF THE LOWER PERCENTAGE OR WHAT

03:18PM 21  IS IT?

03:18PM 22  MR. VAN NEST: IT'S ONE THING TO RISK 20 MILLION.

03:18PM 23  THE COURT: OKAY.

03:19PM 24  MR. VAN NEST: IT'S ANOTHER TO RISK 324 MILLION.

03:19PM 25  THAT'S A MUCH BIGGER RISK, RIGHT? I MEAN, JUST FROM THEIR

UNITED STATES COURT REPORTERS

73

| | |
|---|---|
| 03:19PM 1 | STANDPOINT OF COMPENSATING THE CLASS -- |
| 03:19PM 2 | THE COURT:  OKAY. |
| 03:19PM 3 | MR. VAN NEST:  -- IT'S ONE THING TO SAY, "OKAY, I'M |
| 03:19PM 4 | GOING TO FORGO 20 MILLION AND TAKE MY SHOT." |
| 03:19PM 5 | IT'S QUITE ANOTHER THING TO SAY, "I'LL FORGO 324 MILLION |
| 03:19PM 6 | AND TAKE MY SHOT."  I MEAN, THAT IS A VASTLY DIFFERENT |
| 03:19PM 7 | QUESTION. |
| 03:19PM 8 | AND, YES, THE EVIDENCE IS DIFFERENT IN THE TWO CASES AND, |
| 03:19PM 9 | YES, WE CAN ALL DISAGREE ABOUT WHAT IT MEANS. |
| 03:19PM 10 | BUT ULTIMATELY NONE OF THAT MATTERS BECAUSE IT'S A HUGE |
| 03:19PM 11 | RISK, ONE WAY OR THE OTHER, THAT THE JURY SEES IT YOUR WAY, AND |
| 03:19PM 12 | IF THEY DON'T, YOU HAVE SQUANDERED $324 MILLION, WHICH IS NOW A |
| 03:19PM 13 | SURE THING, YOU KNOW, IF THE SETTLEMENT WERE TO BE APPROVED. |
| 03:19PM 14 | SO I DON'T -- I DON'T, FOR ONE MINUTE, THINK THE |
| 03:19PM 15 | DIFFERENCE BETWEEN 400 AND 324 IS MEANINGFUL, I DON'T, BECAUSE |
| 03:19PM 16 | THIS IS ALL WITHIN THE RANGE OF JUDGMENT. |
| 03:19PM 17 | YOU CAN'T JUST TAKE A RULER AND MULTIPLY IT OUT AND SAY |
| 03:19PM 18 | YOU'RE FALLING SHORT. |
| 03:19PM 19 | AND EVEN IF YOU DID THAT, IF YOU USE MY RULER, WE'RE |
| 03:19PM 20 | PAYING A PREMIUM.  IF YOU USE THEIR RULER, WE'RE PAYING LESS. |
| 03:20PM 21 | BUT IT'S ALL WITHIN THE RANGE OF A REASONABLE RECOVERY FOR |
| 03:20PM 22 | THE CLASS IN LIGHT OF ALL OF THE VARIOUS RISKS.  THAT'S WHAT IT |
| 03:20PM 23 | IS. |
| 03:20PM 24 | SO I DON'T THINK YOU WOULD REACH A DIFFERENT RESULT EVEN |
| 03:20PM 25 | IF YOU SAID, "I THINK THE FAIR WAY TO LOOK AT IT IS BASED ON |

UNITED STATES COURT REPORTERS

75

| | |
|---|---|
| 03:21PM 1 | MS. DERMODY:  NO.  IT'S US SAYING TO YOUR HONOR, WE |
| 03:21PM 2 | HAVE BEEN DRIVING THIS TRAIN AND WE RAN INTO JURY WORK, AND WE |
| 03:21PM 3 | HAVE BEEN SOBERED BY DOING THAT WORK AND BY LEARNING HOW |
| 03:21PM 4 | DIFFICULT IT IS TO CONVINCE A UNANIMOUS ROOM OF PEOPLE, EVEN |
| 03:21PM 5 | WITH THIS EVIDENCE, TO MEET THE STANDARD IN THIS CASE. |
| 03:21PM 6 | AND SO WHAT -- COULD WE HAVE DONE IT?  IS IT POSSIBLE? |
| 03:21PM 7 | THE COURT:  WERE YOU DOING RULE OF REASON OR WERE YOU |
| 03:21PM 8 | DOING PER SE IN YOUR JURY STUDIES? |
| 03:22PM 9 | MS. DERMODY:  WE WERE DOING EVERYTHING IN THE MOST |
| 03:22PM 10 | FAVORABLE WAY TO US, INCLUDING THINGS LIKE TELLING THE JURY |
| 03:22PM 11 | ABOUT THE D.O.J. INVESTIGATION. |
| 03:22PM 12 | I MEAN, YOUR HONOR, I JUST -- YOU KNOW, THE RISK THAT -- |
| 03:22PM 13 | THE COURT:  I WOULD HAVE ALLOWED THAT PROBABLY. |
| 03:22PM 14 | PROBABLY. |
| 03:22PM 15 | MS. DERMODY:  WELL, AT THE RISK OF EXPOSING A LOT OF |
| 03:22PM 16 | WORK PRODUCT THAT WE WOULD NOT WANT THE DEFENDANTS TO HAVE IF |
| 03:22PM 17 | THE COURT WAS TO DENY OUR REQUEST TO APPROVE THE SETTLEMENT, I |
| 03:22PM 18 | DO WANT THE COURT TO UNDERSTAND THE AMOUNT OF CONCERN AND |
| 03:22PM 19 | EFFORT AND THE EMPIRICAL WORK WE DID TO GET TO A PLACE WHERE WE |
| 03:22PM 20 | RECOGNIZE THAT THAT RISK WAS NOT THEORETICAL, THAT IT WAS REAL, |
| 03:22PM 21 | AND WE HAD TO AT LEAST ACKNOWLEDGE IT. |
| 03:22PM 22 | THE COURT:  OKAY.  ALL RIGHT.  THANK YOU ALL VERY |
| 03:22PM 23 | MUCH. |
| 03:22PM 24 | MR. VAN NEST:  THANK YOU, YOUR HONOR. |
| 03:22PM 25 | THE COURT:  LET'S TAKE A BREAK BEFORE THE LAST CASE. |

UNITED STATES COURT REPORTERS

74

| | |
|---|---|
| 03:20PM 1 | PAY, 5 PERCENT." |
| 03:20PM 2 | I STILL THINK THIS IS EASILY WITHIN THE RANGE OF A |
| 03:20PM 3 | REASONABLE RESULT GIVEN EVERYTHING WE'VE TALKED ABOUT. |
| 03:20PM 4 | YOUR HONOR AND I COULD DEBATE ALL DAY HOW THE EVIDENCE |
| 03:20PM 5 | COMES OUT, BUT YOU AND I BOTH KNOW, IT'S THE JURY THAT DECIDES, |
| 03:20PM 6 | AND THAT'S VERY HARD TO PREDICT, VERY HARD TO PREDICT. |
| 03:20PM 7 | AND I WOULDN'T, IN A MILLION YEARS, IF I WERE IN THEIR |
| 03:20PM 8 | SHOES, RISK $324 MILLION ON WHAT I THOUGHT A JURY OF EIGHT |
| 03:20PM 9 | PEOPLE WAS GOING TO DO IN A CASE LIKE THIS WITH SO MUCH |
| 03:20PM 10 | DISPARATE EVIDENCE AND SO MANY DIFFERENT FACETS. |
| 03:20PM 11 | THAT'S, I THINK, THE KEY TAKE AWAY.  IT'S A MUCH, MUCH |
| 03:20PM 12 | BIGGER RISK FOR THE CLASS. |
| 03:20PM 13 | MY ONLY OTHER COMMENT IS I DON'T THINK WE SHOULD BE |
| 03:20PM 14 | GETTING INTO PUTTING NUMBERS INTO THE NOTICE OF WHAT THE CLASS |
| 03:21PM 15 | COULD HAVE WON, I MEAN, BECAUSE THAT IS SO SPECULATIVE. |
| 03:21PM 16 | THE COURT:  I'M NOT GOING TO DO THAT. |
| 03:21PM 17 | MR. VAN NEST:  YEAH.  THANK YOU. |
| 03:21PM 18 | THE COURT:  ALL RIGHT. |
| 03:21PM 19 | OKAY.  DO YOU WANT TO HAVE THE LAST WORD? |
| 03:21PM 20 | MS. DERMODY:  I JUST WANT TO MAKE IT CLEAR ON THE |
| 03:21PM 21 | RECORD, YOUR HONOR, THAT EVERYTHING I'VE BEEN TALKING ABOUT |
| 03:21PM 22 | TODAY IS ABOUT RISK ASSESSMENT AND IT'S NOT ABOUT THE |
| 03:21PM 23 | PLAINTIFFS' FEELING ABOUT THE CASE BEING A WEAK CASE OR TRYING |
| 03:21PM 24 | TO TELL YOUR HONOR THIS WAS A DOG AND ALL OF THAT. |
| 03:21PM 25 | THE COURT:  AND WHY WE WASTED YEARS ON THIS CASE. |

UNITED STATES COURT REPORTERS

76

| | |
|---|---|
| 03:22PM 1 | THANK YOU FOR YOUR PATIENCE FOR THE LAST CASE. |
| 03:22PM 2 | MS. DERMODY:  THANK YOU, YOUR HONOR. |
| 03:22PM 3 | (THE PROCEEDINGS WERE CONCLUDED AT 3:22 P.M.) |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

UNITED STATES COURT REPORTERS

<u>CERTIFICATE OF REPORTER</u>

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED
STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,
280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY
CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.

_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  JUNE 24, 2014

UNITED STATES COURT REPORTERS